**EXHIBIT 1**

# 公 证 书

## 中华人民共和国上海市静安公证处

## State of California
### Secretary of State

This Certificate is not valid for use anywhere within the United States of America, its territories or possessions.

| | | | | |
|---|---|---|---|---|
| **APOSTILLE**<br>(Convention de La Haye du 5 octobre 1961) | | | | |
| **1. Country:**<br>Pays / País: | United States of America | | | |
| **This public document**<br>Le présent acte public / El presente documento público | | | | |
| **2. has been signed by**<br>a été signé par<br>ha sido firmado por | Matt G. Miller | | | |
| **3. acting in the capacity of**<br>agissant en qualité de<br>quien actúa en calidad de | Notary Public, State of California | | | |
| **4. bears the seal / stamp of**<br>est revêtu du sceau / timbre de<br>y está revestido del sello / timbre de | Matt G. Miller , Notary Public, State of California | | | |
| **Certified**<br>Attesté / Certificado | | | | |
| **5. at**<br>à / en | Los Angeles, California | **6. the**<br>le / el día | 15th day of July 2025 | |
| **7. by**<br>par / por | Secretary of State, State of California | | | |
| **8. Nº**<br>sous nº<br>bajo el número | 34652 | | | |
| **9. Seal / stamp:**<br>Sceau / timbre:<br>Sello / timbre: | | **10. Signature:**<br>Signature:<br>Firma: | | |

This Apostille only certifies the authenticity of the signature and the capacity of the person who has signed the public document, and, where appropriate, the identity of the seal or stamp which the public document bears.
This Apostille does not certify the content of the document for which it was issued.
To verify the issuance of this Apostille, see: apostille-search.sos.ca.gov/.
This certificate does not constitute an Apostille under the Hague Convention of 5 October 1961, when it is presented in a country which is not a party to the Convention. In such cases, the certificate should be presented to the consular section of the mission representing that country.

Cette Apostille atteste uniquement la véracité de la signature, la qualité en laquelle le signataire de l'acte a agi et, le cas échéant, l'identité du sceau ou timbre dont cet acte public est revêtu.
Cette Apostille ne certifie pas le contenu de l'acte pour lequel elle a été émise.
Cette Apostille peut être vérifiée à l'adresse suivante: apostille-search.sos.ca.gov/.
Ce certificat ne constitue pas une Apostille en vertu de la Convention de La Haye du 5 Octobre 1961, lorsque présenté dans un pays qui n'est pas partie à cette Convention. Dans ce cas, le certificat doit être présenté à la section consulaire de la mission qui représente ce pays.

Esta Apostilla certifica únicamente la autenticidad de la firma, la calidad en que el signatario del documento haya actuado y, en su caso, la identidad del sello o timbre del que el documento público esté revestido.
Esta Apostilla no certifica el contenido del documento para el cual se expidió.
Esta Apostilla se puede verificar en la dirección siguiente: apostille-search.sos.ca.gov/.
Este certificado no constituye una Apostilla en virtud del Convenio de La Haya 5 de octubre de 1961 cuando se presenta en un país que no es parte del Convenio. En estos casos, el certificado debe ser presentado a la sección consular de la misión que representa a ese país.

Sec/State Form NP-40 LA (rev. 01/2021)

# CALIFORNIA ALL PURPOSE ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document, to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA        }

COUNTY OF _San Francisco_ }

On _July 2, 2025_ before me, _Matt G Miller_ Notary

Public, personally appeared _Lizbeth Hasse_

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature: _____

Seal

-------------------------------------------------- OPTIONAL --------------------------------------------------
*Though this section is optional, completing this information can deter alteration of the document or fraudulent attachment of this form to an unintended document.*

**Description of Attached Document**
Title or Type of Document: _Arbul Award_    Document Date: _7/2/2025_
Number of Pages: _77_    Signer(s) Other Than Named Above: _____

**Capacity(ies) Claimed by Signer(s)**
Signers Name: _Lizbeth Hasse_
☐ Corporate Officer – Title(s) _____
☐ Partner - ☐ Limited ☐ General
☐ Individual ☐ Attorney in Fact
☐ Trustee ☐ Guardian or Conservator
Other: _Arbitrator_
Signer is Representing: _____

Signers Name: _____
☐ Corporate Officer – Title(s) _____
☐ Partner - ☐ Limited ☐ General
☐ Individual ☐ Attorney in Fact
☐ Trustee ☐ Guardian or Conservator
Other: _____
Signer is Representing: _____

JAMS ARBITRATION CASE REFERENCE NO. 5220002118

**Paul Frank Limited,**

    **Claimant,**

        **and**

**Grand Union International Trading Limited,**

    **Respondent.**

---

## FINAL AWARD

    1.    <u>Parties and Counsel</u>. The Parties to this Arbitration are identified in the caption and are represented as follows:

| | |
|---|---|
| Jessica R. Corpuz Esq.<br>Weintraub Tobin<br>10250 Constellation Blvd<br>Suite 2900<br>Los Angeles. CA  90067<br>Tel: 310- 858-7888 | Matthew Weldon Esq.<br>Thomas A. Warns Esq.<br>K&L Gates LLP<br>599 Lexington Ave.<br>Floor 32<br>New York, NY  10022-6030<br>Tel: 212-536-3900 |
| Kavan J. Jeppson Esq.<br>Katie A. Collins Esq.<br>Weintraub Tobin<br>Landmark<br>400 Capitol Mall<br>11th Floor<br>Sacramento, CA  95814<br>Tel: 916-558-6000 | Cindy Ha Esq.<br>K&L Gates LLP<br>44/F Edinburgh Tower, The<br>15 Queen's Road Central<br>Hong Kong, China<br>Tel: +852.2230.3536<br><br>Mason Liang Mei<br>DHH Washington DC Law Office |
| Counsel for Paul Frank Limited ("Claimant") | Counsel for Grand Union<br>International Trading Limited<br>("Respondent") |

    2.    <u>Arbitrator</u>:
        Lizbeth Hasse, Esq.
        Two Embarcadero Center Suite 1500
        San Francisco, CA 94111

3. **Case Manager:**
   Aimee Hwang
   Two Embarcadero Center Suite 1500
   San Francisco, CA 94111
   415-774-2607

**Place of Arbitration:** Los Angeles (Century City), California

**Date of Revised Restated Interim Award (liability only):** October 14, 2024

**Date of Interim Award (including liability and damages):** June 13, 2025

**Date of Final Award (including liability, damages and interest):** July 2, 2025

The UNDERSIGNED ARBITRATOR, issued an Interim Award on June 6, 2024, resolving the bulk of the liability issues in this Arbitration and setting forth a timeframe for Parties to propose a schedule for submission of briefing by both Parties on damages and to propose a procedure for Grand Union to resume aspects of servicing its Sublicensees and enforcement of rights under the amended MLA during the remaining term going forward.

Given the multitude of claims in this matter and the factual complexity, Parties were also invited to submit to the Arbitrator any issue or procedure which they propose must be considered before advancing to the next phase of the Arbitration, the damages phase. As the Arbitrator further explained (July 1, 2024), submissions were welcomed from either Party making clear what in the Interim Award each believed needed correcting. Given that an Interim Award had been issued (prior to the Final Award which would follow the damages phase), the Arbitrator retained full jurisdiction to address anything the Arbitrator deemed appropriate, consistent with the Rules. Thus, while strict application of Rule 24(j) would be premature at this stage, as applying to a Final or Partial Final Award, the Arbitrator provided the Parties with guidance for their submissions, if they chose to make them: The submissions "should be on the order of typos, mistakes of reference, clarification, etc. and not re-weighing of facts or reconsideration of the law and the application of it. The Arbitrator, in the Arbitrator's discretion, will determine which items should be corrected or clarified." Thereafter, the Parties filed their submissions beginning with Claimant's Request to Correct the Interim Award and Respondent's Reply thereto, following which, at Claimant's request, and in the exercise of the Arbitrator's discretion, the Arbitrator held a hearing on August 15, 2024, to address, if Parties chose to do so, both the matters raised by the Parties with respect to the correction or clarification of the Interim Award, and the concerns raised by Claimant about publication or public disclosure by Grand Union of the contents of the Interim Award. Following the hearing, on August 21, 2024, the Arbitrator issued an Order addressing the public disclosure of the Interim Award and indicated that other matters raised in the Request to Correct would be addressed subsequently. The Restated Interim Award then issued encompassed those other matters and reflected the Arbitrator's determinations with respect to matters to be clarified or corrected following careful consideration of the Parties' submissions.

In addition to a number of requests for correction or clarification, Claimant also voiced a concern that the Interim Award is "biased" and/or that the Arbitrator had a bias against Paul Frank. This statement was not left unaddressed. The undersigned Arbitrator, in practice and by principle, values neutrality as essential to her role and holds this value consciously in mind throughout the

2

arbitration process. The appointment of the undersigned was predicated on her disclosures and a thorough inquiry into her impartiality. The decisions reflected in the Interim Award, the Restated Interim Award, the Revised Restated Interim Award, and in the Interim Award (Including Damages), as well as all of the Arbitrator's rulings in this matter, are the product of careful, impartial consideration of the evidence presented orally by witnesses and in writing, in the context of the law and arguments offered by both Parties. Further, the Arbitrator allocated additional time, allowed for additional briefing and accommodated scheduling and modes of presentation as needed or requested by counsel to be sure that both sides had the opportunity to present the facts they felt were important to the determinations. The Arbitrator has carefully considered the concerns of Claimant and found no basis for the statement or suggestion that the Arbitrator, or her decision, was not impartial and unbiased. Claimant has indicated that certain articulations in the Interim Award suggest a bias or unfair attitude against Paul Frank or its witnesses. The Arbitrator carefully examined all those passages in the Interim Award, and where clarification or a different word choice might have proved helpful, revised the language. This is not to imply that the language which was modified reflected a bias or lack of impartiality, but to avoid any misapprehensions.

Following the issuance of the Revised Restated Interim Award (addressing liability) in this Arbitration, the parties proceeded to brief the damages component of this case. Towards the completion of the briefing process, Paul Frank accompanied its final brief regarding damages (January 24, 2025) with a Request for Stay or Reopening of Arbitration based on assertions by Claimant Paul Frank that it had received new evidence which it stated was materially relevant to the liability determination and, according to Paul Frank, called into question the existence (*vel non*) of a relevant license agreement, the authenticity of one or more documents central to this arbitration and raised serious questions of alleged criminality with respect to Respondent and its employees. Based on assertions in Claimant's Request for Reopening or Stay, the Arbitrator permitted Parties to brief the relevance and materiality of the new issues raised. The Arbitration subsequently identified five (5) issues that might possibly be affected by the concerns Claimant articulated. Those five issues became the subject matter of further briefing with opportunity offered for full hearing. Following that examination, the Arbitrator issued a ruling finding that the liability decision was not impacted by the matters asserted, and the damages portion of this Arbitration could proceed. Parties completed their damages briefing. An additional request for consideration or reconsideration of items with respect to the Request for Reopening or Stay was denied. The Arbitrator ruled that the waiver issue raised by Claimant with respect to reliance or Wasted Costs damages would be further considered by the Arbitrator in the decision on damages. The opportunity for additional submissions or argumentation in this arbitration was Closed (June 2, 2025), and the Arbitrator completed the Interim Award addressing both liability and damages.

The UNDERSIGNED ARBITRATOR, having been designated in accordance with the Parties' arbitration agreement, and having examined pre-and post-hearing submissions, proof and allegations of the Parties, the testimony of fact and expert witnesses, and the transcript of the arbitration and the admitted exhibits, including witness statements and expert reports, and, further, having considered the Parties' submissions and oral arguments addressing the damages phase and addressing the alleged potential for the introduction of new evidence or re-consideration of previous decisions (including multiple requests for clarification), and further, having considered Claimant's Objections to Arbitrator's Jurisdiction and Motion to Dismiss, as well as Respondent's submission, including Legal Authorities, in support of its entitlement to interest on the monetary award in Respondent's favor in this matter, all as more fully set forth below, finds, concludes and

3

issues this Final Award, as follows, and dispositive of all issues presented for resolution in this matter.

## I.    Introduction and Jurisdiction of the Arbitrator

This matter came to arbitration with the submission of Claimant's Demand –Statement of Claims – dated November 22, 2022, by which, as summarized in Claimant's Pre-Hearing brief, Paul Frank Limited ("Licensor" or "Paul Frank"), the owner of the world-famous Paul Frank brand, seeks money damages against its licensee, Grand Union International Trading Limited ("Licensee" or "Grand Union"), following Licensor's effort to terminate the Master License Agreement (MLA) between them, as a result of alleged repeated material breaches and other alleged breaches by Licensee of the MLA, as amended. Grand Union asserts that Paul Frank Limited's termination of its license was invalid and a breach of its agreement, and Grand Union seeks damages for invalid or wrongful termination of the license.

Respondent's Response to Claimant's Demand and Counterclaims was submitted on December 16, 2022. Claimant and Counter-Respondent submitted its Response to Respondent and Cross-Claimant's Counterclaims on December 29, 2022.

The arbitration clause setting forth the Parties' agreement to arbitration by JAMS is contained in Section 28 of the First Amendment, dated as of April 27, 2018, to the Master License Agreement dated as of January 1, 2015, between Licensor and Licensee herein.

Section 28 provides as follows:

"If a dispute arises out of or relates to this Agreement, or the breach hereof, and if the dispute cannot be expeditiously settled through negotiation, the parties agree to first try in good faith, for a period of thirty (30) days after written notice of a request for mediation, to settle the dispute by mediation administered by JAMS, Inc. ("JAMS") in Los Angeles, California. At no time prior to the end of such thirty (30) day mediation period referenced above shall either side initiate an arbitration related to this Agreement except to pursue a provisional remedy that is authorized by law or by the mutual agreement of the parties. However, this limitation is inapplicable to a party if the other party refuses to comply with the requirements of this Section 28. All applicable statutes of limitation and defenses based upon the passage of time shall be tolled while the procedures specified in this Section 28 are pending and for fifteen (15) calendar days thereafter. The parties will take such action, if any, required to effectuate such tolling. If the parties are unable to resolve a dispute pursuant to mediation as referenced above, such dispute, including the determination of the scope or applicability of this Agreement to arbitrate, shall be determined by arbitration in Los Angeles, California, before a single arbitrator (who is a retired judge from a federal or state court located in Los Angeles County, California or a lawyer with at least ten (10) years of active practice in the subject matter of the dispute), in accordance with the laws of the State of California for agreements made in and to be performed in that State. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures in effect at the time of arbitration (available at https://www.jamsadr.com/rules-comprehensivearbitration/). Judgment on any award rendered by the arbitrator may be entered and enforced by any court having

4

jurisdiction thereof. Notwithstanding the foregoing, this Section 28 shall not apply to any claim by Licensor for injunctive relief under Section 21 of the Agreement."

In accord with the arbitration provision, the applicable substantive law in this Arbitration is California law, and the JAMS Comprehensive Arbitration Rules and Procedures ("Rules") shall apply in this proceeding. As determined by the Arbitrator at the outset and set forth in the initial Scheduling Order in this proceeding dated March 22, 2023, the claims are arbitrable. Neither Party contested arbitrability or the jurisdiction of the Arbitrator at the commencement of this proceeding.

The arbitration provision required mediation to be attempted prior to either party's initiation of arbitration. The Parties reported that Hon. James L. Smith (Ret.) conducted mediation between the Parties on November 7, 2022, which did not resolve the dispute.

## II.    Summary of the Arbitration Procedure

On November 22, 2022, Claimant Paul Frank Limited ("Paul Frank") submitted its "Demand for Arbitration – Statement of Claims" ("Demand").

On December 16, 2022, Respondent Grand Union International Trading Limited ("Grand Union") submitted its Response and Counterclaims to Paul Frank's Demand.

On December 29, 2022, Paul Frank submitted its Answer to Grand Union's Counterclaims.

On February 16, 2023, JAMS neutral Lizbeth Hasse, Esq. was appointed to serve as the Arbitrator in this arbitration.

On March 22, 2023, the Arbitrator issued Scheduling Order No. 1.

On March 24, 2023, Grand Union submitted Respondent's Application for Interim Relief.

On April 21, 2023, the Arbitrator issued Amendment #1 to Scheduling Order No. 1, which set a hearing for threshold issues for June 1, 2023, and adjusted briefing.

On April 27, 2023, Paul Frank submitted its Combined Opposition to Respondent's Application for Interim Relief and Affirmative Motion for Preliminary Injunction, including exhibits and declarations.

On April 27, 2023, Paul Frank submitted a Motion for Leave to Amend Demand for Arbitration, which sought to add CBG as a party to this arbitration.

On May 23, 2023, Grand Union submitted its Opposition to Motion for Leave to Amend.

On May 30, 2023, Paul Frank submitted its Reply in Support of Motion for Leave to Amend.

On June 5, 2023, the Arbitrator issued a Ruling on Motion for Leave to Amend which denied Claimant's Motion for Leave to Amend Demand for Arbitration.

On June 5, 2023, Grand Union submitted its Reply Brief in Support of Application for Interim Relief and Opposition to Claimant's Motion for Preliminary Injunction, accompanied by legal authorities, exhibits and witness statements.

On June 27, 2023, Paul Frank submitted its Reply in Support of Motion for Preliminary Injunction, including supplemental exhibits and declaration.

5

On July 15, 2023, the Arbitrator issued a Ruling on Claimant's and Respondent's respective Applications for Interim or Preliminary Injunctive Relief, which denied each Party's respective application on the grounds that neither Party had made the demonstration required by Rule 24(a) of the necessity of interim or temporary equitable relief to preserve assets or status quo in the interests of a meaningful final award in this matter.

On August 31, 2023, the Arbitrator issued Amendment 2 to amended Scheduling Order No. 1 dated March 22, 2023, which adjusted the procedural timetable.

On August 31, 2023, Notice of Rescheduled Hearing issued from JAMS setting the first day of the Phase 1 Hearing in this Arbitration for January 29, 2024.

On December 11 and 15, 2023, the Arbitrator issued Orders postponing and extending the Phase 1 Hearing dates for cause to commence on February 26, 2024, for 7 or more days, subject to availability of key witnesses.

On January 24, 2024, the Arbitrator issued a Revised Amendment to the Scheduling Order, setting the Phase 1 Hearing dates for the period from February 26 through March 7, 2024, and specifying other related deadlines.

On February 20, 2024, the Arbitrator issued an Order and Instruction following February 19, 2024 noticed Hearing on Motions *in Limine*.

On February 26-29, March 1, and March 4-7, 2024, the Phase 1 Hearing (the "Hearing") was held for nine (9) days at JAMS Resolution Center in Century City, at 1925 Century Park E Ste 1400, Los Angeles, CA 90067.

On June 6, 2024, following extensive post-hearing briefing by the Parties, the Arbitrator issued an Interim Award covering the Phase 1 hearing, as planned, not yet determining damages.

Commencing on July 22, 2024, the Parties submitted Requests for Correction and replies thereto, in writing and during a hearing on that subject and the issue of public disclosure of the Interim Award. A Restated Interim Award taking those Requests and replies into account was issued on September 25, 2024. Thereafter, during the period of October 4-8, 2024, the Parties each referenced some specific matters pertaining to the wording of the rulings on liability that in their respective views, would benefit from additional clarification. Taking into account those additional requests for clarification, the Arbitrator issued a Revised Restated Interim Award on October 14, 2024. Thereafter, a schedule was set for briefing of the Damages portion for the subsequent Interim Award with Damages in this matter. Respondent, which had previously submitted its damages position on June 25, 2024, revised it to be responsive to the October 14, 2024 Revised Restated Interim Award and Parties proceeded to submit their full round of Damages briefing.

On or about January 24, 2025, the date of its last brief submitted on the Damages matter, (following extensions of time requested and granted), Claimant submitted its Reply Brief on Damages accompanied by a Request for Reopening or Stay of Arbitration. Claimant foregrounded various issues pertaining to appeals, rulings and other on-going processes in China, all separate actions from the Demand and Counterclaims in Arbitration in this proceeding which, Claimant stated, have "thrown this entire Arbitration into disarray." While the relation of (a) various legal matters in China (including on-going matters in Chinese courts

6

and investigative bodies) to (b) this Arbitration (during which the liability had already been determined from a full hearing on the matters at issue), was not readily apparent, this Arbitrator sought to permit Claimant to present its concerns and to avoid the possibility of a premature decision not based on the relevant material evidence. The Arbitrator sought to avoid concerns by either Party that it had been prevented from fully presenting matters of material importance in this action or from introducing evidence that had a material bearing on the decision about liability in this action.

Accordingly, on March 1, 2025, after giving full consideration to the issues raised in Claimant's Reply Brief on Damages accompanied by a Request for Reopening or Stay of Arbitration, this Arbitrator gave a reasoned ruling with instructions to the Parties permitting Claimant to have examined or reexamined matters which (a) Claimant felt were materially affected by the proceedings or evidence raised in China and which (b) Arbitrator determined could possibly have an effect on the present Arbitration. The Arbitrator stated that reconsideration or consideration would be given to several very specific matters in view of the materials submitted by Claimant regarding proceedings in China. In accord with this ruling by the Arbitrator, consideration or reconsideration would be given to the following:

"The ruling by the [China] Appellate Court and the central nature of the GU-CBG License, as well as its relation to the MLA and to Grand Union's business structure and practices, merits a hearing on the impact of the No. 975 ruling on the liability and damages determinations here.

At the same time, based on the potential impact of the following items, the Arbitrator asked the Parties to address each of them in their briefing for this additional hearing:

1. Any evidence that there was unauthorized use of the Paul Frank brand in Paul Frank-themed hotel rooms enabled by Grand Union or under its control during 2024 and, if so, the effect of that unauthorized use on the damages analysis.

2. The significance for purposes of the damages or liability analysis in this case of CBG's alleged knowledge about, or participation in, Tai'an You's actions in registering Paul Frank trademarks.

3. CBG's alleged control over Hong Toong Fang and the significance to the liability and damages analyses in this case.

4. The availability of "wasted cost" damages in California, and whether this measure can be (or needs to be) analyzed as reliance damages under the circumstances of this case."

On March 6 and 18, 2025, the Parties made submissions regarding the scope and scheduling for the briefing on the consideration of the (above) specific matters to be considered pursuant to Clamant's Request for Reopening or Stay of Arbitration issues. Following briefing, the Arbitrator held a hearing on the matters raised on April 17, 2025, in accord with the briefing and hearing schedule requested by the Parties.

On May 8, this Arbitrator issued a reasoned Ruling on the Request to Stay or Re-open. The summary of this ruling by the Arbitrator is that that none of the arguments raised or evidence newly referenced by Paul Frank in its request to Reopen warranted a revision to or new finding relating to the Revised Restated Interim Award, or any stay or suspension

7

during the pendency of the China Trial Court case, as described, or new discovery. No new actionable and material breach by Grand Union had been shown that would affect liability and damages in this Arbitration. This included a consideration by the Arbitrator of a question of whether a certain "GU-CBG" (Grand Union/ CBG) License Agreement between Respondent Grand Union and an entity variably described as its subsidiary or agent during this arbitration, was invalid or whether evidence of it submitted during the arbitration Hearing was properly authenticated. The Arbitrator determined that whether or not the GU-CBG License Agreement was valid or authentic was immaterial to the analysis of Grand Union's damages at this stage of the Arbitration, and unlikely to have impact with respect to any relevant and material on any factual determination herein. The Arbitrator also extensively reviewed the case law and addressed the availability of reliance-type damages in a case such as this one, under the characterization of Wasted Costs.

On May 28, 2025, Claimant Paul Frank submitted its letter request and memorandum requesting that the Arbitrator amend the May 8, 2025, Ruling to specifically address three issues: (1) the authenticity and validity of the GU-CBG License Agreement; (2) Grand Union's waiver of reliance damages and prejudice to Paul Frank resulting from the conversion from wasted costs to reliance damages; and (3) the impact of the criminal proceedings as represented by Claimant to be currently pending against Grand Union and/or its related parties in China.

On June 2, 2025, the Arbitrator issued a Ruling on Claimant's May 28, 2025 Request for Revision of the May 8, 2025 Ruling with a reasoned decision stating that the three issues raised on May 28th had been previously addressed or would be addressed in the Damages determination, and, in particular, that the waiver issue as pertains to the Wasted Costs damages measure would be addressed in the damages award. With this June 2, 2025 Ruling, the Arbitrator closed the Arbitration Hearing which had been re-opened by Claimant on March 3, 2025, and expressly notified all Parties that "no further opportunities for introduction of new evidence or interpretations thereof are available in this action, and that opportunities for proposed extensions by way of motions or Requests for Re-opening, Stay or Delay have been exhausted." The Arbitrator went on to state in the final paragraph of that June 2, 2025 ruling that " [t]he Hearing, including Reconsideration of the Hearing and/or extensions of that Hearing, by way of various requests or motions made or proposed, is now closed, and the damages determination shall be forth-coming on or about June 13, 2025, allowing for the time of JAMS administration to proof the document." While, as per Rule 22 subsections (h) and (i), a Final Award in this Arbitration would not be due until July 2, 2025, the Arbitrator estimated the June 13th date for issuance of the damages award (an Interim Award pending completion of interest calculations), for the convenience of counsel and in order to give the Parties information about the pacing of the final rulings in this arbitration.

On June 11, 2025, Claimant Paul Frank filed an Objection to Arbitrator's Continuing Jurisdiction and Motion to Dismiss. There was no apparent basis for this Objection or Motion. In fact, Paul Frank acknowledged in its briefing that the Arbitrator clearly stated in the June 2, 2025 order that the Re-Opened Hearing was closed and no further evidence or argument would be permitted. Both Respondent and Claimant also referenced Rule 24(a) whereby "The Arbitrator shall render a final Award or a Partial Final Award within thirty (30) calendar days after the date of the close of the Hearing, as defined in Rule 22(h) or (i)." By

8

the dates acknowledged by all, that Final Award or Partial Final Award date would be July 2, 2025.

Instead, Claimant mistakenly sought on June 11, 2025, to assert that the deadline for the Final Award had been June 8 or June 9, 2025, thirty days after the holding (at Claimant's request) of a Re-Opening Hearing, after which Claimant itself had submitted two additional requests for reconsideration of rulings and had received two additional reasoned rulings in response. Claimant simply has no basis in the rules for contending that June 8 or June 9 was the date on which the Final Award should have been issued. Claimant asserted California Code of Civil Procedure Section 1283.8(a) in support of its contention that the arbitration should be dismissed for failure to issue a Final Award by June 8 or June 9. However, as Claimant itself notes, Section 1283.8 requires that "the arbitration award shall be issued within the time fixed therefor by the agreement." In this case, the agreement is that the JAMS Rules shall apply, and the JAMS Rules as noted herein, provide for the Final Award in this matter to be issued by July 2, 2025. So too, California courts hold that "nonjudicial arbitration proceedings are <u>generally regulated by the procedural rules established by the arbitration agency</u>; such proceedings are not necessarily controlled by the Code of Civil Procedure unless expressly provided for by that code, <u>by the arbitration rules</u>, by the parties' contract, or other provisions of law regulating such nonjudicial arbitration." *Paramount Unified School Dist. v. Teachers Assn. of Paramount*, 226 Cal. App.4th 1371, 1387 (1994); *Elden v. Superior Court*, 53 Cal. App. 4th 1497, 1508 (1997) (emphasis added). In any event, no Final Award was due to issue prior to the Interim Award on Damages and briefing on interest eligibility and rates. Accordingly, the Arbitrator denied the Claimant's Motion to dismiss and issued a Ruling on June 19, 2025, that Claimant's Objection to the Arbitrator's Continuing Jurisdiction was unfounded under the JAMS Rules.

On June 13, 2025, the Arbitrator issued an Interim Award Including Damages which supplemented the Revised Restated Interim Award (addressing liability) issued on October 14, 2024. The Interim Award Including Damages concluded that:

"(a) Respondent has not committed a Material Breach with respect to Claimant that is actionable as defined in the amended MLA;

(b) All claims for relief asserted by Claimant in this Arbitration are denied;

(c) Claimant's purported termination of the MLA with respect to Respondent was invalid, ineffective and amounted to a breach of the MLA;

(d) Respondent has not established its entitlement to damages for any failures by Claimant during the term at issue to perform under the Second Amendment;

(e) Respondent, through its counterclaims against Claimant, is entitled to monetary damages from Claimant due to Claimant's failure and refusal to perform, such damages in the amount of (a) US **$26,966,117** to be based on the wasted costs measure articulated at the Arbitration, plus (b) any interest allowed by California law.

(f) Respondent is the prevailing party."

9

The Arbitrator also determined that Respondent had not waived its entitlement to wasted cost damages for Paul Frank's material breach of the MLA and that Paul Frank committed that Material Breach in February 2022, precisely on February 22, 2022. The Arbitrator instructed the Parties each to submit, within seven (7) days of the date of issuance of the Interim Award addressing liability and damages, an argument about and calculation of any pre-judgment interest owed to Respondent based in the full and defined measure for wasted costs damages (AKA "reliance damages"), as awarded, from February 23, 2022 through only the date of the Final Award, anticipated to be July 2, 2025.

On June 20, 2025, Respondent timely submitted its Argument for and Calculation of Interest, including exhibits consisting of legal authority supporting its assertion of its entitlement to pre-judgment interest at a rate of ten percent (10 %) simple interest from February 23, 2022 (the date following Claimant's material breach) through the date of the Final Award, anticipated as July 2, 2025. Claimant did not submit any argument for or against interest or calculation relating thereto. The Arbitrator *sua sponte* extended the deadline for Claimant to provide such argumentation, if it so desired, but Claimant did not make use of the opportunity to submit on the matter.

On June 20, 2025, Claimant submitted a Continuing Objection to Arbitrator's Jurisdiction and Motion to Dismiss, citing again the same authority it had cited for its Objection to Jurisdiction and Motion to Dismiss submitted in this Arbitration on June 11, 2025. In this Final Award, the Arbitrator addresses the Continuing Objection and Motion and again denies the submission on the same grounds as Claimant's initial Objection and Motion to Dismiss were denied.

The Final Award, incorporating all Interim Awards, and addressing liability, damages and interest follows.

## III.    Findings of Fact

### A. Claimant's Objection to Admission of Certain Evidence

In considering the factual record in this matter, Claimant asked that the Arbitrator disregard those exhibits to which Claimant lodged its objections on the grounds that, it contends, they lack foundation, require authentication, violate the best evidence rule and/or contain multiple levels of inadmissible hearsay.

As the Arbitrator pointed out throughout this proceeding, including during discovery conferences, any evidence which is directly relevant, and material is generally admitted in Arbitration. Concerns about prejudice, reliability of the evidence, confusion of or misinterpretation of the evidence by the finder of fact are not a factor in an arbitration as they are in the jury trial setting. Further, JAMS Rule 22(d) takes this into account in providing that:

> "Strict conformity to the rules of evidence is not required, except that the Arbitrator shall apply applicable law relating to privileges and work product. The Arbitrator shall consider evidence that he or she finds relevant and material to the dispute, giving the evidence such weight as is appropriate. The Arbitrator may be guided in that determination by principles contained in the Federal Rules of Evidence or any other applicable rules of evidence. The Arbitrator may limit testimony to exclude

10

evidence that would be immaterial or unduly repetitive, provided that all Parties are
afforded the opportunity to present material and relevant evidence."

Thus, the Arbitrator follows the JAMS Rule in assessing weight and reliability, without
excluding relevant evidence. Of those exhibits Claimant seeks to exclude (set forth in its Post-
Hearing Brief), the Arbitrator agreed during the course of the Hearing to the exclusion of Ex. 1298
(original) [Ex. 1299 (translation)], Transcript between Wei Wei and Tony Chu, and will continue
to exclude that transcript, as determined. All other exhibits referenced are admitted.

Claimant also complained about the use of witness statements. However, the use of witness
statements was addressed prior to and at the Hearing, and they were permitted. Witness statements
are frequently used in JAMS international arbitrations and encouraged. In this proceeding, the
statements were provided in advance of the respective witness's testimony, and counsel were given
additional time to prepare their cross-examinations when they requested it. No prejudice has been
demonstrated from the use of witness statements in this arbitration. The Arbitrator admits the
witness statements and, as with all admitted evidence in this proceeding, gives them such weight
as is appropriate.

### B. Fact and Expert Witnesses

#### Fact Witnesses

1. Mr. Stanley Wan -- CEO and Chairman of Futurity Brands Group. Paul Frank Limited,
   which was created to hold the global rights to the Paul Frank Brand, is ultimately owned
   by Futurity Brands Switzerland AG, for which Mr. Wan is the sole executive director
   and CEO.

2. Ms. Hana Mu -- Initially outsourced by her law firm to provide general counsel service
   to Futurity on a monthly retainer basis, Ms. Mu became a board member of Futurity
   Brands Switzerland AG in around May or June 2022 before joining Futurity as an
   employee in 2023. Ms. Mu is Director of Legal and Corporate Affairs for Futurity
   Brands Switzerland.

3. Mr. Michael Puglisi -- Mr. Michael Puglisi is located in Sydney, Australia, and is
   employed by Futurity Brands Pte., Ltd., a Singapore entity within the Futurity Brands
   Group. Mr. Puglisi is the Global Licensing Manager, and testified that his job
   responsibilities include negotiating contracts, finding new licensees, and addressing the
   licensees' day-to-day concerns. Mr. Puglisi also worked on the Paul Frank Brand at
   Saban prior to the assignment of the Paul Frank brand from Saban to Futurity Brands.

4. Mr. Bo Zheng -- Mr. Zheng is the Founder of the China Brands Group. He first obtained
   a license for the Paul Frank Brand from Saban in around 2009, and through one of his
   companies developed the brand in China.

5. Ms. Jennifer Huang -- Ms. Jennifer Huang worked for Click Licensing Asia, LLC, a
   company which formerly acted as an agent for the Paul Frank Brand in China. She then
   joined CBG in early 2019 and became the General Manager of the Licensing
   Management Department at CBG. She provides back-end services to the Sublicensees
   after they enter into sublicensee agreements.

6. Ms. Zhang Yuzhen --- Ms. Zhang Yuzhen joined CBG in 2019. Her title is the IP

11

Specialist, and she reviews and approves sublicensee agreements and letters of authorization issued to sublicensees.

7. Mr. Wang Haibin -- Mr. Wang Haibin joined CBG in 2015 and is the authorized business department supervisor.

8. Mr. Zhang Lisong -- Mr. Zhang Lisong joined CBG in 2013 and is Vice Director of the accounting department. He heads the accounting department.

9. Mr. Yang Guowei --Mr. Yang Guowei is the IT Director at CBG. His work relates to the company's hardware, the network servers, and the maintenance of the IT system.

**Expert Witnesses**

1. Professor Merges -- Professor Robert P. Merges provided testimony relying on his experience and expertise in licensing law in the United States and internationally. Professor Merges is the Wilson Sonsini Professor of Law and Technology at the University of California, Berkeley Law School where he has taught Intellectual Property Law (including Trademark Law), among other courses since 1995. Professor Merges is the author of numerous books on Intellectual Property law and Patent Law. In addition to teaching at Berkeley, Professor Merges taught at Boston University Law School from 1988-1995. He has conducted and published empirical research on licensing agreements in the biotech industry. Professor Merges has lectured on IP law at major law schools in China, including Peking University (Baida), Renmin University of China, China University of Political Science and Law (CUPL), East China University of Politics and Law (ECUPL), Fudan University, Southwest University of Political Science and Law (Chongqing), and University of Hong Kong, among others.

2. Mr. Moser -- Mr. Bryan C. Moser is a Certified Public Account (CPA) licensed in the Commonwealth of Virginia and other jurisdictions, and a Partner at Grant Thornton LLP, in Virginia, in the Forensic Advisory Services practice. Mr. Moser is also a Certified Fraud Examiner (CFE). Mr. Moser's responsibilities include providing damages analysis, valuation, forensic accounting, fraud investigation, dispute consulting and other services to clients. Mr. Moser holds a Master of Business Administration from Duke University's Fuqua School of Business, and testified as Claimant's damages expert in this arbitration

3. Mr. Xiao --Mr. Xiao is admitted to practice law in Washington, DC and in the People's Republic of China. He holds a bachelor's degree in law from Xi'an University and a Juris Doctor degree from Indiana University Robert H. McKinney School of Law. Mr. Xiao has over 15 years of in-house experience as a legal professional in China.

4. Ms. Booth --Ms. Pauline Booth is a managing director of Kroll, focusing on intellectual property for more than 20 years. She has been retained as an expert around 50 times, half of which relate to licensing disputes.

12

5. Mr. He -- Mr. He is a Hong Kong resident qualified to practice law in the People's Republic of China. He has extensive licensing experience and over 24 years experience doing trademark prosecution and litigation in the IP industry.

### C.  Joint Statement of Uncontested Facts

Following the Hearing, the Parties each submitted Post-Hearing briefs and Post-Hearing Reply briefs on schedule. In accord with the amended Scheduling Order, the Parties also submitted a Joint Statement of Uncontested Facts, on April 26, 2024, setting forth the following Uncontested Facts:

1. On or around January 1, 2015, the Master License Agreement ("MLA"), which included Schedules and various exhibits, was entered into between Paul Frank Industries, LLC and Grand Union. JX-1; JX-5.

2. On or around April 27, 2018, the First Amendment to the MLA was entered into between Paul Frank Industries, LLC and Grand Union. JX-2.

3. On or around August 19, 2021, the Second Amendment to the MLA was entered into between the Parties. JX-3.

4. On or around February 10, 2022, the Third Amendment to the MLA was entered into between the Parties. JX-4.

5. On or around November 22, 2022, Paul Frank filed a Demand for Arbitration against Grand Union. JX-6.

6. On or around December 16, 2022, Grand Union filed a Response and Counterclaims against Paul Frank. JX-7.

[Note that Paul Frank Industries, LLC, referenced in Statements of Fact 1 and 2 above, is also referred to in this Arbitration as "Saban" or "Saban Brands," the parent company of Paul Frank Industries, LLC, in order to avoid confusion between Paul Frank Industries, LLC and Paul Frank Limited, the Claimant herein.]

### D.  Material Findings of Fact

To the Statement of Uncontested Facts set forth above, the Arbitrator adds the material findings below. The material findings below and the determination of claims that follows contain in their analyses those facts found by the Arbitrator to be true and necessary to the Award.  To the extent that the facts stated herein differ from any party's position, that is the result of determinations by the Arbitrator regarding credibility and relevance, considerations of burdens of proof, and the weighing of evidence, both oral and written

After several years under a non-exclusive licensing engagement with Paul Frank Industries, LLC/Saban and after investing in the marketing and growth of the Paul Frank brand (also referenced herein as the "Brand"), in the form of facility expansions (factories, and storage), equipment, various forms of marketing and promotion, staffing and design, Grand Union ("Licensee" herein) sought a long-term, exclusive license to the Brand from Saban for the Territory of Mainland China, Hong Kong and Macau. Saban agreed to enter into a Master License

13

Agreement ("MLA") and extended to Grand Union a 15-year license for the period January 1, 2015, through February 28, 2030, for a pre-paid ("upfront") fee of $65 million (consisting of a $55 million license fee and a $10 million extension fee, both paid in advance). Basically, from the start of the license term in 2015, Grand Union pre-paid most of the fees involved, to cover 15 years of using the Property, as defined, in the Territory. This license fee was recognized as a robust or high fee for such a license in the Territory. Mr. Zheng, managing director of Grand Union, indicated that he wished to make a lasting impression on Licensor going in by offering a noticeably high fee up front. Mr. Zheng represented that Grand Union is related to China Brands Group ("CBG"), an operating company which manages the licensing activities under the MLA for Grand Union. Mr. Zheng is Director of Grand Union.

Both Mr. Zheng of Grand Union and Mr. Stanley Wan of Saban, who later came to be CEO and Chairman of Futurity Brands Group (owner of Paul Frank Limited, the rights holder of the Brand), testified about the cooperative relationship that Saban and Grand Union enjoyed. Mr. Zheng specifically testified that Saban provided Grand Union with "all the necessary documents we required in terms of licensing and the channels, including the certification for the license and public license and anti-counterfeiting product and trademark-related documents." Ms. Zhang Yuzhen also attested to the same cooperation regarding prerequisite documents prior to 2020. Mr. Zheng testified about Saban providing Grand Union with a notarized Letter of Authorization (notarized LOA) and that Grand Union used the notarized LOA to demonstrate to third parties that Grand Union had the rights it represented it had to exploit or sublicense the Brand. Notarization was important because Saban was an overseas company with respect to Grand Union and its sublicensees. Ms. Zheng testified to the use of a notarized LOA being a common practice in the licensing industry when a Chinese company is in the position of having to prove to an online platform that a foreign company's letter of authorization is authentic or "truthful." Also, there was evidence of regular seasonal meetings between Saban and Grand Union about designs and of an effective design and approval process, testified to by both Mr. Michael Puglisi and Mr. Zheng. Mr. Puglisi testified about email approvals from Saban to Grand Union. Ms. Jennifer Huang testified to an OA monitoring process in place, and to a system for assessment of the positive impact (or not) on the Brand of a plan or projection offered by an authorized party or sublicense, and then of the steps of a process through multiple departments for review and approval, as well as for the issuance of anti-counterfeiting labels and review of applications for new stores.

There was also direct credible testimony about Saban entrusting Grand Union to handle anti-counterfeiting actions on behalf of the Brand under the MLA. Mr. Wan testified about Grand Union as a sizeable company and its management as a strong one. Mr. Puglisi and Mr. Wan testified to Saban's satisfaction with Grand Union's activities under the MLA.

In addressing the nature of the relationship between Saban and Grand Union, Mr. Wan also testified that he did not believe the Quarterly Statements or reports specified in Section 6(a) of the MLA were required or sought by Saban.

In and around early 2018, after approximately three years of operating under the MLA, and having developed and produced product to a great degree, Grand Union sought to utilize sublicensees more and to build a broader network of sublicensees throughout its licensed Territory. Grand Union's performance to this point, along with Saban's own plans as to the Territory, apparently led Saban to enter into an asset purchase agreement with Grand Union in April 2018. The April 27, 2018 Asset Purchase Agreement called for Grand Union to make a $35 million

14

payment to Saban. While Grand Union made an initial $5 million installment payment on the Asset Purchase Agreement, it was unable to complete full payment within the required time due, it was claimed, to currency fluctuations. In the context of entering into the Asset Purchase Agreement with Grand Union, Saban amended the MLA on April 27, 2018, primarily to revise the Dispute Resolution provision and to specify California law as governing.

Saban cancelled the Asset Purchase Agreement with Grand Union on November 12, 2018. Approximately two years later, in December, 2020, Futurity Brands Switzerland AG came to hold the global rights to the Brand through its entity Paul Frank Limited, (the Claimant in this arbitration), through an assignment of the MLA. Recounting the exact means of Futurity's purchase of those rights is not necessary to this resolution. It is of interest that Mr. Wan, CEO and Chairman of Futurity Brands Group, had been an employee of and consultant to Saban.

Mr. Wan testified that Futurity was required to set up and staff a wholly new office to undertake any activities with respect to the Brand in China. He also indicated that during the Acquisition, he or Futurity/Paul Frank did not pay a lot of attention to the terms of the MLA. In early February of 2021, shortly after Futurity/Paul Frank's purchase of the Brand closed, Paul Frank indicated, through communications by Ms. Hana Mu with Ms. Peggy Wang and communications by Mr. Wan with Mr. Zheng, that Paul Frank would be taking over some of the anti-counterfeit or related legal monitoring and/or litigation actions, tasks which during the Saban tenure had fallen almost entirely to Grand Union. Assumptions may have been made that the results of taking such actions were potentially lucrative and that the hope of Futurity/Paul Frank was to secure some proceeds through litigation. This was not proven.

Promptly upon the assignment of the MLA to Futurity/Paul Frank, given that the notarized LOA from Saban to Grand Union was no longer effective, Grand Union immediately requested a notarized LOA from the new Paul Frank licensor. Paul Frank did not provide that Notarized LOA and, ultimately, refused to. For several months, Grand Union requested this notarized LOA from Paul Frank which said that Covid-19 restrictions were making it difficult to impossible to get anything notarized from outside China and delivered into the country. After 4 or 5 months of claiming that getting an LOA notarized for Grand Union would not happen until Covid restrictions were loosened, Paul Frank then claimed it did not think Grand Union needed the notarized LOA and would not be receiving it. At the same time Grand Union experienced difficulties getting a notarized POA from Futurity which was needed to initiate actions against counterfeiters. Ultimately, after approximately 6 months had passed with respect to the notarized documentation requested by Grand Union, in and around May 2021, Paul Frank issued a Notice of Termination to the Licensee asserting that Grand Union or its officers or principals had been registering or attempting to register Paul Frank trademarks for their own private interests. In testifying about the matter Mr. Wan said he actually had little knowledge of the particulars (although the decision to terminate had been his), and finally stated that what he had attempted with the Notice of Termination was to force a good, strong discussion with Grand Union.

Paul Frank made accusations of Grand Union's misuse of the Brand in May and June of 2021, for which neither Mr. Wan nor Ms. Mu could provide justification or convincing evidence at the Hearing. Then Paul Frank issued a list of expenses to Grand Union in July 2021, stating that Grand Union owed it, in the form of an amendment to the license agreement, approximately $585,000 in costs and $5 million in compensation for damages for the wrongful registration of trademarks by entities controlled by Grand Union. Proof of the source of the costs purportedly

15

incurred, of the amount of the damages, or of the actual wrongful registration for which Grand Union had responsibility, was never provided. A wrongful or incorrect registration of a "Paul Frank" referenced brand by a separate entity (not Grand Union) was identified, and that entity corrected or withdrew the errant registration the next day, thus, effecting a cure of any violation, misconduct or mistake that may have been caused by that entity.

During late July 2021, (a) Paul Frank sent an additional notice of Material Breach to Grand Union, which cited, not a material breach by Grand Union, but a violation by a sublicensee which Grand Union was working to correct; and (b) Paul Frank continued to refuse or omit to provide the notarized LOA which Grand Union found critical to its operations with this new Licensor. Thereafter, Grand Union agreed to sign an amendment (Second Amendment) to the MLA with Paul Frank. Mr. Zheng testified that, at the time, Grand Union felt forced by Paul Frank's threats to pay substantial consideration for the amendment Paul Frank was demanding. Mr. Zheng hoped that, thereafter, the two companies could move forward in good faith.

In or around August 19, 2021, the Second Amendment was entered into, now between Paul Frank Limited ("Paul Frank") (the successor to Saban/Paul Frank Industries, LLC), and Grand Union. This Second Amendment came into existence out of a negotiation between Paul Frank Limited and Grand Union following delivery by Paul Frank Limited ("Licensor") of the July 2021 notice to Grand Union of termination of the MLA. The Second Amendment provides for additional monetary consideration from Grand Union and includes a provision about Grand Union developing Paul Frank's as yet unregistered and undeveloped A.NI.MA. brand. The Second Amendment also documents a modification of certain procedures in the MLA by addressing breach, cure, waiver and collaboration or "working together" under certain circumstances of potential breach, uncured breach or new breach. The Second Amendment is central to this dispute in that it is the Second Amendment, including its waiver, notice and cure provisions that is operative at the time of the alleged breaches referenced in Paul Frank's August 24, 2022 Notice of Termination. Paul Frank then purports to perfect that Notice of Termination as a Termination of the MLA, as amended, on or about September 23, 2022.

As stated, on August 19, 2021, Grand Union signed the Second Amendment ("SA") and paid an additional $8.5 million for relatively little additional consideration except for elements essential to the contractual undertaking, including, Paul Frank's commitment to providing necessary documentation for the relationship, its promise of some peace and collaboration, new more generous cure provisions, as well as a broad waiver, and the added capacity for Grand Union to build another brand for Futurity. Even though Grand Union signed the SA and paid the fee, Futurity continued to refuse to provide Grand Union with the notarized LOAs and trademark certificates Grand Union stated it needed to work with sublicensees. The Second Amendment contained a 6-month Extraordinary Cure Period which ended on February 19, 2022. It also contained an express waiver mechanism allowing, following Grand Union's payment of an $8.5 million license fee, for general waiver, under certain conditions, of potential breaches of contract.

Then in May and June 2022, Ms. Mu inquired about the identities of certain sublicensees that had opened TikTok stores and specifically how the sublicensees had obtained the authorization to do so. On June 10 and 15, 2022, Ms. Huang was able to partially respond to Ms. Mu by providing the names of certain sublicensees that had opened TikTok stores and a list of flagship stores. Ms. Mu reported during the Hearing that she was concerned about these flagship stores because Paul Frank did not issue any letters of authorization for these 13 flagship stores. However, Ms. Mu was

16

not clear to Grand Union at the time of her questioning, in and around June of 2022, about the exact breach or violation she may be foocused on and whether she is assuming illegitimacy from her knowledge or assumption that no authorization had issued. Ms. Mu's question did not show that she was working with or collaborating with Grand Union, but, to the contrary, avoiding a collaborative relationship.

Then in July 2022, Paul Frank sent a "Notice of Material Breaching" to Grand Union and alleged that "Licensee has not only not cured all the breaches…but moreover has also continued on committing additional material breaches, such as alleged acts of fraud by forging documents to open online stores on certain platforms by unqualified store operators." Paul Frank went on to state that it was temporarily suspending performance of the Agreement (MLA) until any and all breaches of the Agreement are cured (without specificity as to what that entailed). Further, Paul Frank stated that during what it was calling this "suspension of the Agreement," Paul Frank also stated that "Licensor will temporarily take over the management of License in the Territory directly, including, without limitation, managing all sublicensees, coordinating sublicensees with marketplaces, receiving royalty payables and future royalty payments (going into an escrow account), issuing authorization letters to sublicensees directly, etc., as well as any other acts necessary in order to protect the Brand and the business in the Territory."

Paul Frank's July communication lacked all specificity about the conduct it considered to constitute the breach by Grand Union (thus neither justifying a Notice of Termination nor enabling cure or other recourse by Grand Union under the amended MLA). Paul Frank also took the opportunity (in relation to this July 2022 communication with Grand Union and unilateral announcement to Grand Union's sublicensees) to engage in self-help of a nature not permitted under the amended MLA. That is, nothing in the MLA or the recent SA permitted Paul Frank to suspend its own performance in the event it believed there was a breach without also offering opportunities to cure or to work together with the Licensee. Nor should Paul Frank's unilateral conclusions or suspicions about a breach, without an opportunity to cure or other effort to work together, have permitted Paul Frank to begin to manage or collect royalties directly from Grand Union's sublicensees.

Paul Frank then added to the potential for injury to Grand Union and its business relationships by announcing to Grand Union's sublicensees that it would:

- Suspend the performance of the Master Licensing Agreement by Grand Union International Trading Limited and suspend the right to sublicense granted to Grand Union International Trading Limited.

- During the suspension of performance, conduct an overall audit on the performance of the Master Licensing Agreement in China.

- Carry out comprehensive rectification against breaches and violations.

- In order to ensure the normal operation of the licensees at all levels during the referenced "audit" and "rectification," the brand owner Paul Frank Limited would also temporarily "take over all Paul Frank" licensees in China.

On August 24, 2022, Paul Frank then issued another purported Notice of Termination to Grand Union. Paul Frank purported to identify four Material Breaches of the MLA as grounds for Paul Frank now to terminate the amended MLA with Grand Union:

17

1. the Forged Authorization Letter (one of Grand Union's related entities, Hong Tong Fang (Shanghai) Cultural Development Co., Ltd. had forged an LOA from Paul Frank in order to open an online store (the "Forged LOA");

2. the sale of Paul Frank products outside the Territory and the Channels of Distribution in the MLA;

3. the failure to cure the breaches during the Extraordinary Cure Period in the Second Amendment; and

4. the refusal to work with Grant Thornton to perform an audit.

During the month that followed the August 24, 2022 Notice of Termination, Grand Union's Jennifer Huang clearly requested explanations, evidence, and supporting materials for the alleged breaches, but nothing to support the allegations was provided by Paul Frank prior to its formal Termination of the license on September 23, 2022, and its submission of its Demand for Arbitration in November 2022. Prior to the issuance of the September 23, 2022 Termination, Mr. Zheng set up a meeting with Stan Wan in Singapore to discuss the situation. According to Mr. Zheng, Mr. Wan then made further demands, repeating Paul Frank's 2021 approach of demanding an Amendment after the issuance of an unexplained or unfounded Notice of Termination. This time the demands included allowing for Paul Frank to issue LOAs and anti-counterfeiting labels directly to the sublicensees who would also work directly through Paul Frank's OA (approval) system; an additional profit percentage to Paul Frank on adult apparel; and Grand Union taking on the new responsibility of developing the A.NI.MA brand globally.

Mr. Zheng testified to feeling tricked at the time, and that he would not give further consideration to Paul Frank Limited only to be "deceived" and deprived of his licensing rights again. Jennifer Huang denied the breaches of which the August 24, 2022 Notice of Termination accused Grand Union and asked for evidence of them. Nothing was sent to Ms. Huang or Grand Union in response.

Thereafter, on September 23, 2022, Paul Frank sent Grand Union a formal Termination of Master License Agreement via email. Paul Frank reports that it gave Grand Union proper notice and an opportunity to cure in the Notice of Material Breaching and the Notice of Termination which it provided to Grand Union on July 21, 2022, and August 24, 2022, respectfully. Therefore, states Paul Frank, the Termination (formal Termination dated September 23, 2022) was valid. Paul Frank's expert Professor Robert P. Merges stated that the termination was entirely proper: "to me, it looked like a very clean termination, in terms of the steps they went through and the timing and the sort of mechanics of notice." It seemed to Paul Frank's expert that the Notice of Termination and formal Termination were mechanically sound. This particular opinion by Professor Merges addressed the timing and sequence, but not the substance of the notice(s) or the context.

Paul Frank reports that following the formal Termination, it contacted "each of Grand Union's sublicensees to inform them of the Termination, as each of the sublicense agreements automatically terminated as soon as Paul Frank terminated the MLA and, therefore, the sublicensees were directly affected by Grand Union's Material Breaches."

Paul Frank initiated this Arbitration on November 22, 2022, seeking to recover money damages. In and around the same time, Paul Frank retained the accounting firm of Grant Thorton to review public records and Grand Union's production of documents in order purportedly to

18

identify Material Breaches committed by Grand Union and to "perform a detailed analysis of Grand Union's compliance with the MLA over the years." Paul Frank asserts that it unearthed an overwhelming amount of evidence establishing Grand Union's further Material Breaches, in addition to those Material Breaches which formed the basis of the Termination, which further support Paul Frank's Termination of Grand Union's license and claims of Material Breach. In 2023, Paul Frank began entering into license agreements directly in the Chinese market. Paul Frank reported that the license fees it was able to negotiate were significantly lower than in previous years and that this decrease forms the basis of Paul Frank's claims against Grand Union for loss of goodwill.

## IV.    The Agreements

This is, above all, a breach of contract action. The central agreement is the MLA. It is amended three (3) times between April 27, 2018, and February 10, 2022. The most important amendment for this analysis is the Second Amendment to the MLA.

### A. Relevant Provisions of the MLA

Among the key provisions of the January 1, 2015 MLA with respect to the issues of this Arbitration are:

Section 1 setting forth generally the subject matter of the License:

> *"1. License.*
>
> *(a) Licensor hereby grants to Licensee an exclusive, sublicensable, and nontransferable license under the Property and modifications to the Core IP to (i) design, develop, manufacture, market, promote, distribute, advertise, offer to sell, sell, provide, and otherwise offer Licensed Products in the Territory and the Channels of Distribution and (ii) provide Licensed Services in the Territory and during the License Period (all together, the "License")."*

[Specifications relating to the Scope of the License, including those setting forth the particulars of the Territory, the License period, License Fees and payment dates, categories of permitted Licensed Product, channels of distribution (e.g., types of retail outlets), and cooperation by License in Licensee's obtaining certificates, registrations, government approvals and the like, are in the Schedules appended to the MLA.]

Section 2 that places limits on geographical regions where the Licensee may sell and the regions in which the sublicensees it engages may export:

> *2. Territory and Channels of Distribution*
>
> *(a) The License granted herein is limited to the Territory. Except as otherwise provided in this Agreement, no sales shall be made to any customer and no sublicense shall be granted to any Sublicensee whom Licensee knows, or has reason to believe, will export Licensed Products to parties outside the Territory. This Agreement shall not be interpreted and the rights granted herein shall not be exercised in a manner as would contravene any provision of any national anti-trust or restrictive practice legislation in the Territory.*

Section 9 addressing ownership and protection of the property (that is, the Brand).

19

Section 9 includes provisions about ownership in the Property remaining Saban's (the Licensor's), including derivations and new versions of the Property. It also provides for the responsibility of the Licensee, at its own cost and within legal bounds, to identify misuses of the Brand and undertake actions, such as anti-counterfeit actions or other litigation to protect the Brand:

> 9. (c) Licensee. at its cost and in accordance with applicable laws, will be responsible for actively monitoring the Territory to identify misuses of the Property. and shall undertake all actions reasonably necessary or advisable to protect the Property. including conducting investigations. raids, administrative actions. enforcement actions. anti-counterfeiting actions, litigation. and any other suit. action or proceeding with respect to claims for infringement or imitation of the Property.

Of importance to this dispute is Section 13 of the MLA providing limited circumstances under which the Licensor may terminate the License for less than satisfactory performance by the Licensee. Note that, except for insolvency-type situations, the Licensor may only terminate the License when a Material Breach occurs, of which a required thirty (30) day notice is to be provided to Licensee, during which notice period, the Licensee may avoid termination by curing the Material Breach. The limited circumstances that give rise to the Material Breach scenario all involve conduct by the Licensee, which means that there is no Material Breach unless the (a) Licensee ships or sells Licensed Products outside the specified Territory or Channels of Distribution, or (b) the Licensee provides Licensed Services outside the specified Territory, or (c) the Licensee engages in [other] conduct beyond the scope of the granted rights AND that conduct adversely and materially affects the goodwill and market value associated with the Property AND the adverse and material effect on the goodwill and market value persists for at least 120 days or (d) the Licensee or any of Licensee's executive officers or owners commits fraud or any other act … that adversely and materially affects the goodwill and market value associated with the Property AND the adverse and material effect on the goodwill and market value persists for more than one hundred and twenty (120) days. It is clear from this formulation that the prerequisite to Material Breach is unpermitted conduct _by the Licensee. and that, except where that conduct consists of extra-territorial sales. shipments or services, the unpermitted conduct (beyond the License scope) by the Licensee (or its owners or officers) must have material adverse consequences for an extended period of time.

The "Property" (in the MLA/Second Amendment) is the Paul Frank Intellectual Property (consisting of trademarks, copyrights, designs and the like) as listed in Exhibit 1 to the MLA, and including the Core IP, primarily the "Paul Frank" trademark per se and the Julius design.

There is a rationale for the definition of Material Breach and the prerequisites to Termination being as exacting as they are. In this MLA arrangement, the Licensee has, from the commencement of the license term, already pre-paid most of the fees involved, and they are substantial ($65 million to cover 15 years of using the Property, as defined, in the Territory). The Licensee must be protected against a casual accusation of breach or an overly broad definition of Material Breach and against being penalized for less than substantially adverse conduct over an extended period of time if its large advance investment is to be reasonably safe.

> 13. Termination, Breaches, and Bankruptcy.
>
> (a) Termination by Licensor. If ... (iii) Licensee commits a Material Breach (as

20

*defined below) of this Agreement, Licensor shall have the right to terminate this Agreement upon thirty (30) days' notice in writing to Licensee (except Licensor shall have the right to immediately terminate this Agreement for breach of Section 13(b)(i) below), and such notice of termination shall become effective unless Licensee completely cures such breach within such thirty (30) day period.*

*(b) The following are deemed to be a Material Breach under this Agreement:*

...

*(ii) Licensed Products are sold, shipped from, or distributed outside the Territory and/or the Channels of Distribution, or Licensed Services are provided outside the Territory by Licensee (except as otherwise permitted under Schedule B); or*

*(iii) Licensee engages in conduct beyond the scope of the rights granted under this Agreement that adversely and materially affects the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value persists for more than one hundred and twenty (120) days; or*

*(iv) Licensee or any of Licensee's executive officers or owners commits fraud or any other act or omission that adversely and materially affects the goodwill and market value associated with the Property and such adverse and material effect on the goodwill and market value persists for more than one hundred and twenty (120) days (for avoidance of doubt, the Parties agree that an action by Licensee that breaches any representation and warranty in Section 34 of this Agreement and results in the conviction of any officer, director, principal, or owner of Licensor or Licensor's Affiliates under the FCPA shall be a Material Breach under this Section 13(b)(iv)).*

*(c) Breach by Licensor. ...*

*(d) Breach by Licensee. In the event that Licensee commits any breach of this Agreement this is not a Material Breach, Licensor may provide written notice of such breach to Licensee, in which case Licensee shall have thirty (30) days to cure the breach. If a breach is not cured within thirty (30) days after notice of the breach, then such breach shall be an **Uncured Breach.** Licensee shall pay a fine of $20,000 for each Uncured Breach.*

### B. First Amendment to the MLA

Some of the key provisions of the April 27, 2018 First Amendment to the MLA are:

Provision 3 of the First Amendment deleting the reference to Hong Kong law as the governing law in the MLA and replacing the governing law with California law. The First Amendment also provides that the MLA remains in effect and that, in the event there is a conflict between the First Amendment and the MLA, the First Amendment shall prevail.

### C. Second Amendment to the MLA

The Second Amendment to the MLA, dated August 19, 2021, contains provisions setting

21

forth a new additional flat fee advance payment ($8.5 million) to be paid by Grand Union for licensing of the A.NI.MA brand (which Paul Frank will depend on Grand Union to develop), and new fees for Brand Management Services which Paul Frank transfers to itself, as well as other new percentage of profits payments. The most important provision for interpretation of this Second Amendment with respect to the MLA and the activities addressed in this dispute is <u>Section 7</u>.

> 7. *Extraordinary Cure Period and Waiver*

>> *i. Licensor hereby agrees to grant Licensee an extraordinary cure period of six (6) months from the Second Amendment Date so that Licensee may undertake whatsoever actions are necessary in order to cure any potential breaches of the Agreement and misconduct incurred currently, whether known or unknown to Licensor. The cure period shall be ended on date February 19. 2022 (The "Cure Date").*

>> *ii. As consideration of Licensee's obligations under this Second Amendment, upon the payment obligations stipulated in Li(a) are complete and fulfilled by Licensee. Licensor agrees to waive any and all liabilities of the Licensee for potential breaches of contract that is known or should have known to Licensor as of the Second Amendment Date.*

>> *Licensor hereby represents and warrants that it has disclosed all known potential breaches of contract to Licensee.*

>> *iii. After the Cure Date. Licensor has the right to perform a due diligence in order to ascertain whether there are any uncured breaches. In the event that after the Cure Date Licensee is still in default of such cure obligation, the parties shall collaborate in good faith to resolve such issue. Under the performance of the Due Diligence Licensee shall collaborate with Licensor and or with Licensor's designated entity to perform such due diligence in order to make available to Licensor any documents requested in relation to the due diligence.*

>> *iv. After the Cure Date, if any new breach of the Agreement is identified by either party, the parties agree to work together and the breaching party shall cure such breach.*

Like the First Amendment, this Second Amendment operates with respect to the underlying "Agreement" that is, the MLA, and where the Second Amendment conflicts with the MLA, the Second Amendment prevails. Section 7 of the Second Amendment provides the Licensee, Grand Union, with added protections, that is an additional cushion involving good faith "collaboration" or "work together" in the event of an alleged breach or Material Breach by Grand Union. First, Section 13 of the MLA (discussed above) defines the conditions under which the Licensee's conduct or omission may amount to a breach or Material Breach of the MLA. If the conduct meets one of the Material Breach thresholds, the Licensor may terminate the License, provided proper notice and cure provisions are extended to the Licensee. Following the addition of the Second Amendment to the MLA, the Licensee has the benefit of a new additional 6-month "extraordinary" cure period from the Date of the Second Amendment (that is, until February 19, 2022), to attempt to effect a cure in the event of breach (any breach, not just a Material Breach).

22

Beyond this new extraordinary cure period, even more protection is extended under the Second Amendment to the Licensee (once the additional upfront payment obligation (Section 1.i(a)) is made). After the new payment, the Licensee has the benefit of an expressed waiver of liability extended by Paul Frank for any potential breach (not just for a Material Breach) that is known or should be known to the Licensor as of the Second Amendment Date (August 19, 2021). Since most of the conduct addressed by the MLA and the Second Amendment relates to trademarks, marketing, public designs, promotion and other publicizing or public-facing activities, as well as registration of IP and use of branding on articles in commerce, or where public goodwill is at stake and known adverse effects occur, arguably most potential breaches will fall into the category of something that is known or should have been known by the Licensor. In any event, the addition of an express waiver of liability with respect to certain violations of the MLA by Respondent is one more protection against Termination or penalty for breach that becomes available to the Licensee following the Second Amendment Date (and additional payment).

Paul Frank incorrectly reads the waiver for the benefit of the Licensee as "dependent on Grand Union satisfying the cure and due diligence requirements. This is the only logical reading of the Second Amendment. The entire agreement was contingent on Grand Union curing its prior breaches and agreeing to a comprehensive audit in order to demonstrate its cure. It would be supremely irrational for Paul Frank to require a cure and due diligence but agree to a waiver of claims regardless of whether Grand Union actually cured the breach."

In fact, the waiver is not dependent on curing the breach or it would have little value. Rather, the waiver, provided contractually, is meant to protect a Licensee who has paid the license fee in advance, and then has added to that fee another significant sum. Anything less would be irrational. The Second Amendment adds provisions for situations where a cured breach is found or continues. Those involve collaboration and working together, not depriving the Licensee of protections it already has.

Of further added value to the Licensee with the implementation of the Second Amendment are the provisions calling for the parties to collaborate in good faith to resolve an issue if a breach remains uncured following the 6-month cure date. This provision appears to require the good faith collaboration of Licensor and Licensee, but not necessarily to require, following the Second Amendment and the extraordinary cure period, that the effort result in a complete cure. What is required is the good faith collaboration between Licensor and Licensee, whether with respect to due diligence or "issues" relating to any uncured breaches that are not waived, as well as working together with respect to new breaches that the Licensee shall endeavor to cure. There are no express time limitations put on the periods for collaboration or working together.

## V.    The Claims.

The following determination of the claims in this arbitration contains in its analysis those facts found by the Arbitrator to be true and necessary to the Award. To the extent that the facts stated herein differ from any party's position, or from those facts recounted in the Findings of Fact above, that is the result of determinations by the Arbitrator regarding credibility and relevance, considerations of burdens of proof, and the weighing of evidence, both oral and written.

### A. Claimant's Claims

In setting forth its summary of issues before the Arbitrator, Paul Frank states that the only

23

issues the Arbitration is required to consider are those Paul Frank presented in the Arbitration
Hearing, to wit:

1.  Grand Union has committed multiple, sustained, Material Breaches of the MLA, as
    well as Uncured Breaches of the MLA.

2.  Paul Frank is entitled to monetary damages for Grand Union's breaches.

In fact, Claimant's Post-Hearing brief states additional claims. It references claims for
Breach of Contract, Breach of the Implied Covenant of Good Faith and Fair Dealing, Lanham Act
violations and Unjust Enrichment damages. By the close of its Post-Hearing Reply brief, Claimant
appears to have abandoned the Implied Covenant claim. Further, while Claimant continues to set
forth (in parentheses) alternative damages amounts based on Lanham Act and Unjust Enrichment
claims, Claimant never adequately argues for the applicability of the Lanham Act because it never
overcomes the presumption against extraterritoriality. Grand Union is not alleged to have sold Paul
Frank branded products in the US, to have intended to do so, or to have offered to sell such product
within the US; nor is it accused of having licensed any entity to sell Paul Frank branded products
within the US. Thus, any Lanham Act claim by Clamant is denied in this arbitration.

As for Unjust Enrichment, or other equitable or quasi-contract allegation, Claimant has not
stated the basis for an Unjust Enrichment claim in that it is not seeking to enforce a duty
independent of the contract or claiming that the MLA was procured by fraud. There is no dispute
here about the existence of the contract. Thus, an unjust enrichment claim is unavailable to
Claimant for the conduct it alleges in the arbitration.

### B. Claimant's Breach of Contract Claims – the Exacting Requirements of the MLA and of the Second Amendment

To prevail on a breach of contract claim under California law, the Claimant must prove (1)
the contract, (2) that Claimant performed the contract or was excused for its nonperformance, (3)
breach by the Respondent, and (4) resulting damage to the Claimant. The MLA describes two
kinds of breach: (a) a Material Breach, which when committed by the Licensee gives the Licensor
the right to terminate the MLA following thirty (30) days' notice, unless the Licensee cures the
breach within that notice period; and (b) other breaches (not Material Breaches) which, when
committed by the Licensee and not cured within thirty (30) days after Licensor provides Licensee
with notice of the breach, entitle the Licensor to impose a $20,000 fine.

For any breach of contract claim asserted by the Licensor after August 19, 2021, the alleged
breach must be examined in the context of the Second Amendment to the MLA (discussed above).
A substantial portion of the Second Amendment, specifically Section 7, modifies or supplements
Section 13 of the MLA which addresses and delineates Material Breach, breach and cure under
the MLA. Section 7 (ii) also allows (after Licensee satisfies certain payment obligations, which it
did) for waiver of any and all liabilities of the Licensee for potential breaches of contract that are
known or should have been known to the Licensor as of the date of the Second Amendment,
August 19, 2021. Further, after the time of a specified "Cure Date" (February 19, 2022), Licensor
has the capacity to perform due diligence which includes collaboration by the parties with the
Licensee making available to Licensor those documents Licensor may request relating to the due
diligence. Finally, if after the Cure Date, there are new breaches of the Agreement (the MLA)
identified by either Party, the Parties agree to work together with the breaching party undertaking

24

to cure the breach.

The underlying prerequisites to Licensor's charging (a penalty) for an uncured breach or imposing the termination consequence for an uncured Material Breach (as defined) are exacting in themselves (13(d) and 13(b), respectively), entailing notice and cure procedures as well as, in the case of a Material Breach, defined extra-Territorial conduct and/or consequential adverse act or failure on the part of Licensee. The Second Amendment supplements the protection the prerequisites of Section 13 accorded the Licensee. It makes rational business sense that where an advance multimillion dollar payment is made for an extended licensing term, the Licensee would seek or be accorded the benefit of these guardrails against abrupt, noncollaborative or over-aggressive penalties. With a meticulous analysis of each of the breaches asserted by Paul Frank in this Arbitration, the Arbitrator finds that none of the Claimant's breach allegations appears to have merit under the amended MLA, with its added protections.

The Arbitrator considered the categories of alleged breaches (both Material and Uncured) set forth by Paul Frank on its schedule for damages (page 79, Paul Frank Limited's Post-Hearing Brief). As stated below, these alleged breaches either fail to reach the definitional threshold for "breach" under the MLA or fail to survive the additional requirements for actionable breach imposed by the combination of the MLA and section 7 of the Second Amendment, as follows just below. (In almost all instances, Grand Union was not properly provided with a written notice of breach and contractual cure period that is prerequisite to finding a breach.)

1. Forgeries of Official Paul Frank Documents – all forgeries, if any, were by third parties or by sublicensees, not Grand Union; Grand Union did not know about the objectionable Hong Tong Fang use of a forged document until it was informed by Paul Frank at which time it took immediate action to investigate and cause Hongtongfang to undertake a cure (to close)

2. Unauthorized Registration and Sales - Unauthorized registrations of trademarks and URLs were by sublicensees, namely HangShou Mofang Farm and Dierui. Jennifer Huang addressed Dierui as soon as she was informed of unauthorized registrations; with respect to others, Paul Frank did not provide adequate notice under the MLA notice and cure procedure and did not follow the good faith collaboration requirement of the Second Amendment. For the alleged unauthorized registration of the Paul Prime trademarks, Paul Frank did not provide sufficient notice and opportunity to cure under the MLA; this infringement, if any, would have been waived with the Second Amendment.

3. Sales Outside of Territory and Distribution Channels – Paul Frank has demonstrated no sales outside of the permitted Territory or distribution channels by Grand Union, only by sublicensees. Paul Frank did not give adequately specific notice of the sales or distributions outside of the territory or outside of channels of distribution for Grand Union to address or attempt to cure those of which Paul Frank was apparently aware. Those of which Paul Frank was aware or should have been (none were concealed by Grand Union) were waived with the Second Amendment; as shown by Paul Frank's expert, others were not revealed by Paul Frank until the Arbitration, thus without the requisite collaboration between the Parties and without giving Grand Union an opportunity to cure.

25

4. Unauthorized Milk Tea and Hamburger Franchise – The milk tea violation was conducted by a sublicensee which, to the extent Grand Union was made aware of it, it timely addressed. Grand Union itself was permitted to engage in milk tea licensed services under its cafes and restaurants channel. Grand Union was given no notice of objectionable Hamburger Franchise activity or licensing until after the arbitration demand was submitted, thus, with no opportunity to cure.

5. Branded Products in China Failing to meet Inspection Standards – These are products offered by third parties or sublicensees. Some were approved or allowed by Saban (thus prior to the statute of limitations cut-off); some were also waived under the Second Amendment; for any that may have occurred after the Cure Date, no notice was given such that the Parties would have had an opportunity to collaborate or Grand Union the opportunity to cure. No substantial impact on market value or damages could be shown.

6. Unauthorized Co-branding – Much of the co-branding noted by Claimant's expert had been approved by Saban during its ownership; a large post-Saban co-branding item was the hotel rooms which was not addressed until the filing of the arbitration, thus not providing for collaboration or the opportunity for Grand Union to cure; other co-branding was known or should have been known by Paul Frank and was waived with the signing of the Second Amendment.

7. Unauthorized Promotion – According to Claimant's schedule, this caused little if any damage; there were no notices to Grand Union of unauthorized promotion until after the arbitration commenced, thus no opportunity afforded to Grand Union to collaborate or cure.

8. Sales Outside of Licensed Product Category – With Dierui, this is conduct by a sublicensee; additionally, most of these areas were known to Paul Frank and waived under the Second Amendment; the precious metal and gold and silver coin products were historical and barred by the Statute of Limitations; others were not raised until after the arbitration was commenced, hence not affording an opportunity for collaboration or cure efforts by Grand Union.

9. Sales after Sell-Off Period – this conduct, by definition, took place after Termination when no requisite collaboration or proper notice-and-cure could be afforded.

10. Failure to Provide Required Reporting – this alleged violation prior to the Second Amendment was obviously known to Paul Frank and waived with the Second Amendment. Following the Second Amendment, some reporting did take place; there was no notice in advance of the Termination that Grand Union's reporting under the Second Amendment was considered inadequate by Paul Frank, thus no opportunity to collaborate, work together or to cure was afforded to Grand Union.

11. Failure to comply with Audit Provisions – the MLA and the Second Amendment did not actually have audit provisions; the Second Amendment provided Paul Frank with the capacity to engage in due diligence and with a requirement that Licensee collaborate and make available requested documents. There was no showing of failure by Licensee to make available any requested documents, only its confusion about Paul Frank's communication that an audit was required or being ordered. Even if an audit were

26

contractually required (which it was not), no requisite notice and cure period was afforded.

12. Failure to Report Sublicenses – this accounts for relatively minimal damages according to Claimant; there was no notice to Grand Union of such alleged failure until after the arbitration, thus no opportunity to collaborate or to cure was afforded to Grand Union.

13. Damage to Goodwill – according to Claimant's experts, damage to goodwill has been assessed by them over the comprehensive situation and extended time frame, and not with respect to any individually alleged breach or violation (not associated with a particular breach or violation.

Determining whether there was a Material Breach or other breach by Grand Union of a contract like the amended MLA (with its notice, cure, collaboration and cooperation provisions) necessitates a close analysis of the alleged violations in the context of the definitions, steps and required procedures set forth in the MLA and in the Second Amendment. Damages are a required element of a contract claim. Yet Professor Merges testified that he depended on Mr. Moser for any facts that went into valuation; that he, Professor Merges, could identify what had a potential to harm brand value or goodwill, but he could not independently assign a value or extent of harm. Nor could Professor Merges verify the accuracy of the facts Mr. Moser cited or relied on. With respect to the usefulness of Mr. Moser's testimony to the assessment of whether there has been a breach causing damages, as is essential to prevail on a breach of contract claim in California, Mr. Moser testified that he had been unable to quantify the impact on the brand of any particular alleged breach. He described his analysis as calculating the overall impact of something which took place over years. Thus, whether one is evaluating an alleged Material Breach (as defined in the MLA) or a breach that does not fall within the Material Breach definition, neither Mr. Moser nor Professor Merges provides a means for calculating the harm or damages stemming from a violation or failed performance as would be necessary for establishing a breach of contract. In fact, since the contract structure in this relationship is that of a large prepayment at the commencement of the licensing period, and since, as Respondent's expert convincingly argues, diminution of goodwill cannot be accurately assessed or estimated simply by comparing the price or value of different licenses over different periods of time (given the number of factors at play), it is difficult to determine from the evidence any loss to Paul Frank or any adverse impact on brand value tied to a contractual breach.

The enumerations of categories of alleged Material and Uncured breaches set forth above illustrate the absence of any actual actionable breach (whether Material Breach or other Uncured Breach) by Licensee that fits the definitions and qualifications of the MLA and the Second Amendment. The Arbitrator has determined that this grouping of allegations by category, as well as the particular categories listed, satisfies the requirements under the JAMS Rules of a concise statement of the reasons for this Award, and, in this instance, for the finding of a lack of actionable breach by Grand Union.

### C. Paul Frank's Claim of Material Breach Fails as Grounds for Termination of the MLA

In August 2022, Paul Frank attempted to issue a Notice of Termination (either for the purpose of forcing a concession from Respondent and a new amendment to the MLA (as previously) or for the purpose of actually terminating the license in accord with such Notice). As discussed in the Agreement section above, the MLA allows the Licensor to terminate in the event

27

Licensee commits a Material Beach (as defined) and does not cure it within 30 days of Licensor's written notice to Licensee of that Material Breach. Claimant contends that Paul Frank gave Grand Union proper notice and an opportunity to cure in its Notice of Termination. Paul Frank's expert stated that the process amounted to "a very clean termination, in terms of the steps they [Paul Frank] went through and the timing and the sort of mechanics of notice."

In fact, the Notice of Termination was ineffective. The August 24, 2022 Notice of Termination set forth four grounds for termination, all ostensibly Material Breaches as required by the MLA to support a Termination by Licensor:

1. Paul Frank alleged that Grand Union forged Paul Frank's official stamp on documents which it then provided to certain Platforms to open up online stores;

2. Paul Frank alleged, without specificity, that Grand Union, "has sold and/or distributed Licensed Products outside the Territory and the Channels of Distribution;"

3. Paul Frank alleged that Grand Union did not cure "existing or potential" breaches of the MLA during the Extraordinary Cure Period described in the Second Amendment (with complete lack of specificity or clarity about what "existing or potential" breaches); and

4. Paul Frank alleged that Grand Union wrongfully denied Paul Frank's request for an audit.

All four allegations failed as grounds for Termination because they did not amount to Material Breaches as defined in the MLA, as follows:

1. Grand Union was never shown to have forged official stamps or official Paul Frank documents. In fact, both Parties were aware that a sublicensee, frustrated by its inability to get a letter of authorization (LOA) from Paul Frank through Grand Union had submitted an inauthentic LOA in an effort to open an online store. Grand Union learned of this inappropriate action from Paul Frank on April 19, 2022, and was in the process of investigating it when Paul Frank issued the Notice of Termination. For the conduct, "beyond the scope of rights granted under the Agreement" to amount to a Material Breach, (a) it must have been carried out by the Licensee itself, and (b) it must materially and adversely affect the goodwill and market value of the Property (the brand) for more than 120 days. Neither (a) nor (b) were the case.

2. Grand Union did not know what Licensed Products Paul Frank's over-general language was referring to and did not learn until after the arbitration commenced. It emerged then that Paul Frank was referring to branded Sunglasses sold in Indonesia by a former sublicensee. Thus, this conduct "beyond the scope of rights" and also, outside the Territory, was carried out by a former sublicensee, not by Grand Union. This was not a Material Breach and, in any event, was waived under the Second Amendment.

3. The Notice of Termination provided no explanation at all to identify "the existing or potential" breaches of the [MLA] during the Extraordinary Cure Period that had not been cured. Grand Union did not know if they existed, or, if so, if a cure would be possible to avoid Material Breach. In effect, no notice was afforded by this language.

28

4. As for the allegation of wrongfully denying Paul Frank's request for an audit, Grand Union did not realize that this "audit" demand was a due diligence request Paul Frank had made for books and records. Such a demand was not expressly made. In any event, the failure to comply with an audit demand was not the basis for "Material Breach" under the MLA.

After receiving this Notice of Termination, Jennifer Huang, Licensee's General Manager of the Licensing Management Department asked for further information to help her understand the Paul Frank's accusations and in order to help Grand Union cure or correct. Mr. Zheng tried promptly to get a meeting with Stan Wan, the CEO and Chairman of Futurity Brands Group. Mr. Wan proposed a "cure" which would require Grand Union to waive any claims against Paul Frank, put Paul Frank in the position of issuing all LOAs and anti-counterfeiting labels directly to sublicensees (thus taking over the basic licensing activites for the Territory), accord Paul Frank a super-majority interest in the profits from the branded adult apparel products, and require Respondent to take over the responsibility for developing the A.NI.MA brand globally, an expensive ground-up project. Mr. Zheng was unhappy and angry that the collaboration and working together/cooperation that the Second Amendment was supposed to afford did not happen.

Mr. Zheng and Ms. Huang did not believe Grand Union was in Material Breach, and Mr. Zheng did not want to agree to what he considered an unfair and onerous proposal. Ms. Huang denied the accusation in writing to Ms. Hana Mu, then Futurity's Director of Legal and Corporate Affairs, and asked her to provide proof for the Material Breaches alleged. Ms. Mu refused to provide the explanation or materials, indicating among other noncollaborative comments that "We assume they know everything." Again, the collaboration required by contract was not afforded.

On September 23, 2022, Mr Zheng received a formal letter from Paul Frank referencing the August 24, 2022 Notice of Termination and confirming that the MLA was now terminated pursuant to Section 13(a)(iii) of the MLA which depends both on Licensee's committing a Material Breach and failing to cure a Material Breach.

Paul Frank's conduct went beyond sending the unjustified formal letter of Termination. It also began to undermine Grand Union's relationships with its sublicensees by issuing letters of authorization from Paul Frank directly to the sublicensees, letting them know it was stepping in for Grand Union and beginning to negotiate new license agreements with some of them. The relationship between Grand Union and at least one of its sublicensees was already fragile because Grand Union had been unable to deliver an authenticated letter of authorization to that sublicensee due to Paul Frank's refusal to cooperate in giving it to Grand Union. That in itself, may have been the reason for a sublicensee's forging Paul Frank's official stamp on documents (if it did), in order to provide certain Platforms with the document required to open up online stores. This was the "forgery" that formed the basis for one of the alleged "Material Breaches" which Paul Frank attributed to Grand Union.

Following the formal Termination on September 23, 2022, Paul Frank then contracted with Grant Thornton, forensic accountants, to help it identify potential breaches by Grand Union of the amended MLA. Paul Frank then submitted its Demand for arbitration against Grand Union on November 22, 2022.

**D. Paul Frank's Failed Notice of Termination and its Actual Termination of the MLA Amount to its Material Failure to Perform under the MLA.**

29

The effect of the formal Termination by Paul Frank, of its refusal to work with Grand Union to enable Grand Union to understand the substance of the Material Breach(es), if any, and thereafter, to attempt to cure them, and of Paul Frank's refusal to issue a notarized POA or LOA as needed by Grand Union's sublicensees to market the brand, is that Paul Frank suspended its performance, as it is admitted, without justification, under the MLA at least two months before the purported Termination Date. That is, Paul Frank breached the contract by materially ceasing essential performance during the contract term.

Paul Frank's failure to substantially perform under the contract (the MLA) as described, excused any breach, if any, of which Grand Union was accused by Paul Frank. Paul Frank's defective Termination Notice, its failure to provide notarized LOAs and POAs to Grand Union, its issuing of its own letters of authorization to Grand Union's clients and identifying itself to Grand Union's sublicensees as the real party in interest, demonstrate its own substantial breach. These actions also demonstrate that, given the timing of its letter of termination and the events surrounding it, Paul Frank deprived Grand Union of its contracted for opportunity to cure alleged breaches it may have committed. Paul Frank's August 24, 2022 Notice of Termination was invalid.

Accordingly, the MLA was not properly terminated and should have remained in effect to the present. That said, there are additional reasons that none of the other alleged breaches would have provided a basis to terminate the MLA. In addition to the specific reasons discussed above, Paul Frank has not demonstrated that any of so-called breaches had an adverse and material effect on the goodwill and market value of the Property.

In sum, the amended MLA was a valid and binding agreement. Grand Union fully performed under the MLA. Grand Union paid the $65 million upfront license fee contemplated by the MLA, the $8.5 million payment in the Second Amendment, and complied with its other obligations under the MLA. To the extent there were any breaches or shortcomings under the MLA (whether or not allegedly Material), they were waived under the Second Amendment. As discussed, with respect to any alleged breaches or violations following the institution of the Second Amendment, contractually required opportunities for notice and cure, working together and collaboration were not afforded to Grand Union. Grand Union should be given the benefit of the bargain it made, as it requests.

### E. Paul Frank's Failure to Perform under the MLA Amounts to Breach and Entitles Grand Union to the Benefit of the Bargain it Made and For Which It Paid.

As discussed above, it was Paul Frank that breached the MLA. Paul Frank breached Section 1(a) of the MLA and Section 2(ii) of the Second Amendment by withholding notarized LOAs and trademark certificates, and disrupting Grand Union's rights to an exclusive license to the Licensed Products and Licensed Services in the Territory. Paul Frank also breached the MLA by interfering with Grand Union's rights to sublicense the Paul Frank Brand, by suspending Grand Union's license, and by instructing the sublicensees to work with Paul Frank instead of Grand Union. Ms. Mu admitted that Paul Frank stopped performing under the MLA, thus appearing to confirm that a breach took place. Paul Frank also breached the MLA by purporting to terminate the MLA without complying with the termination provision set forth in Section 13, including the requirement for notice and cure. Additionally, Paul Frank never attempted to cure, remedy or mitigate the adverse effects on Grand Union of Paul Frank's material failure to perform.

30

Further, Paul Frank failed materially to provide benefit with respect to Section I (i) of the Second Amendment because it agreed to license the A.NI.MA Brand to Grand Union but, prior to the signing of the Second Amendment, registration of the A.NI.MA trademarks was not complete so as to permit Grand Union's commencement of the development of the brand. By purporting to terminate the license when it did, Paul Frank did not allow for any correction or collaboration with respect to that lapse, and Grand Union could not meaningfully develop the Brand it had paid for. Paul Frank's breaches damaged Grand Union significantly. Grand Union's sublicensees likely suffered significant financial losses. Grand Union was deprived of the benefit of the remaining eight years for which it had paid a large portion of its \$73.5 (65 + 8.5) million advance payments.

## VI.    LIABILITY CONCLUSION

The undersigned Arbitrator came to a decision regarding liability, finding basically that Grand Union had not committed a Material Breach and that Paul Frank had failed materially to perform, thus entitling Grand Union to damages on a breach of contract theory measured by a wasted costs measure which Respondent through its expert witness presented at the Hearing stage, and which the Arbitrator, in subsequent rulings on the Parties' requests and motions, confirmed as being a form of reliance damages under California law. As set forth in the Interim Award, the Restated Interim Award and the Revised Restated Interim Award, the Arbitrator decided the following, and, thereby, found that there was no basis for an award of damages to the Claimant, and that there was a basis for an award of damages to Respondent. The Arbitrator:

(a)    Denied all claims for relief asserted by Paul Frank in this Arbitration;

(b)    Declared that Grand Union has not committed a Material Breach as defined in the amended MLA;

(c)    Declared that Paul Frank's purported termination of the MLA is invalid and ineffective; and

(d)    Granted Grand Union its counterclaims against Paul Frank for Paul Frank's failure and refusal to perform, and awarded Grand Union its damages for Paul Frank's breach (due to its failure and refusal to perform) with such damages based on the wasted costs measure articulated at the Arbitration, including interest allowed by California law.

Given that the above liability decision forms a basis for damages to be awarded to Grand Union, which the Parties discussed and debated in their various briefings about damages and in other Requests and Motions between June 25, 2024 and May 28, 2025, the Arbitrator has withdrawn the specific performance and injunctive-type temporary measures or suggestions set out in the Interim Award. These injunctive measures were possible measures or bases for the Parties to attempt to mitigate damages, if possible, to avoid future damages to the brand or to their business relations, to avoid losses and/or to preserve business relations or the potential therefore, and/or to wind-down in an orderly manner during the period, within the jurisdiction of the Arbitration, prior to the final determination of the specifics of the damages remedy and amount. These measures were in large part ignored or objected to by the Parties. Thus, at this stage, the Arbitrator is not imposing on any Party any new performance requirements or any injunctive relief measures (such as providing formal documents, etc.) that would require them to resume, preserve status quo or conduct their activities consistent with the terms of the MLA or Second Amendment.

31

Claimant's expert Bryan C. Moser sets out in his "Response to Restated Interim Award and Opening Brief Report, page 13, a general rule about the application of the wasted costs measure in contract or license disputes, which applies here to avoid the potential for a duplicative recovery to Respondent for the liability determined here. Mr. Moser's general rule merits quotation in full:

> "¶ 49. The wasted costs measure, as it is applied, does not consider Grand Union's resumption of its activities as licensee. The wasted costs damages calculation effectively refunds Grand Union the portion of the license fee relating to the period from termination to the end of the MLA in 2030. It assumes that Licensee will not resume activities, effectively resulting in a refund of the license fee to Grand Union for future periods even though Grand Union will [or would] now continue to have use of the license. As such, no credit is given for the fact that resumption of the license …[would] enable Grand Union to continue to receive the benefit of the MLA in the future. This essentially results in a "double dipping" of damages. By awarding both all the wasted costs damages and resumption of the license, Grand Union is essentially receiving free use of the license until February 28, 2030."

Thus, accordingly, the Arbitrator makes clear that only wasted cost damages, a reliance-type damages measure, is being applied here, and that injunctive or other specific performance measures are not imposed by this Award.

Fees and costs of arbitration to date were not awarded.

## VII.  DAMAGES DISCUSSION

### A. Reliance Damages in the Form of "Wasted Costs" are allowed in California for Breach of Contract

Claimant argues in its damages briefing that wasted costs damages are not a "proper form of damages" in California law. According to both the California Legislature and the California Supreme Court, the goal of a breach of contract action is to put a claimant in the position in which that party would have been had the breach not occurred. Section 3300 of the California Civil Code states that for a breach of an obligation arising from contract, the measure of damages is the "amount which will compensate the party aggrieved for all the detriment proximately caused thereby" or the amount which, "in the ordinary course of things, would be likely to result therefrom."

As the Arbitrator discussed in her May 8, 2025 Ruling on Matters Raised in Claimant's Request for Stay or Reopening of Arbitration, the Parties' Arbitration Agreement governing this action does not specifically restrict the damages that may be awarded (other than a reference it makes to injunctive relief in a situation irrelevant to this discussion).

California law generally recognizes two fundamental types of damages, expectation damages and reliance damages. These may go by a number of names or labels such as "benefit of the bargain" damage, "direct" losses and consequential" damages, "out-of-pocket" costs, and even "restitution" damages. However, the type of specific damages is described in actual fact, its characterization as, for example, lost wages, increased cost of a widget, substitution or replacement, etc. will not in itself preclude consideration of one type of loss or damages, or

32

another. This general rule can be contrasted to the specific instance relating to the application of, for example, the "American rule" where characterizing damages expressly as "attorneys' fees" may well mean they are precluded from the category of compensable damages in certain circumstances.

Here, the wasted cost damages referred to in Respondent's briefing, in its expert's report and summary, and during the hearings are a concrete description of reliance damages. Reliance damages are allowed in California for breach of contract, particularly when expectation damages (the amount the non-breaching party would have earned if the contract had been performed) are difficult to prove, overly speculative, or the contract in question may have been unprofitable. Reliance damages aim to put the non-breaching party in the position they would have been in had they not relied on the breaching party's promise. Reliance damages may be awarded if expectation damages are too speculative or the claimant suffered a loss due to breach, but the expectation loss is uncertain or not readily ascertainable. Generally, both reliance damages and expectation damages are not awarded with respect to a single claim or transaction because the party could end up being overcompensated rather than being fairly compensated for a loss. The point is to attempt to place the non-breaching party in the financial position they would have been prior to their reliance on a promise which resulted in a loss to that party when the breaching party did not keep the promise.

Judicial Council of California Civil Jury Instruction No. 361 provides the following (editable) instruction with respect to "Reliance Damages":

> "If you decide that [name of defendant] breached the contract, [name of plaintiff] may recover the reasonable amount of money that [he/she/nonbinary pronoun/it] spent in preparing for contract performance. These amounts are called "reliance damages." [Name of plaintiff] must prove the amount that [he/she/nonbinary pronoun/it] was induced to spend in reliance on the contract. If [name of plaintiff] proves reliance damages, [name of defendant] may avoid paying [some/ [or] all] of those damages by proving [include one or both of the following]

> [1. That [some/ [or] all] of the money that [name of plaintiff] spent in reliance was unnecessary;]. [or]

> [2. That [name of plaintiff] would have suffered a loss even if [name of defendant] had fully performed [his/her/nonbinary pronoun/its] obligations under the contract]."

In its Damages briefing, Respondent cites the Restatement (Second of Contracts) Section 349 providing for reliance damages, which may include expenditures made "in preparation for performance or in performance" as an alternative measure of damages in breach of contract actions. California Supreme Court and appellate court cases allowing for reliance damages include the situation where a party made expenditures on the "faith of the contract," *Agram v. Gavra*, 236 Cal..App.4[th] 91 (2015); or where one party to a contract who is willing to perform it is prevented from doing so by the other party, and the measure of damages is the amount of his loss, which may be his reasonable outlay or expenditure toward performance, *Buxbom v. Smith*, 23 Cal.2d. 535 (1944).

33

Claimant provides no citation to any case that holds against awarding reliance damages, where suffered, or against awarding lost costs or expenditure damages (by any other name) in reliance on the terms of a contract or contractual obligation. Rather, Claimant cites *Cooper v. Lavely & Singer Pro. Corp.*, 230 Cal.App.4th 1,17 (2014) which speaks more to the scope and standards for judicial review of an arbitration award where the remedy is not authorized by the parties' arbitration agreement or applicable law, rather than addressing the unavailability of reliance damages, by any name. Also, both Parties here appear to recognize that *Fahnestock & Co v. Waltman,* 935 F.2d 512, 519 (2d Cir. 1991) is inapposite.

At the Hearing, Grand Union demonstrated that it "expended [the license fees] on the faith of the contract (the MLA)." Respondent made a large flat fee payment and, on a subsequent transaction, another large flat fee payment in exchange for the promises it bargained for in the MLA and in the Second Amendment. The California case law makes clear that the Respondent's burden of establishing reliance damages is not hefty. Rather, as *Agam v Gavra*, 236 Cal.App.4th 91, 105 (2015) states, following the well-preserved US Supreme court case, *US v. Behan, 110 U.S.,* 338 (1884), the nonbreaching party is "clearly entitled to recover his or her actual outlay or expense, unless the other party, who has voluntarily stopped the performance of his or her contract, can clearly demonstrate that lack of entitlement." In addition to the clear entitlement of a nonbreaching party to "recover his or her actual outlay and expense," *[Agram, at* 91], there are only two limitations under California law that serve to reduce reliance damages. One is where respondent has made large or extravagant expenditures him- or herself in reliance on the contract, and awarding the claimant's reliance could be unjust. The other is where the breaching party can demonstrate that the non-breaching party would have suffered a material loss if, in fact, the breaching party had performed. Claimant did not establish these limitations, and they do not appear to have been present in the circumstances presented in this Arbitration. Therefore, the money that Respondent spent in preparation for the contract performance, in this case, the License Fees, is recoverable as "reliance damages." This measure is not a future damages sum in that the amount is not paid on an installation or other periodic basis stretching into the future, nor is it paid in reference to an amount anticipated to be earned in the future. Rather, the sum has already been spent by Respondent as a flat fee, fully transmitted in the past, paid on the "faith of the contract," in preparation in the past for expected performance.

### B. Respondent did not Waive its Entitlement to Reliance Damages with Respect to the License Period following the September 22, 2022 Termination and Breach.

Claimant argues that in the event the Arbitrator allows wasted costs or reliance damages as a measure, the Arbitrator should nonetheless deny Respondent this remedy because Respondent waived the entitlement to them by failing explicitly to include a demand for reliance damages in its briefing or other presentations in this Arbitration. The Arbitrator considered this contention in previous rulings addressing the briefing on Requests for Stay or Reopening of the Arbitration and determined that Respondent's damages expert, Pauline Booth, adequately prepared the Claimant for a reliance-type measure when she opined about and explained the wasted costs recovery, and the results of applying it, as did Respondent in its briefing when it sought the wasted costs measure.

As previously ruled, Respondent did not waive a Wasted Costs measure of damages, and it adequately notified Claimant that it was seeking to apply one. However, in keeping with that notification, the Arbitrator finds that this measure should not be applied to claim potential damages prior to September 23, 2022. As Claimant argues, Ms. Booth's application of the Wasted Costs

34

(reliance) measure is in relation to the termination of the MLA on September 22, 2022. As Ms. Booth calculates from the termination date of September 22, 2022, Respondent is 7 years, 8 months and 23 days into the 15 year and 2-month contract term, in reliance upon which Respondent made its lump sum licensing payment.

Thus, there is no waiver with respect to Respondent's claiming Wasted Costs damages for the period commencing September 23, 2022 (after September 22, 2022).

### C. Reliance Damages in the Form of "Wasted Costs" are Appropriate to Address Paul Frank's Material Breach of Grand Union's Contractual Rights and Expectations under the MLA.

Claimant also objects that the Wasted Costs measure is not a true measure of Respondent's damages, and that the length of the period of time for which Respondent expected to hold the license cannot simply be divided by what Respondent paid since, (i) Respondent might be expected to make different amounts of revenue over time (and, in fact, it was estimated by Ms. Booth, in the event the license had not been breached, to continue to earn much the same in royalties as Respondent had earned over the previous two years) and (ii) Respondent cannot collect for future damages. Claimant's first objection (i) is, in fact, directed towards an expectation measure not a reliance measure. The second objection (ii) is not a concern here, as discussed above.

In this case, attempting to use an expectation form of damages, and accounting for the factors that might affect them could be a complex and dauntingly hard task. Thus, the reliance measure, which fits the facts, is far more appealing for its simplicity and the more certain nature of the damages sum. So too, the measure will not vary over the years, in different years, because, in fact, we are looking at a specific fixed flat fee paid for the expectation of a reliable and available license which Respondent might have used to grow or enhance a business in any number of ways over years (with varying amounts of profits, or with some profitable years and other unprofitable years in development). A flat license fee is typically fixed by contract and, in general, is arrived at by the parties through contract negotiations, and then accepted by them. This typicality of the flat license fee, among other factors, makes it a fair and well-grounded figure for valuing what Respondent lost when the breaching party refused to permit Respondent to use or exploit the license that was granted (however uncertain future profits or other indicia of success may have been at the time of the grant). In this case, the reliance measure of damages, characterized as "Wasted Costs" by Respondent's expert, provides a far more stable and easily ascertainable number than an expectations measure would be under the circumstances of a long-term license subject to the vicissitudes of the retail market.

As the evidence established in this Arbitration, Respondent Grand Union made an upfront, flat fee payment of Sixty-Five Million dollars ($65,000,000) conveyed in two tranches in 2015 of $10 Million and $55 Million, respectively for a license to run from January 1, 2015 to January 28, 2030. Referencing the MLA, Ms. Booth, in her Opening Report, refers to these two payments upon which reliance damages are founded: Grand Union paying "a fully paid-up license fee US $55 million," and a "non-refundable extension fee of US $10 million," both paid at the outset of the license period. Respondent argues that, although Ms. Booth definitively points to September 23, 2022, as the date from which to calculate the loss to Grand Union of its benefit of the bargained-for performance (based on the date of Claimant's wrongful termination of the MLA, and attendant deprivations of the benefit of Respondent's bargain), other earlier breach periods would be appropriate given various instances of Paul Frank's refusal to perform. Nonetheless, considering

35

Claimant's waiver position and the strength of the argument calling for notice to Claimant, this Arbitrator has chosen the time period explicitly identified by Ms. Booth: September 2022, through the contractual termination of the license period of the MLA, February 28, 2030 ("License Period").

Thus, the MLA was terminated by September 23, 2022, 7 years, 8 months and 23 days into the 15-year and 2-month contract term. As Ms. Booth states in her Opening Report, Section 6, the amount of a fully paid-up license fee is typically spread over the license period for which the rights are granted. In this case, this kind of calculation is consistent with Grand Union's amortization of the license fee in its financial statements, as referenced by Ms. Booth. At the termination date, according to Ms. Booth in her Opening Report and March 7, 2024 presentation, a portion of the fixed license fee that may be apportioned to the license period from January 1, 2015, through September 23, 2022, is US $28,033,883, leaving US $26,966,117 for the remainder of the license period and the amount of Wasted Costs damages attributed to the unjustified termination in the breach by Claimant of the MLA.

### D. Grand Union's Entitlement to Reliance Damages for Breach of the Second Amendment or for the Payment of Brand Management Fees is not Adequately Demonstrated and No Injunctive Relief is Granted.

Beyond the **$26,966,117** in Wasted Costs damages for wrongful termination (breach) of the MLA, Grand Union also claims, and Ms. Booth calculates, further Wasted Costs damages (payments by Respondent in reliance on Paul Frank's breached promises) of the **$8.5 Million** paid by Grand Union to Paul Frank for the A.N.I.M.A. brand and other consideration under the Second Amendment entered into by the Parties on or about August 19, 2021, and **$217,178** for payment of a Brand Management Fee.

With respect to the Guaranteed Minimum Payment made for the Second Amendment (for the same term as the MLA), it is clear from the evidence that Grand Union was disappointed by Paul Frank's delayed and inadequate performance. Nonetheless, there is also no question that Grand Union received something for that payment which it valued, including, if nothing more, the assurance about a waiver of liability for certain alleged past breaches by Grand Union prior to the Second Amendment. Grand Union would also argue that it did not have the benefit of that consideration since, even with the Second Amendment in place, Paul Frank at various times (including during this Arbitration) denied that the Second Amendment acted as a waiver of those alleged breaches. Still the waiver of past breaches by virtue of the Second Amendment figured in the Arbitrator's assessments of the liability of Claimant and/or Respondent under the MLA-related claims in this Arbitration. The Arbitrator has determined, with respect to the damages claim on the Second Amendment ($8.5 million) payment, that Grand Union did not adequately examine and separate out aspects of the promised performance it was denied from those that were delivered. While reliance damages are requested by Respondent under the Second Amendment, Respondent's entitlement to them for breach by Claimant of the Second Amendment has not been clearly or adequately demonstrated.

The Brand Management Fee is also included by Ms. Booth and by Respondent in their arguments about the categories of reliance damages to which Grand Union is entitled. While Ms. Booth includes them as a line item, Respondent never adequately argued for these fees to be included in its reliance damages argument. For that reason, the Arbitrator did not previously award

the Brand Management Fee expressly as a portion of Respondent's damages, under a reliance theory or any other theory, and does not do so now.

At this stage in the proceedings, there is no basis for injunctive relief whether in the form of requiring a press release, some means of preventing damages to business relationships, setting up a means for monitoring third party violations of rights, requiring the provision of formal trademark documents, etc. The only form of award provided here is monetary damages, and Respondent is the prevailing party.

### D. Grand Union is Entitlement to Pre-judgment Interest at the California Statutory Rate on the Wasted Costs ("Reliance Damages") Awarded for Claimant's Breach of the MLA.

JAMS Rule 24(g), applicable in this Arbitration, states that the "Award of the Arbitrator may allocate attorneys' fees and expenses and interest (at such rate and from such date as the Arbitrator may deem appropriate) as provided by the Parties' Agreement or allowed by applicable law," The applicable law in this proceeding is California law in accord with which arbitrators are permitted to award interest: "[u]nless otherwise agreed by the parties, the arbitral tribunal may award interest," Cal. Civ. Proc. Code Section 1297.317. There is no pre-existing agreement of these Parties against the award of interest on arbitration awards.

Further, as explained by renowned International Commercial Arbitration author Gary B. Born, in *International Commercial Arbitration* (Third Edition) (Kluwer International, *updated* August 2022) cited as Respondent's RLA-93 (at text accompanying footnotes 651-654), "[r]equests for an award of interest raise choice-of-law issues. In particular, as in other contexts, questions arise as to the tribunal's authority to award interest and the standards governing the exercise of such authority. As to the tribunal's authority or power to award interest, there is a substantial argument for applying the law governing the arbitration agreement, on the rationale that the arbitrators' authority derives from the agreement to arbitrate. An alternative approach is to apply the law of the arbitral seat – on the theory that most questions regarding the arbitrators' authority are governed by the law of the seat, including competence-competence, authority to grant provisional measures and authority to order disclosure. Although there is room for debate, the better view is that, absent contrary agreement, questions concerning the arbitrators' authority to award interest are subject to the law of the arbitral seat. It is that law which is generally regarded as having the closest connection to questions of the tribunal's procedural and remedial powers and which should ordinarily be applicable to questions regarding the arbitrators' authority."

Whether one follows the "substantial argument" for applying the law governing the arbitration agreement, or the "better view" that interest awards in arbitration are subject to the law of the arbitral seat, the Arbitrator in this proceeding has ample reason, in the arbitrator's broad discretion, to apply the California statutory rate of ten percent (10%) simple interest per annum which, in California, applies in the event of a contract breach, to award pre-judgment interest in this matter. See, e.g., *Good Times Restaurants, LLC v. Shindig Hospital Group LLC,* 2025 WL 522872 *2 (N.D. Cal). 2025) (Respondent's Legal Authority RLA-102) (ordering defendants to pay prejudgment interest on the outstanding amounts owed at the prevailing rate of 10%, measured from the date on which the outstanding amounts were due under a contract claim resolved by settlement agreement, and citing Cal. Civ. Code § 3289(b) (identifying 10% per annum as the rate of interest after a breach of contract)).

37

685

Accordingly, in accord with the damages award in the Interim Award of June 13, 2025, Respondent, through its counterclaims against Claimant, is entitled to damages from Claimant due to Claimant's failure and/or refusal to perform, with such damages in the amount of (a) US **$26,966,117** to be based on the wasted costs (reliance measure) articulated at the Arbitration, plus (b) any interest allowed by California law. That pre-judgment interest owed to Respondent shall run from February 23, 2022 (the date of Claimant's breach) through the date of the Final Award, anticipated to be July 2, 2025. This amounts to pre-judgment interest for 1,225 days (the number of days between the date of the breach and the Final Award). Applying the rate of ten percent (10%) simple interest per annum or a daily rate of 0.027% against Grand Union's **$26,966,117** in damages leads to daily interest of $7,387.98 per day; calculated over a period of 1,225 days to the principal amount yields a total interest amount of US **$9,050,272.14**.

Additionally, the Arbitrator, in her discretion, assesses interest at the rate of ten percent (10%) simple interest per annum or a daily rate of 0.027% on the amount awarded in the Final Award (the principal amount of the money judgment), until it is paid, as permitted by Cal. Civ. Pro. Code § 685.010(a)(1).

Thus, the monetary award to Respondent in this Final Award is **$36,016,389.14** (consisting of damages in the principal amount of US $26,966,117 and 10% simple interest from February 23, 2022 until the date of the Final Award in the amount of US $9,050,272.14) (the "Awarded Amount"), plus interest of 10% simple interest, per annum (or a daily rate of 0.027% ) on any unpaid portion of the Awarded Amount from the date of the Final Award until the full satisfaction of the Final Award.

## VIII.  SUMMARY OF AWARD

(a)      Respondent has not committed a Material Breach with respect to Claimant that is actionable as defined in the amended MLA;

(b)      All claims for relief asserted by Claimant in this Arbitration are denied;

(c)      Claimant's purported termination of the MLA with respect to Respondent was invalid, ineffective and amounted to a breach of the MLA;

(d)      Respondent has not established its entitlement to damages for any failures by Claimant during the term at issue to perform under the Second Amendment

(e)      Respondent, through its counterclaims against Claimant, is entitled to monetary damages from Claimant due to Claimant's its failure and refusal to perform, such damages in the amount of (a) US **$26,966,117** to be based on the wasted costs measure articulated at the Arbitration, plus (b) any interest allowed by California law.

(f)      Claimant shall pay to Respondent **$36,016,389.14** (consisting of (a) damages in the principal amount of US $26,966,117 and (b) 10% simple interest from February 23, 2022 until the date of the Final Award in the amount of US $9,050,272.14) (the "Awarded Amount"), plus (c) interest of 10% simple interest, per annum (or a daily rate of 0.027% ) on any unpaid portion of the Awarded Amount from the date of the Final Award until the full satisfaction of the Final Award.

(g)      Respondent is the prevailing party.

38

(h) There is no award of costs or fees. All Parties are responsible for their share of the costs of the arbitration.

## IX. ALL ISSUES SUBMITTED FOR DECISION IN THIS PROCEEDING HAVE BEEN RESOLVED

This is a FINAL Award in a binding arbitration and resolves all claims and issues submitted for decision in this proceeding.

All requests and additional requests for reconsideration to date have been addressed and/or denied on the grounds that these submissions by Claimant addressed issues that had already been resolved or had been eliminated by the Interim and/or Restated Awards, and there were no procedural irregularities alleged.

All Objections to Jurisdiction and Request for Dismissal related thereto have been or are denied on the grounds that these submissions by Claimant were without basis, as set forth herein and in a previous ruling, or are based on grounds previously considered which remain without basis. This includes Claimant's Continuing Objection to Arbitrator's Jurisdiction and Motion to Dismiss submitted on June 20, 2025, which are hereby, respectively, dismissed as baseless and denied, on the same grounds as those stated in the Ruling issued by this Arbitrator on June 19, 2025, respecting Claimant's June 11, 2025 Objection to Jurisdiction and Motion to Dismiss.

The Interim Awards and any restated interim awards are incorporated in this Final Award. For the purposes of clarification, some points are addressed in different or greater detail in this Final Award than they were in the Interim Award(s).

This Final Award is in full and complete settlement, resolution, and satisfaction of any and all claims submitted in this Arbitration. Any other claim not specifically addressed herein is deemed denied.

In accord with the Parties' Arbitration Agreement, Parties have consented that judgment upon this Final Award may be entered and enforced in any court having jurisdiction thereof.

IT IS SO ORDERED.

Dated: July 2, 2025

Elizabeth Hasse, Esq.
Arbitrator

SEE ATTACHED
CALIFORNIA COMPLIANT
NOTARY CERTIFICATE

39

687

## PROOF OF SERVICE BY U.S. MAIL

Re: Paul Frank Limited vs. Grand Union International Trading Limited
Reference No. 5220002118

I, Aimee Hwang, not a party to the within action, hereby declare that on  July 2, 2025. I served the

attached FINAL AWARD on the parties in the within action by depositing true copies thereof enclosed in sealed

envelopes with postage thereon fully prepaid, in the United States Mail, San Francisco, CALIFORNIA,

addressed as follows:

Matthew Weldon Esq.
Thomas A. Warns Esq.
K&L Gates LLP
599 Lexington Ave.
Floor 32
New York, NY  10022-6030
   Parties Represented:
   Grand Union International Trading Limited


I declare under penalty of perjury the foregoing to be true and correct. Executed at San Francisco.

CALIFORNIA, on  July 2, 2025.


Aimee Hwang

688

加利福尼亚州

州务卿

本附加证明书不得在美利坚合众国本土、领地和属地使用。

| 附加证明书 | | |
|---|---|---|
| （1961 年 10 月 5 日海牙公约） | | |
| **1. 国家：** | 美利坚合众国 | |
| **本公共文件** | | |
| **2. 签名人** | *Matt G. Miller* | |
| **3. 行事身份** | *加利福尼亚州公证员* | |
| **4. 加盖印章** | *加利福尼亚州公证员 Matt G. Miller* | |
| **已证明** | | |
| **5. 地点** | 加利福尼亚洛杉矶 | **6. 日期** 2025 年 7 月 15 日 |
| **7. 认证人：** | 加利福尼亚州州务卿 | |
| **8. 编号：** | *14719* | |
| **9. 印章：** | （印章：加利福尼亚州 大印） | **10. 签名：** |

本附加证明书仅对本公开文件中的签名、签署本公开文件人士的职能以及在适当情况下文件中印章的真
实性进行证明。

本附加证明书不对其为之签署的文件内容做出证明。

欲验证本证明真实性，请至：apostille-search.sos.ca.gov/。

根据 1961 年 10 月 5 日海牙公约，本证明若在非公约成员国使用则不具附加证明书的效力。在此情况下，
本证明应呈交至该国机构的领事部门。

Sec/State Form NP-40 LA（2021 年 01 月修订）



## 加州通用公证确认书

填写本证书的公证人或其他官员仅核实签署本证书所附文书的个人的身份，而不核实该文书的真实性、准确性或有效性。

加利福尼亚州}

旧金山县}

___Lizbeth Hasse___（签署人姓名）于 2025 年 7 月 2 日亲至本公证员 MATT G. MILLER 而前，基于充分的证据向本人证明，其确为在本文书上签名之人，并向本人确认其是以授权身份签署本文书，且通过其在该文书上的签名，其所代表的实体已签署本文书。

本人根据加州法律以伪证罪罚则确认前述内容真实准确。

本人特此签字并加盖公章，以兹证明。

签字

                                              **MATT G. MILLER**

                                    公证员注册编号：#2517976

                                公证印章的制造商注册编号：#NNA1

                                              公证员

                                            加利福尼亚州

                                              旧金山县

                              本人的委任有效期至：2029 年 5 月 18 日

                                              印章

-------------------------------------选填内容-------------------------------------

尽管本部分为选填内容，但完整填写本页信息可有效防止文件被篡改或本表格被欺诈性附加至非目标文件。

**随附文件说明**

文件标题/类型：     文件日期：2025 年 7 月 2 日

页数：39    除上述署名者外的其他签署人：

**签署人声明的法律身份**

签署人姓名： Lizbeth Hasse    　　　　签署人姓名：_____

☐公司高级管理人 - 职务_____    　　☐公司高级管理人 - 职务_____

☐合伙人-☐有限合伙☐普通合伙    　　　☐合伙人-☐有限合伙☐普通合伙

☐个人☐事实代理人    　　　　　　　　☐个人☐事实代理人

☐受托人☐监护人或财产管理人    　　　☐受托人☐监护人或财产管理人

其他：_____（仲裁员）    　　　　其他：_____

签署人代表：_____    　　　　　　签署人代表：_____

Matt Miller 移动公证服务    415 -448 -7343    www.mmmobilenotary.net

**JAMS 仲裁案参考编号：5220002118**

**Paul Frank Limited**

申请人

及

**Grand Union International Trading Limited**

被申请人

## 最终裁决

1. **当事方和律师。** 本仲裁的当事方在标题中已列明，具体代表如下：

| | |
|---|---|
| Jessica R. Corpuz 律师 | Matthew Weldon 律师 |
| Weintraub Tobin | Thomas A. Warns 律师 |
| 10250 Constellation Blvd Suite 2900 Los Angeles, CA 90067 | K&L Gates LLP |
| 电话：310 858 -7888 | 599 Lexington Ave. Floor 32 New York，NY 10022-6030 |
| | 电话：212-536-3900 |
| Kavan J. Jeppson 律师 | Cindy Ha 律师 |
| Katie A.Collins 律师 | K&L Gates LLP |
| Weintraub Tobin | 中国香港皇后大道中 15 号公爵大厦 44 楼 |
| Landmark | 电话：+852.2230.3536 |
| 400 Capitol Mall 11th Floor Sacramento, CA 95814 | |
| 电话：916-558-6000 | |
| | Mason Liang Mei |
| | DHH Washington DC Law Office |
| 保罗弗兰克有限公司（"申请人"）律师 | 宏联国际贸易有限公司（"被申请人"）律师 |

2. **仲裁员：**

Lizbeth Hasse 律师

Two Embarcadero Center Suite 1500 San Francisco, CA 94111

3. **案件管理人：**

Aimee Hwang

Two Embarcadero Center Suite 1500 San Francisco, CA 94111

415 -774 -2607

**仲裁地点：** 加利福尼亚州洛杉矶（世纪城）

**经修订的重述《中间裁决》（仅责任）** 签发日期：2024 年 10 月 14 日

**《中间裁决》（包括责任认定和损害赔偿）** 签发日期：2025 年 6 月 13 日

**最终裁决书（包括责任认定、赔偿责任和利息）** 签发日期：2025 年 7 月 2 日

本仲裁员于 2024 年 6 月 6 日签发了《中间裁决》，解决了本仲裁中大部分资任问题，提出了当事方就损害赔偿提交书面陈述的日程安排，并确定了宏联公司在剩余期限内传复对被诉商四方服务及根据修订后的《主许可协议》行使权利的程序建议。

1

鉴于本案中存在众多索赔和复杂的事实情况，当事方被邀请向仲裁员提交任何他们认为在进入下一个仲裁阶段（损害赔偿阶段）之前必须考虑的问题或程序。正如仲裁员在 2024 年 7 月 1 日进一步的解释，欢迎任何一方提交意见，明确他们认为需要更正的《中间裁决》中的内容。鉴于已经签发了《中间裁决》（在损害赔偿阶段之后将签发最终裁决），仲裁员具有对所有相关事项的完全管辖权，以处理仲裁员认为合适的事项，并符合相关规则的规定。因此，尽管在此阶段严格遵守规则 24(j)（针对最终或最终裁决）为时尚早，仲裁员仍为当事方提供了提交意见的指导（如果他们选择提交）；这些意见"应当涉及错别字、引用错误、澄清等方面的内容，而不是重新权衡事实或重新考虑法律及其适用。仲裁员将根据自己的自由裁量权决定应更正和澄清哪些事项。"随后，当事方提交了意见，首先是申请人对《中间裁决》的更正请求及被申请人的回复。之后，在申请人的请求下，仲裁员根据自由裁量权于 2024 年 8 月 15 日举行了开庭，以处理当事方提出的与《中间裁决》更正或澄清相关的事项，以及申请人关于宏联公司发布或公开披露《中间裁决》内容的担忧。开庭后，仲裁员于 2024 年 8 月 21 日发布了一项命令，处理《中间裁决》的公开披露，并表示在更正请求中提出的其他事项将随后处理。此重述《中间裁决》涵盖了这些其他事项，并反映了仲裁员在仔细考虑当事方提交的意见后，对需要澄清或更正的事项的决定。

除了多个更正或澄清的请求，申请人还表达了对《中间裁决》的担忧，认为其中"存在偏见"和/或仲裁员对保罗公司有偏见。这一陈述并未被忽视。本件仲裁员在实际工作中和原则上都重视中立性，认为这是其职责的重要组成部分，并在整个仲裁过程中始终牢记这一观点。仲裁员的任命基于其披露及对公正性的全面审查。反映在《中间裁决》、重述《中间裁决》、经修订的重述《中间裁决》和现在的《中间裁决》（涉及损害赔偿）中的决定，以及仲裁员在本案中的所有裁定，均是在对当事方提供的证据进行仔细、公正的考虑后作出的，包括证人口头陈述和书面证据，以及法律和当事方提出的论点。此外，仲裁员还分配了额外时间，允许提交补充书面陈述材料，并根据律师的需求或请求调整日程安排和呈现方式，以确保双方都有机会陈述他们认为对裁决重要的事实。仲裁员认真考虑了申请人的担忧，未发现任何依据支持申请人关于仲裁员本人或仲裁员的决定不公正和有偏见的说法或暗示。申请人指出，《中间裁决》中某些表述暗示了对保罗公司及其证人的偏见或不公正态度。仲裁员仔细审查了《中间裁决》中的这些段落，并在需要澄清或选择不同用词的地方进行了修改。这并不意味着被修改的用词反映了偏见或缺乏公正性，而是为了避免任何误解。

在本件仲裁签发经修订的重述《中间裁决》（涉及责任）后，当事方开始对本案的损害赔偿部分进行书面陈述。在书面陈述接近完成时，保罗公司于 2025 年 1 月 24 日提交了关于损害赔偿的最终书面陈述，并附上了中止或重启仲裁程序请求，理由是申请人保罗公司声称收到的新证据与责任判断具有实质性相关性，并质疑了相关许可协议的存在（或不存在）、一份或多份与本件裁核心相关的文件的真实性，并对被申请人及其员工提出了严重的涉嫌犯罪问题。基于申请人在中止或重启仲裁程序请求中的主张，仲裁员允许当事方就新提出的问题的相关性和实质性进行讨论，并随后确定了五（5）个可能受到申请人所表达担忧影响的问题。这 5 个问题成为进一步书面陈述的主题，并为前述问题提供了充分的开庭机会。经过审查，仲裁员裁定责任决定不受所主张事项的影响，损害赔偿部分的仲裁可以继续进行。当事方完成了损害赔偿的书面陈述。关于对中止或重启仲裁程序请求的事项将待考虑或重新考虑的再次申请被拒绝。仲裁员同时允许申请人提出的关于信赖利益损害赔偿或浪费成本赔偿的放弃问题在损害赔偿决策中进一步考虑。关于本件裁的其他提交陈述或辩论的机会于 2025 年 6 月 2 日关闭，仲裁员完成了《中间裁决》（涉及责任和损害赔偿）。

本件仲裁员经各当事方仲裁协议指定，在审阅双方庭前及庭后提交的陈述、证据及主张，核查事实证人与专家证人的证言，查阅仲裁庭审记录及已采信的证据材料（包括证人证词与专家报告），并进一步考量各当事方就损害赔偿阶段提出的书面意见及口头辩论（包括针对引入新证据或重新审议先前裁决（含多次澄清请求）可能性的相关主张），同时审议了申请人对仲裁员管辖权的异议及驳回动议，以及被申请人为支持其在本案中获得裁决金额利息权利而提交的法律意见（含相关法律依据）后，现基于下文详述的理由，作出本最终裁决，具体裁定如下，并以此结束本案所

2

有待决争议。

一、　**仲裁员简介及管辖权**

本案因申请人于 2022 年 11 月 22 日提交的请求—仲裁陈述书而进入仲裁。正如申请人在庭前简述所述，世界著名品牌 Paul Frank 的所有者保罗弗兰克有限公司("许可方"或"保罗公司")在其试图终止双方之间的《主许可协议》(MLA)后，向其被许可方宏联国际贸易有限公司("被许可方"或"宏联公司")追索金钱赔偿。许可方声称被许可方违反了《主许可协议》及其修订协议，含有多次重大违约和其他违约行为。宏联公司主张，保罗弗兰克有限公司终止其许可的行为是无效的，违反了协议，要求赔偿因无效或不当终止许可协议而造成的损失。

被申请人于 2022 年 12 月 16 日提交了《对申请人请求的答辩意见及反请求》。申请人暨反请求被申请人于 2022 年 12 月 29 日提交了《对被申请人暨反请求申请人反请求的答辩意见》。

许可方与被许可方之间于 2018 年 4 月 27 日签订的《主许可协议之第一修订协议》对 2015 年 1 月 1 日签订的《主许可协议》进行了变更，《主许可协议之第一修订协议》第 28 条约定了许可方与被许可方之间达成由 JAMS 进行仲裁的仲裁条款。

第 28 条规定如下：

"如果因本协议引起或与本协议有关的争议，或违反本协议的情况，以及如果无法通过谈判迅速解决争议，双方同意在书面通知调解请求后的三十(30)天内，首先本着诚意尝试通过由位于加利福尼亚州洛杉矶的美国司法仲裁调解服务股份有限公司("JAMS")进行调解来解决争议。在上述三十(30)天调解期结束之前，任何一方均不得启动与本协议相关的仲裁，要求法律或当事方共同协议授权的临时补救措施的除外。但是，如果一方拒绝遵守第 28 条的要求，则该限制不适用于另一方。在本第 28 条规定的程序未决期间及其后十五(15)个日历日内，所有适用的时效法规和基于时间流逝的抗辩均应暂停执行。双方将采取必要的行动(如有)，使上述延期生效。如果当事方无法通过上述调解解决争议，则此类争议(包括确定本协议的仲裁范围或适用性)应根据加利福尼亚州法律在加利福尼亚州洛杉矶由一名仲裁员(该仲裁员是位于加利福尼亚州洛杉矶县的联邦法院或州法院的退休法官，或在争议标的物方面至少有十(10)年积极从业经验的律师)进行仲裁。该仲裁应由 JAMS 根据仲裁时有效的《综合仲裁规则和程序》进行。(可在 https://www.iamsadr.com/rulescomprehensivearbitration/查阅)。仲裁裁决可以由任何有管辖权的法院承认并予以执行。尽管有上述规定，第 28 条不适用于许可方根据协议第 21 条提出的禁令救济。"

根据仲裁条款，本次仲裁适用的实体法为加利福尼亚州法律，JAMS《综合仲裁规则和程序》("规则")应适用于本程序。正如仲裁员在开始时所确定并在 2023 年 3 月 22 日程序的初始排期命令中所述，仲裁请求是可仲裁的。在本仲裁程序启动时，任何一方均未对可仲裁性或仲裁员的管辖权提出异议。

仲裁条款要求在任何一方提起仲裁之前应首先尝试调解。各当事方确认，Hon. James L. Smith（已退休）曾于 2022 年 11 月 7 日主持调解，但争议未得到解决。

二、　**仲裁程序概述**

2022 年 11 月 22 日，申请人保罗弗兰克有限公司（"保罗公司"）提交了《仲裁请求—仲裁请求陈述书》（"请求"）。

2022 年 12 月 16 日，被申请人宏联国际贸易有限公司（"宏联公司"）对保罗公司的请求提交了答辩意见和反请求。

2022 年 12 月 29 日，保罗公司提交了对宏联公司反请求的答辩意见。

2023 年 2 月 16 日，JAMS 仲裁员 Lizbeth Hasse 律师被任命为本件裁案的仲裁员。

2023 年 3 月 22 日，仲裁员签发《1 号排期命令》。

3

2023 年 3 月 24 日，宏联公司提交《被申请人临时救济申请书》。

2023 年 4 月 21 日，仲裁员签发《1 号排期命令》第 1 号修正案，将门槛问题的开庭定在 2023 年 6 月 1 日，并调整了简述。

2023 年 4 月 27 日，保罗公司提交"《对被申请人临时救济申请和批准初步禁令申请书的联合反对意见》"，含证据材料及声明。

2023 年 4 月 27 日，保罗公司提交《允许修改仲裁请求的申请书》，要求将红纺文化加入仲裁，并作为仲裁一方。

2023 年 5 月 23 日，宏联公司提交了《允许修改仲裁请求的申请书的反对意见》。

2023 年 5 月 30 日，保罗公司提交《支持允许修改申请书的答辩意见》。

2023 年 6 月 5 日，仲裁员签发《关于修改仲裁请求的裁决》，驳回申请人提出的《允许修改仲裁请求的申请书》。

2023 年 6 月 5 日，宏联公司提交《支持申请临时救济和反对申请人初步禁令申请书的答辩简述》，并附有法律授权、证据和证人证词。

2023 年 6 月 27 日，保罗公司提交《支持初步禁令申请书的答辩意见》，含补充证据及声明。

2023 年 7 月 15 日，仲裁员签发《关于申请人与被申请人各自申请临时或初步禁令救济的裁决》，该裁决驳回了当事方各自的申请，理由是任何一方都没有按照规则第 24(a)条的要求证明有必要采取临时或临时衡平法救济来保护资产或现状，以便就此做出有意义的最终裁决。

2023 年 8 月 31 日，仲裁员发布了对 2023 年 3 月 22 日修正后的《1 号排期命令》的第二修订案，该修正案调整了程序时间表。

2023 年 8 月 31 日，JAMS 发出重新安排开庭的通知，将本仲裁第一阶段开庭的第一天定为 2024 年 1 月 29 日。

2023 年 12 月 11 日及 15 日，仲裁员发布命令，因故将第一阶段开庭开始日期延期至 2024 年 2 月 26 日，开庭持续 7 天或更长时间，但须视关键证人是否在场而定。

2024 年 1 月 24 日，仲裁员签发《排期命令修正案》，确定了 2024 年 2 月 26 日至 3 月 7 日期间的第一阶段开庭日期，并规定了其他相关截止日期。

2024 年 2 月 20 日，仲裁员在 2024 年 2 月 19 日后发布了命令和指示，通知初步事项动议的开庭。

2024 年 2 月 26 日至 29 日、3 月 1 日、3 月 4 日至 7 日，第一阶段开庭(以下简称"开庭")在加利福尼亚州世纪城 JAMS 中心举行，为期九(9)天，地址：加利福尼亚州洛杉矶世纪公园东 1925 号 1400 室世纪城 JAMS 中心，邮编：90067。

2024 年 6 月 6 日，在各当事方完成庭后简述后，仲裁员按计划就第一阶段开庭事项作出《中间裁决》，但尚未确定损害赔偿金额。

自 2024 年 7 月 22 日起，各当事方就《中间裁决》的公开披露问题及修正请求事项，通过书面形式及专项开庭陆续提交了《修正请求书》及其答辩意见。经综合考虑这些请求和回复，仲裁员于 2024 年 9 月 25 日作出重述《中间裁决》。此后在 2024 年 10 月 4 日至 8 日期间，各当事方分别就责任认定部分的裁决表述提出需进一步澄清的具体事项。仲裁员在审议这些补充澄清请求后，于 2024 年 10 月 14 日签发经修订的重述《中间裁决》。随后制定了《关于损害赔偿问题的书面陈述时间表》，以便推进后续包含损害赔偿的《中间裁决》的作出。被申请人曾于 2024 年 6 月 25 日提交其损害赔偿立场，后为响应 2024 年 10 月 14 日的经修订的重述《中间裁决》而作出修订，各当事方随即完成了损害赔偿部分的全部简述程序。

2025 年 1 月 24 日左右（经当事方申请延期并获得准许后，此为损害赔偿事项的最后书状提交期限），申请人提交了《损害赔偿答辩状》，并随附《重启或中止仲裁程序请求书》申请书。

4

CERTIFIED TRANSLATION

人重点提出了与中国境内多项上诉、裁决及其他进行中程序相关的各类问题——这些程序均独立于本案仲裁请求与反请求——并声称这些事态 "已导致整个仲裁程序陷入混乱"。尽管中国境内多项法律程序（包括中国法院及调查机构正在处理的案件）与本仲裁案（其中责任问题已通过全面开庭程序作出认定）之间的关联性尚不明确，但仲裁员仍允许申请人陈述其主张，以避免在未充分考虑相关实质性证据的情况下作出草率裁决。仲裁员力求消除任何一方可能产生的疑虑，确保其不会在仲裁程序中丧就重要事项充分陈述或提交对责任认定具有实质影响证据的机会。

鉴于此，2025 年 3 月 1 日，仲裁员在充分审议申请人提交的《损害赔偿答辩状》以及《重启或中止仲裁程序请求》所涉事项后，向各当事方作出附理由的裁决及指令，允许申请人就以下事项进行审查或重新审查：(a)申请人认为受中国境内程序或证据实质影响的事项；(b)仲裁员认定可能对本仲裁案产生影响的有关事项。仲裁员称，其将根据申请人提交的关于中国境内程序的材料，对若干具体事项予以审议或重新审议。根据仲裁员的这一裁决，下列事项将纳入审议范围：

"中国上诉法院的裁决，以及《GU-CBG 许可协议》的核心性质及其与《主许可协议》的关联性、对宏联公司商业架构及实践的影响，均需通过开庭程序评估第 975 号裁决对本仲裁责任认定及损害赔偿裁定的影响。

与此同时，基于下列事项可能产生的影响，仲裁员要求各当事方在本次补充开庭的简述中对以下各项逐一说明：

1. 是否有任何证据表明，宏联公司在 2024 年期间主导或管控了 Paul Frank 主题酒店客房中未经授权使用 Paul Frank 品牌的行为；若存在此类行为，该未经授权使用对损害赔偿分析的具体影响。

2. CBG 被指称对泰安优生活服务有限公司注册 Paul Frank 商标行为的知情或参与程度，以及该事实对本案责任认定或损害赔偿分析的实质意义。

3. CBG 被指称对红童纺的实际控制情况，及其与本案责任认定和损害赔偿分析的关联性。

4. 加州法律是否认可"浪费成本"作为损害赔偿项目；在本案具体情形下，该赔偿标准是否应（或需）被归类为信赖利益损害赔偿进行核算。"

2025 年 3 月 6 日和 18 日，各当事方就（上述）特定事项审议的简述范围及时间安排提交意见，该等事项系根据申请人提出的《重启或中止仲裁程序请求》所引发。在简述结束后，仲裁员按照各当事方请求的简述和开庭时间表，于 2025 年 4 月 17 日就相关事项举行开庭。

5 月 8 日，仲裁员就"中止或重启仲裁程序请求"作出附理由裁决。在仲裁员的裁决摘要中认定，保罗公司在其《重启仲裁程序请求》中提出的任何论点或新引用的证据，均不足以支持对经修订的重建《中间裁决》进行修改或作出新的认定，也无须在中国法院审理相关案件期间（如所述）中止或暂停仲裁程序，或启动新的证据开示。现有证据未表示宏联公司存在任何新的、可诉的重大违约行为以致影响本仲裁中的责任与损害赔偿认定。仲裁员审议了《GU-CBG 许可协议》（即被申请人宏联公司与其在仲裁程序中被称为子公司或代理人的实体所签订）是否无效或者在仲裁开庭期间提交的证据是否经过适当证实的问题。仲裁员最终认定，无论《GU-CBG 许可协议》是否有效或真实，均不影响现仲裁阶段对宏联公司损害赔偿的分析，且不太可能对本仲裁案任何相关重要事实认定产生实质影响。仲裁员还详尽审查了判例法，并论证了在类似本案情形下以"浪费成本"为表征的信赖利益损害赔偿的可适用性。

2025 年 5 月 28 日，申请人保罗公司提交书面请求及备忘录，要求仲裁员修正 2025 年 5 月 8 日作出的裁决，特别要求就以下三项问题作出认定：(1)《GU-CBG 许可协议》的真实性与有效性；(2)宏联公司对信赖利益损害赔偿的弃权主张，以及从浪费成本转为信赖利益损害赔偿对保罗公司造成的损害；(3)申请人所称中国境内正在对宏联公司及其关联方进行的刑事程序可能产生的影响。

上海东方翻译中心有限公司
翻译专用章

CERTIFIED TRANSLATION

仲裁员于 2025 年 6 月 2 日就申请人 2025 年 5 月 28 日提出的"修订 2025 年 5 月 8 日裁决诉求"作出裁定，在说明理由的裁决书中明确指出：5 月 28 日提出的三项问题此前均已处理或将在损害赔偿计算阶段予以处理；特别是关于"浪费成本"损害赔偿计算中的弃权问题，将在损害赔偿裁决中予以处理。根据本 2025 年 6 月 2 日裁决书，仲裁员宣布于 2025 年 3 月 3 日由申请人重新启动的仲裁开庭程序正式终结，并明确告知各当事方："本案不再接受任何新证据的提交或对证据的重新阐释，且通过动议或重新开庭、中止或延期申请等方式提出延期请求的所有程序权利均已用尽。"仲裁员在该 2025 年 6 月 2 日裁决书的最终段落进一步申明："本次开庭程序——包括通过已提出或拟提出的各类请求或动议而启动的开庭重审和/或程序延期——现已正式终结，损害赔偿金额裁定将于 2025 年 6 月 13 日左右作出，此期限已预留 JAMS 管理机构核验文书所需时间。"根据仲裁规则第 22(h)条与第 22(i)条规定，本案最终裁决本应于 2025 年 7 月 2 日前作出，但为便利代理律师工作，并使各当事方知悉仲裁程序的最终裁决进度，仲裁员特将损害赔偿裁决（系待利息计算完成前的中间裁决）的作出时间预估为 2025 年 6 月 13 日。

2025 年 6 月 11 日，申请人保罗公司提交了《对仲裁员持续管辖权的异议及撤销动议》。该异议及动议明显缺乏依据。事实上，保罗公司在其书面陈述中亦承认，仲裁员已在 2025 年 6 月 2 日的命令中明确声明重启开庭程序已终结，且不再接受任何新证据或辩论意见。被申请人与申请人均援引了仲裁规则第 24(a)条的规定："仲裁员应按照第 22(h)条或第 22(i)条定义的开庭程序终结之日起三十（30）个日历日内，作出最终裁决或部分最终裁决。"根据各方确认的时间节点，最终裁决或部分最终裁决本应于 2025 年 7 月 2 日作出。

然而，申请人却于 2025 年 6 月 11 日错误主张：最终裁决的截止期限应为 2025 年 6 月 8 日或 9 日——即在其自身要求重开的开庭程序（申请人随后又两次提出就该复议请求，并相应获得两份附理由的裁决）结束后三十日。申请人主张 6 月 8 日或 6 月 9 日本应为最终裁决作出之日的观点，在规则层面毫无依据。申请人援引《加利福尼亚州民事诉讼法》第 1283.8(a)条，主张仲裁程序因未能在 6 月 8 日或 9 日前作出最终裁决书而应予撤销。然而，正如申请人自身所指出的，第 1283.8 条规定"仲裁裁决应在协议规定的期限内作出"。本案中，双方协议约定适用 JAMS 规则，而如前所述，该规则明确规定本案最终裁决应于 2025 年 7 月 2 日前作出。同样，加州法院也认定，"非司法仲裁程序通常受仲裁机构制定的程序规则约束；此类仲裁程序并不必然受《民事诉讼法》约束，除非该法律、仲裁规则、当事方合同或其他规范非司法仲裁的法律条款另有明文规定。"*Paramount Unified School Dist. v. Teachers Assn. of Paramount*, 226 Cal.App.4th 1371, 1387 (1994); *Elden v. Superior Court*, 53 Cal.App.4th 1497, 1508 (1997)（着重号为后加）。在任何情况下，在就损害赔偿作出中间裁决以及就利息适用和利率提交书面陈述之前，均不得作出最终裁决。因此，仲裁员驳回了申请人的动议，并于 2025 年 6 月 19 日作出裁决，认定申请人关于"仲裁员持续管辖权"的异议依据 JAMS 规则不能成立。

2025 年 6 月 13 日，仲裁员作出包含损害赔偿的《中间裁决》，对 2024 年 10 月 14 日发布的《经修订的重述中间裁决》（涉及责任认定部分）进行了补充。包含损害赔偿的中间裁决如下：

"(a)    被申请人未对申请人构成经修订《主许可协议》所定义的可诉重大违约。

(b)    驳回申请人在本仲裁中提出的所有救济请求；

(c)    申请人针对被申请人作出的《主许可协议》终止行为无效、不生效，且构成对该协议的违约；

(d)    被申请人未能证明其有权就申请人在争议期间违反《主许可协议之第二修订协议》的行为主张损害赔偿。

(e)    被申请人通过对申请人提出的反请求，有权就申请人未履约和拒绝履约的行为获得金钱损害赔偿，具体金额包括：（a）基于仲裁中确定的浪费成本赔偿，计 26,968,117 美元。

6

及（b）加利福尼亚州法律准许的任何利息。

(f) 被申请人为胜诉方。"

仲裁员还认定，被申请人并未放弃就保罗公司实质性违反《主许可协议》的行为主张损失赔偿的权利，且保罗公司确实于 2022 年 2 月——具体而言是 2022 年 2 月 22 日——构成了该实质性违约。仲裁员指示双方在就责任与损害赔偿问题作出《中间裁决》之日起七（7）日内，各自提交相关法律论证及具体计算，说明被申请人基于仲裁庭裁定的全额确定信赖浪费成本损害赔偿（又称"信赖损害赔偿"）应获判的判决前利息，该利息计算期间自 2022 年 2 月 23 日起至最终裁决作出之日（预算为 2025 年 7 月 2 日）止。

2025 年 6 月 20 日，被申请人按期提交了利息主张及计算书，其中包含证明文件，所附法律依据支持其主张——即有权以 10%的单利利率获得自 2022 年 2 月 23 日（申请人实质性违约次日）起至预计最终裁决日（2025 年 7 月 2 日）止的利息。申请人未就利息问题提交任何支持或反对的主张，亦未提供相关计算依据。仲裁员依职权延长了申请人提出相关主张的期限（如申请人有意提出），但申请人未利用该机会就此事项提交任何意见。

2025 年 6 月 20 日，申请人提交了《关于仲裁员管辖权的持续异议及驳回动议》，其中援引的法律依据与其 2025 年 6 月 11 日在本仲裁程序中提交的《管辖权异议及驳回动议》所引用的完全相同。在本最终裁决中，仲裁员针对该持续管辖权异议及驳回动议作出裁定。基于与先前驳回申请人初次提出的管辖权异议及驳回动议相同的理由，再次否决了该项申请。

现作出最终裁决如下：本裁决整合所有中间裁决，并就责任认定、损害赔偿及利息等事项作出最终裁定。

三、 事实认定

A. 申请人反对采信某些证据

在审查本案的证据材料时，申请人要求仲裁员不采纳申请人提出异议的证据，理由是这些证据缺乏依据、需要认证、违反最佳证据规则和/或包含多层的不可采信传闻。

正如仲裁员在整个程序中，包括在证据开示会议期间所指出的，任何直接相关和重要的证据通常都应当在仲裁中采纳。对偏见、证据的可靠性、事实认定者对证据的混淆或误解的担忧在仲裁中并不像在陪审团审判中那样是重要因素。此外，JAMS 规则第 22(d)条的规定也考虑到了这一点：

"不要求严格遵守证据规则，但仲裁员应适用与特权和工作成果有关的适用法律。仲裁员应考虑其认为与争议相关且重要的证据，并给予该证据适当的权重。仲裁员可在《联邦证据规则》或任何其他适用证据规则所载原则的指导下作出该决定。仲裁员可限制证词，排除不重要或过度重复的证据，但所有当事方均应有机会提出材料和有关证据。"

因此，仲裁员在评估证明力和可靠性时将遵循 JAMS 规则，而不排除相关证据。在申请人试图排除的证据中（在其庭后简述中列出），仲裁员在开庭期间同意排除证据 1298(原件)[证据 1299(译文)]，Wei Wei 与 Tony Chu 之间的笔录，并将继续排除该笔录。所提及的所有其他证物均被采纳。

申请人还对证人证词的使用提出异议。不过，在开庭之前和开庭审理时都讨论了证人证词的使用问题，并允许使用证人证词。JAMS 国际仲裁经常使用证人证词，事实上也鼓励使用证人证词。在本仲裁程序中，证人证词是在各证人作证之前提供的，律师在提出要求时被给予额外时间准备盘问。在本仲裁中使用证人证词并未证明有任何偏见，仲裁员接受证人证词，并与本程序中所有被接受的证据一样，给予其适当的重视。

B. 事实和专家证人

事实证人

1. Stanley Wan 先生——未来品牌集团首席执行官兼董事长。保罗弗兰克兰克有限公司的成立

7

697

是为了持有 Paul Frank 品牌的全球权利,该公司最终归未来品牌瑞士股份公司所有,Wan 先生是该公司唯一执行董事兼首席执行官。

2.  Hana Mu 女士/慕晗女士——最初由其所在的律师事务所按月为未来品牌提供总法律顾问服务,大约在 2022 年 5 月或 6 月,Mu 女士成为未来品牌瑞士股份公司的董事会成员,之后于 2023 年作为员工加入未来。Mu 女士在瑞士未来品牌担任法律和企业事务总监。

3.  Michael Puglisi 先生——Michael Puglisi 先生身处澳大利亚悉尼,受庸于未来品牌集团旗下的新加坡实体未来品牌私人有限公司。Puglisi 先生是全球许可经理,他作证表示,他的工作职责包括谈判合同、与新的被许可方签订合同以及解决被许可方的日常问题。在将 Paul Frank 品牌从萨班集团转让给未来品牌之前,Puglisi 先生还在萨班集团负责 Paul Frank 品牌的相关工作。

4.  Zheng Bo 先生/郑波先生——郑先生是红纺文化的创始人。2009 年左右,他首次从萨班集团获得 Paul Frank 品牌的许可,并通过他的一家公司在中国开发了该品牌。

5.  Jennifer Huang 女士/黄紊琴女士——Jennifer Huang 女士曾就职于 Click Licensing Asia,LLC 公司,该公司曾是 Paul Frank 品牌在中国的代理商。随后,她于 2019 年初加入红纺文化,成为红纺文化授权管理部总经理。在被许可方签订分许可协议后,她负责为分许可被许可方提供后台服务。

6.  Zhang Yuzhen 女士/张宇真女士——Zhang Yuzhen 女士于 2019 年加入红纺文化。她的职务是知识产权专员,负责审查和批准分许可协议以及发给分许可被许可方的授权书。

7.  Wang Haibin 先生/王海滨先生——Wang Haibin 先生于 2015 年加入红纺文化,现任授权业务部门主管。

8.  Zhang Lisong 先生/张立松先生——Zhang Lisong 先生于 2013 年加入红纺文化,现任会计部副部长。并负责会计部门。

9.  Yang Guowei 先生/杨国伟先生——Yang Guowei 先生是红纺文化的 IT 总监,负责公司硬件设备、网络服务器及 IT 系统维护工作。

专家证人

1.  Robert P. Merges 教授——Robert P. Merges 教授凭借其在美国及国际许可法律领域的丰富经验与专业造诣提供专家证言。Merges 教授现任加州大学伯克利分校法学院 Wilson Sonsini 教授(法律与技术),自 1995 年起在该校讲授《知识产权法》(含商标法)等多门课程,并著有大量知识产权法与专利法专著。除了在伯克利任教外,Merges 教授于 1988 年至 1995 年间任教于波士顿大学法学院。Merges 教授曾开展生物科技行业许可协议的实证研究并发表相关成果。他曾受邀在北京大学(北大)、中国人民大学、中国政法大学(CUPL)、华东政法大学(ECUPL)、复旦大学、西南政法大学(重庆)及香港大学等中国顶尖法学院校举办知识产权法专题讲座。

2.  Bryan C. Moser 先生——Bryan C. Moser 先生为弗吉尼亚州及其他司法管辖区注册会计师(CPA),现任 Grant Thornton LLP 弗吉尼亚分所法证咨询服务合伙人。Moser 先生持有注册舞弊审查师(CFE)资格。他主要负责为客户提供损害赔偿分析、估值评估、法证会计、舞弊调查、争议咨询等服务。拥有杜克大学富卡商学院工商管理硕士学位,并作为申请人损害赔偿专家在本件裁案中提供证言。

3.  Xiao 先生——Xiao 先生具备华盛顿特区及中华人民共和国执业律师资格,先后获得西安大学法学学士学位及印第安纳大学麦肯尼法学院法学博士学位。他拥有超过 15 年中国企业法务从业经验。

4.  Pauline Booth 女士——Pauline Booth 女士为克罗尔公司(Kroll)执董总裁,专注知识产权领域逾 20 年。约 50 次受聘担任专家证人,其中半数涉及许可纠纷。

8

5. He 先生——He 先生为香港居民，持有中华人民共和国法律执业资格。在知识产权领域具有丰富的许可业务经验，拥有超过 24 年的商标起诉与诉讼实务经验。

C. **无争议事实联合声明**

开庭后，当事方均按时提交了庭后简述和庭后回应简述。根据修正后的《排期命令》当事方还于 2024 年 4 月 26 日提交了一份《无争议事实联合声明》，列出以下无争议事实：

1. 2015 年 1 月 1 日前后，保罗弗兰克实业有限责任公司与宏联公司签订了《主许可协议》(MLA)，其中包括附件和各种附录。JX-1;JX-5。

2. 2018 年 4 月 27 日前后，保罗弗兰克实业有限责任公司与宏联公司签订了《主许可协议之第一修订协议》。 JX-2。

3. 2021 年 8 月 19 日前后，当事方签订了《主许可协议之第二修订协议》。JX-3。

4. 2022 年 2 月 10 日前后，当事方签订了《主许可协议之第三修订协议》。JX-4。

5. 2022 年 11 月 22 日前后，保罗公司向宏联公司提起仲裁。JX-6。

6. 2022 年 12 月 16 日前后，宏联公司针对保罗公司提出答辩意见及反诉求。JX-7。

【请注意，上述事实陈述 1 和 2 中提及的保罗弗兰克实业有限责任公司在本仲裁书中也称为"萨班集团"或"萨班旗下品牌"，即保罗弗兰克实业有限责任公司的母公司，以避免此处与申请人保罗弗兰克有限公司产生混淆。】

D. **重大事实认定**

仲裁员在前述无争议事实声明的基础上，补充作出以下重要事实认定。下列重要事实认定及后续权利主张裁决，其分析结论均基于仲裁员确认为真实且对裁决结果具有必要性的事实作出。若此处陈述的事实与任何一方主张存在差异，此系仲裁员综合考虑下列因素后作出判断的结果：证据可信度与关联性；举证责任分配；对书面和口头证据的权衡采信。

在与保罗弗兰克实业有限责任公司/萨班集团签订非排他性许可协议数年后，并在以设施扩展(工厂和仓库)、设备、各种形式的营销和推广、人员配备和设计的形式投资于 Paul Frank 品牌(以下简称"品牌")的营销和发展后，宏联公司(以下简称"被许可方")向萨班集团要求在中国大陆、香港和澳门等许可区域的长期独占许可。萨班集团同意签订《主许可协议》(MLA)，并向宏联公司延长 15 年的许可期限，即从 2015 年 1 月 1 日至 2030 年 2 月 28 日，预付费用为 6500 万美元(包括 5500 万美元的许可费和 1000 万美元的延期费，均预先支付)。在该许可区域内的此类许可中，该许可费是公认的高额或高昂的许可费用。宏联公司执行董事郑先生表示，他希望通过提供最较高的预付费用来给许可方留下持久的印象。郑先生表示，宏联公司与红纺文化("CBG")有关联，后者是一家运营公司，为宏联公司管理《主许可协议》下的许可活动。郑先生是宏联公司董事。

宏联公司的郑先生和萨班集团的 Stanley Wan 先生(后来成为未来品牌集团(品牌权利持有人保罗弗兰克有限公司的所有者)的首席执行官兼董事长)都证实了萨班集团和宏联公司之间存在合作关系。郑先生在证词中特别提到，萨班集团向宏联公司提供了"我们在许可和渠道方面所需的所有必要文件，包括许可和公共许可证明以及产品打假和商标相关文件"。Zhang Yuzhen 女士也证明了 2020 年之前在先决条件文件方面的合作。郑先生作证称，萨班集团向宏联公司提供了经公证的授权书(LOA)，宏联公司使用经公证的授权书向第三方证明了其所代表的宏联公司拥有开发或再许可该品牌的权利。公证证重要，因为对于宏联公司及其分许可被许可方来说，萨班是外国公司。郑先生作证称，当中国公司必须向在线平台证明外国公司的授权书是原件或"真实的"时，使用经公证的授权书是许可行业的一种~~数据~~惯例。此外，有证据表明萨班集团和宏联公司之间定期举行关于设计的季度性会议以及有效的设计和批准程序，Michael Puglisi 先生和郑先生都证明了这一点。Puglisi 先生就萨班集团给宏联公司的电子邮件审批作证。Jennifer Huang 女士证明了 OA 监控流程的~~到位~~，~~以及萨班的授权~~

CERTIFIED TRANSLATION
翻译专用章

方或分许可提供的计划或规划对品牌的积极影响(或不积极影响)的系统，然后通过多个部门进行审查和批准的流程步骤，以及发放防伪标签和审查新店申请的程序。

还有直接可信的证据表明，萨班集团委托宏联公司根据《主许可协议》代表品牌处理打假行动。Wan 先生证明了宏联公司是一家规模庞大的公司，其管理层实力雄厚。Puglisi 先生和 Wan 先生作证称，萨班集团十分满意宏联公司根据《主许可协议》开展的活动。

在谈到萨班集团与宏联公司之间关系的性质时，Wan 先生还作证称，他不认为萨班集团需要或要求《主许可协议》第 6(a)条中规定的季度报表或报告。

大约在 2018 年初，宏联公司在根据《主许可协议》开展业务的三年后，已在很大程度上开发出了工厂产品，宏联公司寻求更多地利用许可被许可方，并在整个许可区域建立更庞大的分许可被许可方网络。宏联公司到目前为止的表现，以及萨班集团自己对该许可区域的计划，显然促使萨班集团于 2018 年 4 月与宏联公司签订了《资产购买协议》。2018 年 4 月 27 日的《资产购买协议》要求宏联公司向萨班集团支付 3500 万美元。虽然宏联公司就《资产购买协议》支付了首笔 500 万美元分期付款，但宏联公司声称由于外汇管制而无法在规定时间内完成全额付款。在与宏联公司签订《资产购买协议》的背景下，萨班集团于 2018 年 4 月 27 日修订了《主许可协议》，主要是为了修改争议解决条款并指定加利福尼亚州法律为管辖法律。

萨班集团于 2018 年 11 月 12 日取消了与宏联公司签订的《资产购买协议》。大约两年后，即 2020 年 12 月 10 日，未来品牌瑞士股份有限公司通过其实体保罗弗兰克有限公司(本仲裁中的申请人)持有该品牌的全球权利。本决议没有必要详述未来公司购买这些权利的确切方式。值得注意的是，未来品牌集团首席执行官兼董事长 Wan 先生曾是萨班集团的庶员和顾问。

Wan 先生作证称，未来公司需要在中国设立一间全新的办公室并配备庶员，以开展与品牌有关的任何活动。他还表示，在收购过程中，他或未来公司/保罗公司没有过多关注《主许可协议》的条款。2020 年 2 月初，在未来公司/保罗公司收购该品牌后不久，保罗公司通过 Hana Mu 女士与 Peggy Wang 女士的沟通以及 Wan 先生与郑先生的沟通表示，保罗公司将接手一些打假或相关的法律监督和/或诉讼行动，这些任务在萨班集团任期内几乎完全由宏联公司承担。假设采取此类行动的结果可能有利可图，那么未来公司/保罗公司应该是希望通过诉讼获得一些收益。这一点没有得到证实。

在将《主许可协议》转让给未来公司/保罗公司后，鉴于萨班集团向宏联公司发出的经公证的授权书不再有效，宏联公司立即要求新的许可方保罗公司提供经公证的授权书。保罗公司始终未提供该经公证的授权书，并最终明确拒绝履行此项义务。几个月来，宏联公司一直要求保罗公司提供一份经公证的授权书，保罗公司表示由于新冠疫情的限制，很难甚至不可能从中国境外获得公证并快递到中国境内。保罗公司声称，除非新冠肺炎限制有所放宽，否则无法为宏联公司提供经公证的授权书，此后 4 或 5 个月，保罗公司又称其认为宏联公司不需要经公证的授权书，也不会收到授权书。与此同时，宏联公司在从未来公司获得经公证的授权书方面遇到了困难，而该授权书是对打假所必需的。最终，在大约 6 个月的拖延或借口后，保罗公司于 2021 年 5 月前后向被许可方签发了《终止通知》，声称宏联公司或其高级职员或负责人一直在为自己的私人利益注册或试图注册保罗公司商标。Wan 先生在就此事作证时称，尽管《终止通知》的决定是由他作出的，但他实际上对具体情况知之甚少，并在最后表示，他一直试图用《终止通知》来迫使与宏联公司进行一次良好充分的讨论。

2021 年 5 月至 6 月期间，保罗公司曾多次指控宏联公司滥用品牌权利，但 Wan 先生与 Mu 女士在开庭审理时均未能就此提供合理说明或具有说服力的证据。随后，保罗公司于 2021 年 7 月向宏联公司发出费用清单，以许可协议修订协议的形式指出，宏联公司因其控制的实体错误注册商标而欠下约 585,000 美元的费用和 500 万美元的损害赔偿金，但是保罗公司始终未提及所称费用的来源、损害赔偿的数额或宏联公司对实际错误注册负有责任的证据。一家独立实体(非宏联公司)在出现了错误或不正确地注册了 "Paul Frank" 品牌商标的情况。

10

实体在第二天纠正或撤销了错误注册，从而纠正了可能由该实体造成的任何违规、不当行为或错误。

2021 年 7 月下旬，(a)保罗公司向宏联公司发出了另一份《重大违约通知》，其中列举的并非宏联公司的重大违约行为，而是分许可被许可方的违约行为，且宏联公司正在对该违约行为进行纠正；(b)保罗公司一直拒绝或不提供经公证的授权书，而宏联公司认为该授权书对其与新许可方的运营至关重要。此后，宏联公司同意与保罗公司签署《主许可协议之第二修订协议》。郑先生作证称，当时宏联公司受到保罗公司的威胁，必须就保罗公司要求的修改而支付巨额费用。郑先生希望支付该费用后两家公司能够真诚地继续合作。

2021 年 8 月 19 日前后，保罗弗兰克有限公司("保罗公司")(萨班集团/保罗弗兰克实业有限责任公司的继任公司)与宏联公司签订了《第二修订协议》。在保罗弗兰克有限公司("许可方")于 2021 年 7 月向宏联公司发出终止《主许可协议》的通知后，该《第二修订协议》由保罗弗兰克有限公司和宏联公司协商签订。《第二修订协议》规定了宏联公司的额外金钱对价，还要求宏联公司开发保罗公司尚未注册且未投入开发的 A.NI.MA 品牌。《第二修订协议》还对《主许可协议》中某些程序进行修改，涉及违约、补救、豁免和至某些潜在违约、未补救违约或新违约情况下的合作或"共同努力"。《第二修订协议》对这一争议至关重要，因为《第二修订协议》(包括其豁免、通知和补救条款)在保罗公司于 2022 年 8 月 24 日发出的《终止通知》中提及的涉违约行为发生时有效。随后，保罗公司声称将于 2022 年 9 月 23 日前后完善《终止通知》，作为对《主许可协议》及其修订协议的终止。

如前所述，2021 年 8 月 19 日，宏联公司签署了《主许可协议之第二修订协议》("《第二修订协议》")，在仅获得有限新增对价的情况下额外支付 850 万美元（保障合同履行之必要要素除外），具体包括保罗公司承诺提供维系合作关系的必要文件，保证维持合作友好关系，制定更为宽限的违约补救条款，作出概括性弃权声明；以及授予宏联公司为未来公司开发新品牌的附加权利。尽管宏联公司已签署《第二修订协议》并支付相关费用，但未来公司仍持续拒绝向宏联公司提供经公证授权书及商标证书，这些文件正是宏联公司申明其与被分许可方开展合作所必需的法律文件。《第二修订协议》规定了一项为期 6 个月的特别补救期，该期限于 2022 年 2 月 19 日结束。此外，《第二修订协议》还包括一项豁免机制，允许宏联公司支付了 850 万美元的许可费后，对潜在的违反合同的情况给予总体性豁免。

2022 年 5 月至 6 月期间，Mu 女士曾就开设抖音店铺的一些分许可被许可方身份及其具体授权获取途径进行问询。2022 年 6 月 10 日前后，Huang 女士对 Mu 女士作出了部分回应，提供了部分已开设抖音店铺的分许可被许可方名单以及旗舰店名单。Mu 女士在开庭审理时称，她对这些旗舰店感到担忧，因为保罗公司没有为这 13 家旗舰店签发任何授权书。然而，2022 年 6 月前后，Mu 女士在质询过程中未向宏联公司明确说明其关注的具体违约行为，亦未澄清其关于"未获授权"的判断究竟是基于确凿知悉还是主观推定。Mu 女士的质询行为表明，其非但未与宏联公司保持协作关系，反而刻意回避合作。

2022 年 7 月，保罗公司向宏联公司发出"重大违约通知"，声称"被许可方不仅没有补救所有违约行为……此外，还继续实施其他重大违规行为，例如据称不合格的商店运营伪造文件在某些平台上开设网上商店"。保罗公司继续表示，其将暂时中止履行《协议》(《主许可协议》)，直到任何和所有违反《协议》的行为得到补救（但没有具体指出哪些违约行为）。此外，保罗公司表示，在所谓的"暂停协议"期间，"许可方将临时直接接管许可区域内的许可管理，包括但不限于管理所有分许可被许可方、就市场与分许可被许可方进行协调、收取应付许可费和未来许可费(存入托管账户)、直接向分许可被许可方签发授权书等，以及为保护品牌和许可区域内业务所需的任何其他行为。"

保罗公司于 7 月发出的函件中，完全未具体说明其认定宏联公司构成违约的~~行为细节，因而~~既不足以支撑其《终止通知》的正当性，亦使得宏联公司无法根据修订后~~的《主许可协议》~~及其修订协议采取补救或其他追索措施）。保罗公司还利用此次（2022 年 7 月~~宏罗公司司~~

CERTIFIED TRANSLATION

的沟通及单方面向其被分许可方发布声明）机会，采取了《主许可协议》及其修订协议所禁止的自力救济行为。具体而言，无论是《主许可协议》还是最新签订的《第二修订协议》，均未允许保罗公司在自认为存在违约时单方面中止履约，而不同时提供补救机会或与被许可方共同解决问题。此外，保罗公司既未提供补救机会也未尝试协商，仅凭单方违约的推定或怀疑，便擅自开始直接管理宏联公司的分许可被许可方或收取特许权使用费的行为，同样不具备协议依据。

保罗公司随后进一步加剧了对宏联公司及其商业关系的潜在损害，其向宏联公司的分许可被许可方发布声明称将采取以下措施：

- 暂停与宏联国际贸易有限公司履行《主许可协议》，并暂停授予宏联国际贸易有限公司分许可权利。
- 在暂停履行期间，对《主许可协议》在中国的履行情况开展全面审计。
- 对违约、违规行为进行全面整改。
- 确保上述"审核"和"整改"期间各级被许可方的正常运营，品牌方保罗弗兰克有限公司也将在中国临时"接管所有 Paul Frank"被许可方。

2022 年 8 月 24 日，保罗公司再次向宏联公司发出所谓的《终止通知》，声称宏联公司存在四项违反《主许可协议》的重大违约行为，并以此为由要求终止经修订的《主许可协议》协议：

1. 伪造授权书(宏联公司的关联实体之一红童纺(上海)文化发展有限公司伪造了保罗公司发出的开设网上商店的授权书("伪造授权书")；

2. 在《主许可协议》规定的许可区域和分销渠道外销售 Paul Frank 产品；

3. 未在《第二修订协议》约定的特别补救期内纠正违约行为；和

4. 拒绝配合致同会计师事务所开展审计工作。

在 2022 年 8 月 24 日发出《终止通知》后的一个月内，宏联公司的 Jennifer Huang 明确要求就被指控的违约行为做出解释、提供证据和支持材料，但保罗公司在 2022 年 9 月 23 日正式终止许可之前以及 2022 年 11 月提交仲裁请求之前，都未提供任何证据来支持这些指控。在 2022 年 9 月 23 日终止协议发布之前，郑先生在新加坡与 Stan Wan 召开了会议讨论情况。据郑先生称，Wan 先生随后进一步提出了要求，重复了保罗公司 2021 年提出的方法，即在发出未解释或毫无根据的《终止通知》后要求修订协议。这次的要求包括允许保罗公司直接向分许可被许可方签发授权书和防伪标签，这些分许可被许可方也将通过保罗公司的 OA(审批)系统直接操作；在成人服装上为保罗公司增加利润百分比；以及宏联公司承担起在全球发展 A.NI.MA 品牌的新责任。

郑先生生作证称，当时他觉得自己被骗了，他不会再考虑保罗弗兰克有限公司提出的新要求否则只会再被再次"欺骗"并剥夺他的许可权。Jennifer Huang 则全盘否认了 2022 年 8 月 24 日《终止通知》中对宏联公司的所有违约指控，并要求对方提供相关证据。但保罗公司始终未向 Huang 女士或宏联公司提供任何实质性证据材料。

此后，保罗公司于 2022 年 9 月 23 日通过电子邮件向宏联公司发送了一份正式的《<主许可协议>终止函》。保罗公司称，其分别于 2022 年 7 月 21 日和 2022 年 8 月 24 日向宏联公司发出的《重大违约通知》和《终止通知》中给予了宏联公司适当的通知和补救机会。因此，保罗公司表示，终止(2022 年 9 月 23 日正式终止)有效。保罗公司的专家 Robert P.Merges 教授指出，终止完全正确："在我看来，从他们所采取的步骤、时间安排和通知的机制来看该终止非常干净利落"。保罗公司的专家认为，《终止通知》和正式终止函在形式上没有任何缺陷。Merges 教授的专家意见仅仅涉及了时间和顺序，但不涉及《终止通知》的实质内容或事实背景。

12

保罗公司称，在正式终止后，其联系了"宏联公司的每个分许可被许可方，将通知他们《主许可协议》已终止，因为一旦保罗公司终止《主许可协议》，每份分许可协议就自动终止，因此，分许可被许可方直接受到宏联公司重大违约的影响。"

保罗公司于 2022 年 11 月 22 日提起仲裁，要求赔偿金钱损失。大约在同一时间，保罗公司聘请致同会计师事务所审查公共记录和宏联公司提供的文件，据称是为了查明宏联公司的重大违规行为，并"对宏联公司多年来遵守《主许可协议》法律的情况进行详细分析"。保罗公司声称，除了构成终止基础的那些重大违约之外，还发现了大量证据证明宏联公司的进一步重大违约，这进一步支持了保罗公司终止对宏联公司的许可和重大违约的主张。2023 年，保罗公司开始直接在中国市场签订许可协议。保罗公司称，其能够谈成的许可费大大低于前几年的水平，于是许可费的降低成为了保罗公司向宏联公司申诉商誉损失的依据。

四、 协议

首先，这是一项违约纠纷。核心协议是《主许可协议》。该协议在 2018 年 4 月 27 日至 2022 年 2 月 10 日期间历经三（3）次修订，其中对本案分析最具关键意义的是《主许可协议之第二修订协议》。

A. 《主许可协议》的相关规定

2015 年 1 月 1 日《主许可协议》关于本仲裁问题的关键条款包括：

第 1 条 概述了许可的基本事项：

*"1. 许可。*

*(a) 许可方特此向被许可方授予产权和核心知识产权修改项下的独占的、可分许可的、不可转让的许可，用于(i)设计、开发、制造、营销、促销、分销、广告、销售要约、出售、提供，并在许可区域和分销渠道内提供许可产品，以及(ii)在许可区域内和许可期限内提供许可服务(统称为"许可")。"*

【与许可范围有关的规格，包括许可区域详情、许可期限、许可费用及付款日期、准许的许可产品类别、分销渠道(例如零售店的类型)，以及许可方在取得证明书、注册、政府批准等方面的合作，均载于《主许可协议》所附的附录内。】

第 2 条对被许可方可以销售的地理区域及其从事的分许可被许可方可以出口的许可区域进行了限制：

2. 许可地域和分销渠道

*(a) 此处授予的许可仅限于许可区域。除了本《协议》另行规定之外，不得向任何(被许可方知晓或有理由相信会将许可商品出口给许可区域以外的各方的)客户作任何销售，也不得将再许可授予任何(被许可方知晓或有理由相信会将许可商品出口给许可区域以外的各方的)被再许可人。本《协议》不得以违反许可区域任何国家反垄断法的任何规定的方式，或以违反许可区域任何限制性惯例立法的任何规定的方式进行解释，也不得以上述方式行使授权。*

第 9 条 涉及产权（即品牌）的所有权和保护。

第 9 条 其中包括有关知识产权始终归萨班集团(许可方)所有的规定，包括产权的衍生和新版本。还规定被许可方有责任在法律范围内自费识别品牌滥用情况并采取行动，如打假行动或其他诉讼，以保护品牌：

*9. (c) 被许可方在自行承担费用的情况下根据适用法律，有责任积极监督许可区域识别滥用产权，并且应当采取一切合理必要的或可取的行动来保护产权，包括就产权的侵权或仿冒提出索赔方面，开展调查，突袭，采取行政措施，执法行动，反盗版行动，诉讼，起诉，法律行动或法律程序。*

13

上海东方飞译中心有限公司
翻译专用章
CERTIFIED TRANSLATION

对这一争议具有重要意义的是，《主许可协议》第 13 条规定了许可方可以因被许可方的表现不尽人意而终止许可的有限情形。请注意，除破产类情况外，许可方仅可在发生重大违约行为时终止许可，并按规定提前三十(30)天向被许可方发出通知，在通知期内，被许可方可通过纠正重大违约行为避免终止许可。以下有限的情形会导致重大违约的发生，而这些情形均涉及被许可方的行为，这意味着除非 (a) 被许可方在指定的许可区域或分销渠道之外运输或销售许可产品，或者 (b) 被许可方在指定地区之外提供保守服务，或者 (c) 被许可方从事超出授权范围的【其他】行为，并且该行为对知识产权相关的商誉和市场价值产生了不利且重大的影响持续了至少 120 天，或者 (d) 被许可方或其任何高管或所有者犯有欺诈或其他任何行为……这种行为对知识产权相关的商誉和市场价值产生了不利且重大的影响，且这种不利且重大的影响持续超过一百二十（120）天，否则不存在重大违约。从这一表述中可以清楚地看出，"重大违约"的先决条件是被许可方未经许可的行为。而且，如果该违约行为未涉及域外销售、运输或服务的情况，则被许可方(或其所有人或高级职员)未经许可的行为(超出许可范围)必须在较长时间内产生重大的不利后果，才可视为重大违约。。

"知识产权" (在《主许可协议》/《第二修订协议》中)是指《主许可协议》附录一所列的保罗公司知识产权(由商标、版权、设计等组成)，并包括核心知识产权，主要是"Paul Frank"商标本身以及 Julius 设计。

重大违约的定义和终止合同的先决条件如此严格是有道理的。在本《主许可协议》中，被许可方自许可期限伊始已预付了大部分相关费用，而且数额巨大(6,500 万美元用于支付在"许可区域"使用《主许可协议》所定义知识产权的 15 年的费用)。必须保护被许可方，使其免受随意的违约指控或过于宽泛的"重大违约"定义的影响，并使其免受在较长时期内因非重大的不利行为而受到处罚的影响，这样其预付投资才能得到合理的安全保障。

*13. 终止、违约和破产。*

> *(a) 由许可方作出的终止。如果……ii)被许可方对本《协议》犯有重大违约行为(如下定义)，许可方应有权提前三十(30)天向被许可方发出书面通知至止本《协议》(除了因违反以下第13(b)(i)，许可方应有权立即终止本协议之外)，除非被许可方在此三十(30)天期间内彻底纠正该等违约行为，否则该终止通知应生效。*

> *(b) 以下情况视为构成本协议项下的重大违约：*

>> *(ii) 许可商品被销往或流通到许可区域和/或分销渠道以外的地方，或从许可区域和/或分销渠道以外的地方运进来，或在许可区域和/或分销渠道以外的地方提供授权服务(除了附录 B 下另外允许的之外)；*

>> *(iii) 被许可方从事的行为超出了本《协议》下所授予的权利，该行为致使与产权有关的商誉和市场价值受到重大不利的影响，并且该等对商誉和市场价值的重大不利影响持续有一百二十(120)多天；*

>> *(iv) 被许可方或被许可方的任何高管或所有者犯有欺诈罪或任何其他行为或疏忽，这些行为致使与产权有关的商誉和市场价值受到重大不利的影响，并且该等对商誉和市场价值的重大不利影响持续有一百二十(120)多天(为避免疑义，双方同意被许可方违反本《协议》第34 条中的任何声明与保证的行为，并根据《反海外腐败法》(FCPA)造成对许可方或许可方的附属公司的任何高管董事，首要负责人，或所有者的定罪，应被视作是第 13(b)(iv) 下的重大违约行为)。*

> *(c) 许可方违约……*

> *(d) 被许可方违约如果被许可方违反本协议，但不属于重大违约，许可方可向被许可方发出书面违约通知，在此情况下，被许可方有三十(30)天的时间纠正违约行为。如果在违约通知发出后三十(30)天内仍未对违约行为进行纠正，则该违约行为应视为仍未未纠正违约行为。被许可方应就每项未纠正违约行为支付 20,000 美元的罚款。*

上海xx翻译中心 有限公司
翻译专用章
CERTIFIED TRANSLATION

**B.    《主许可协议之第一修订协议》**

2018 年 4 月 27 日的《主许可协议之第一修订协议》中所涉及的一些关键条款是：

《第一修订协议》第 3 条，删除《主许可协议》中以香港法律为准据法，代之以加利福尼亚州法律。《第一修订协议》还规定，《主许可协议》仍然有效，如果《第一修订协议》与《主许可协议》相冲突，则应以《第一修订协议》为准。

**C.    《主许可协议之第二修订协议》**

2021 年 8 月 19 日的《主许可协议之第二修订协议》包含了一些条款，约定了宏联公司将为 A.NI.MA 品牌(保罗公司将依靠宏联公司进行该品牌开发)的许可支付新的额外的统一费用预付款(850 万美元)，以及保罗公司转让给己方的品牌管理服务的新费用，以及其他新的利润百分比付款。就《主许可协议》和本争议所涉及的活动而言，第 7 条是解释本《第二修订协议》的关键条款。

7.    特别补救期和豁免

   i.    *许可方特此同意授予被许可方自第二次修订日期起六(6)个月的特殊补救期，以便被许可方可以采取任何必要的行动，以纠正当前发生的任何潜在违约和不当行为，无论许可方已知或不知。补救期截止日期为 2022 年 2 月 19 日("补救日期")。*

   ii.    *考虑到被许可方在本第二修订协议下的义务，在第 li(a)条中规定的付款义务由被许可方完成并履行后，许可方同意免除被许可方应已知的或应在第二次修订日期之前为许可方所知的潜在违约行为而承担的任何和所有责任。*

   *许可方在此声明并保证，其已向被许可方露了所有已知的潜在违约行为。*

   iii.    *补救日后，许可方有权进行尽职调查，以确定是否存在未纠正违约行为。如果在补救日之后，被许可方仍未履行该补救义务，双方应真诚合作解决该问题。在进行尽职调查时，被许可方应与许可方和或许可方指定的实体合作进行尽职调查，以便向许可方提供与尽职调查有关的任何文件。。*

   iv.    *补救日之后，如果任何一方发现任何新的违约行为，双方同意共同努力补救，违约方应纠正该违约行为。*

与《第一修订协议》类似，《第二修订协议》同样针对《主许可协议》这一基本"协议"执行，当《第二修订协议》与《主许可协议》发生冲突时，以《第二修订协议》为准。《第二修订协议》第 7 条为被许可方宏联公司提供了额外保护，即在宏联公司涉嫌违约或重大违约的情况下，提供包括善意"合作"或"共同努力"在内的额外机会。首先，《主许可协议》第 13 条(如上所述)规定了被许可方的行为或疏忽可能构成违约或重大违约的条件。如果其行为达到了重大违约的门槛之一，许可方可以终止许可，但必须向被许可方发出适当的通知并提供补救条款。在《主许可协议》增加《第二修订协议》后，被许可方可享受自《第二修订协议》修订日起新增的为期 6 个月的"特别"补救期(即至 2022 年 2 月 19 日)，以便在发生违约(任何违约，而不仅仅是重大违约)时尝试进行补救。

除了这一新的特别补救期之外，根据《第二修订协议》，被许可方(一旦履行了额外的预付款义务(第 1.i(a)条))还将获得更多的保护。在新的付款之后，被许可方可享受保罗公司扩展的明确表示的免责条款，该免责条款适用于截至《第二修订协议》修订日期(2021 年 8 月 19 日)时，许可方已知或应当已知的任何潜在违约(不仅限于重大违约)。由于《主许可协议》和《第二修订协议》涉及的大多数行为都与商标、营销、公共设计、促销和其他宣传或面向公众的活动有关，也与知识产权注册和在商业物品上使用品牌有关，或与公众商誉有关，并发生已知的不利影响，因此可以说，大多数潜在的违约行为都属于许可方知道或<u>理应知道的行</u>为。无论如何，对于被许可方而言，在《第二修订协议》生效日期（以及<u>额外付款</u>）之后，新增的明确免责条款是针对被许可方违反《主许可协议》的某些行为的又<u>一重重保护</u>，使其免

15

于因违约而被终止协议或受到处罚。

保罗公司错误地将对被许可方的豁免理解为"取决于宏联公司满足补救和尽职调查的要求。这是对《第二修订协议》唯一合理的解读。整个协议以宏联公司纠正其之前的违约行为并同意接受全面审计为条件,以证明其纠正了违约行为。如果保罗公司要求进行补救和尽职调查,但却同意放弃豁免,而不管宏联公司是否确实纠正了违约行为,这将是极其不合理的。"

事实上,豁免并不依赖于违约行为是否得到纠正,否则豁免就没有什么意义。相反,本协议规定的豁免条款旨在保护已预付许可费、并额外支付大额款项的被许可方权益。否则将有违合理商业原则。《第二修订协议》增加了关于已补救的违约情况被发现或继续存在的约定。这需要双方合作和共同努力,而不是剥夺被许可方已有的保护。

随着《第二修订协议》的实施,对被许可方具有进一步附加价值的条款是,如果违约行为在6个月补救期之后仍未得到纠正,则双方应真诚合作解决问题。该条款似乎要求许可方和被许可方在《第二修订协议》修订日期和特别补救期之后进行真诚合作,以达到完全补救的结果,但不一定会要求进行该等合作。无论是在尽职调查方面,还是在与任何未被豁免的未纠正违约行为有关的"问题"方面,以及在被许可方应努力纠正的新违约行为方面,所需要的都是许可方和被许可方之间的真诚合作。合作或共同努力的期限没有明确的时间限制。

五、 索赔

以下对本仲裁索赔的裁定在其分析中包含了仲裁员认为属实且对裁决必要的事实,如果本文件所述事实与任何一方的立场不同,或与上述事实认定中叙述的事实不同,则这是仲裁员就可信度和相关性、举证责任的考虑以及口头和书面证据的权衡所做裁定的结果。

A. 申请人提出的索赔

保罗公司向仲裁员陈述其问题摘要时指出,仲裁需要考虑的唯一问题是保罗公司在仲裁开庭审理时提出的问题,即:

1. 宏联公司多次、持续、严重违反《主许可协议》,且未对违反行为进行纠正。

2. 保罗公司有权因宏联公司的违约行为获得金钱损害赔偿。

事实上,申请人在庭后简述中还提出了其他索赔。提到了违约索赔、违反诚信和公平交易默示公约索赔、违反《兰哈姆法案》索赔和不当得利损害赔偿。在庭后简述的结尾,申请人似乎放弃了默示公约索赔。此外,虽然申请人继续根据《兰哈姆法案》和"不当得利"索赔提出其他损害赔偿数额(在括号内),但申请人从未充分论证《兰哈姆法案》的适用性,因为该法案无法推翻对域外管辖权的推定。宏联公司并未被指控在美国销售"Paul Frank"品牌的产品,也未打算或提议在美国销售此类产品;也未被指控许可任何实体在美国销售"Paul Frank"品牌的产品。因此,申请人在本次仲裁中提出的任何关于《兰哈姆法案》的索赔均被驳回。

至于不当得利或其他衡平法或准合同指控,申请人没有说明对不当得利提出索赔的依据,因为申请人没有寻求强制执行独立于合同的义务,也没有声称《主许可协议》是通过欺诈获得的。双方对于合同本身不存在争议。因此,申请人无法就其在仲裁中指控的行为提出不当得利索赔。

B. 申请人的违约索赔——《主许可协议》和《第二修订协议》的严格要求

根据加利福尼亚州法律,要在违约索赔中获得支持,申请人必须证明:(1)合同;(2)申请人履行了合同或因不履行合同而被免责;(3)被申请人违约;(4)由此给申请人造成的损失。该《主许可协议》描述了两种违约情况:(a)重大违约,被许可方一旦违约,许可方有权于收到通知三十(30)天内做出补救。根据该《主许可协议》,除非被许可方在通知期限内纠正违约行为,(b)其他违约(非重大违约),被许可方一旦违约,且在许可方向被许可方发出违约通知后三十(30)天内未纠正违约行为,许可方有权处以 20,000 美元的罚款。

上海东方翻译中心有限公司
翻译专用章
CERTIFIED TRANSLATION

对于许可方在 2021 年 8 月 19 日之后提出的任何违约索赔，必须结合《主许可协议之第二修订协议》(如上所述)对所称的违约行为进行审查。《第二修订协议》的大部分内容，特别是第 7 条，修改或补充了《主许可协议》的第 13 条，该条涉及并界定了《主许可协议》下的重大违约、违约和补救情形。第 7(ii)条还规定(在被许可方履行并完成了某些付款义务之后)，对于被许可方在截至《第二修订协议》修订日(2021 年 8 月 19 日)时知道或理应知道的潜在违约行为的任何及所有违约责任，可予以豁免。此外，在指定的"补救日"(2022 年 2 月 19 日)之后，许可方有权进行尽职调查，其中包括双方合作，由被许可方向许可方提供许可方可能要求的与尽职调查有关的文件。最后，如果在补救日之后，任何一方发现有新的违反协议(《主许可协议》)的行为，双方同意与承诺纠正违约行为的违约方共同努力。

许可方如需对未纠正违约行为收取费用(罚款)，或对未纠正的重大违约行为（根据定义）施以终止协议的处理，其基本先决条件本身是严格的(分别为 13(d)和 13(b)，其中包通知和补救程序，以及在重大违约的情况下，前文所定义的被许可方超许可区域行为和/或相应的不利行为或失误。《第二修订协议》对第 13 条给予被许可方许可方保护的先决条件进行了补充。从商业逻辑上讲，当被许可方为长期许可支付了数百万美元的预付款时，寻求或被赋予这些防止突然的、不合作的或过于激进的惩罚的保护措施是合理的。通过对保罗公司在本次仲裁中主张的每一项违约行为进行细致分析，仲裁员发现，在经过修订并增加了保护措施的《主许可协议》下，申请人所声称的违约行为似乎都不成立。

仲裁员审议了保罗弗兰克有限公司在其损害赔偿表（保罗公司庭后简述第 79 页）中提出的所谓违约类别（包括重大违约及未纠正违约）。正如下面所述，这些所谓的违约行为要么未能达到《主许可协议》中对"违约"的定义门槛，要么未能满足《主许可协议》与《第二修订协议》第 7 条结合后对可诉违约行为所施加的额外要求，具体如下。（几乎在所有情况下，宏联公司都没有收到关于违约书面通知和合同规定的补救期的信息，而这二者是认定违约的先决条件。）

1. 伪造保罗公司的正式文件——所有伪造行为（如果有的话）都是由第三方或分许可被许可方所为，而非宏联公司；宏联公司直到被保罗公司告知才知道红童纺公司使用伪造文件的不良行为，当时宏联公司立即采取行动进行调查，并促使红童纺公司进行补救(停止该不良行为)。

2. 注册和销售未经授权——未经授权的商标和网址注册由分许可被许可方(即杭州磨坊和盈芮公司)进行。Jennifer Huang 在得知有未经授权的注册后，立即对盈芮公司进行了处理；对于其他未经授权行为，保罗公司没有根据《主许可协议》的通知和补救程序发出足够的通知，也没有遵循《第二修订协议》的诚意合作要求。对于所称的未经授权注册"Paul Prime"商标的行为，保罗公司没有根据《主许可协议》提供足够的通知和补救机会；这一侵权行为(如有)会在《第二修订协议》中获得豁免。

3. 许可区域和分销渠道之外的销售行为——保罗公司未能证明宏联公司存在超出许可区域或分销渠道的销售行为，仅证明了分许可被许可方存在此类行为。保罗公司没有提供足够具体的关于超出许可区域或分销渠道的销售或分销的通知，以便宏联公司对保罗公司显然已知的销售或分销情况进行处理或尝试纠正。保罗公司知晓或应当知晓的那些问题（宏联公司并未隐瞒任何问题）亦因《第二修订协议》获得豁免；正如保罗公司的专家所称，其他问题直到仲裁程序中才被保罗公司披露，因此缺乏当事方的必要合作，并且没有给宏联公司提供补救的机会。

4. 奶茶和汉堡特许经营未经授权——奶茶的违规经营行为是分许可被许可方的行为，宏联公司在了解这一情况后及时进行了处理。宏联公司本身获准在其咖啡馆和餐饮渠道下从事奶茶特许经营服务。直到保罗公司提仲裁请求后，宏联公司才收到关于汉堡特许经营活动或许可问题的通知，因此没有机会进行补救。

5. 中国国内的品牌产品不符合检验标准——这些产品由第三方或分许可被许可方提供，并非

上海东方翻译中心有限公司
CERTIFIED TRANSLATION

些是由萨班集团批准或允许的(因此是在诉讼时效截止日期之前)；有些是根据《第二修订协议》豁免；对于补救日之后可能进行的任何情况，双方本有机会进行合作或宏联公司本有机会进行补救，但保罗公司均未发出通知。保罗公司无法证明对市场价值或损失有实质性影响。

6. 未经授权的联名——申请人方专家指出的许多未经授权的品牌联名都是萨班集团在其所有权期间批准的；萨班集团之后的一个大型品牌联名项目是酒店客房，直到提起仲裁时才被告知，因此没有提供合作或宏联公司补救的机会；其他品牌联名是保罗公司知道或理应知道的，并且在签署《第二修订协议》时已获豁免。

7. 促销活动未经授权——根据申请人提供的损害赔偿表，这几乎没有造成任何损失；直到仲裁开始后保罗公司才向宏联公司发出关于未经授权的促销的通知，因此没有给宏联公司提供合作和补救的机会。

8. 销售类别不在许可产品类别之内——与叠茵公司的合作属于分许可被许可方的行为；此外，这些销售领域大多已为保罗公司所知，并且根据《第二修订协议》获得豁免；贵金属及金银币产品系列主张受诉讼时效的限制，属于历史遗留问题；其他主张直至仲裁启动后才提出，因此未给予宏联公司协作或补救的机会。

9. 抛售期后的销售——根据定义，该行为发生于协议终止后，此时已无法提供必要的合作或适当的通知与补救措施。

10. 未能提供所需的报告——在《第二修订协议》之前所指控的该项违规行为，保罗公司显然知晓并在《第二修订协议》中予以豁免。继《第二修订协议》之后，确实进行了一些报告；在终止协议之前，保罗公司并未通知宏联公司其根据《第二修订协议》提交的报告被认为不充分，因此未给予宏联公司协作、合作或补救的机会。

11. 未遵守审计条款——《主许可协议》和《第二修订协议》实际上并未包含审计条款；《第二修订协议》赋予了保罗公司进行尽职调查的权利，并要求被许可方进行合作并提供所需的文件。没有证据表明被许可方未能提供任何所要求的文件，仅显示其对保罗公司关于需要或令它进行审计的通信感到困惑。即使合同要求进行审计（实际上没有），也没有提供必要的通知和补救期。

12. 未将分许可情况进行报告——申请人认为这一点造成的损失相对较小；直到仲裁后才通知宏联公司，因此没有给宏联公司提供合作和补救的机会。

13. 商誉损害——根据申请人专家的说法，他们根据整体情况和延长的时间框架评估了商誉损害，而非针对任何单独指控的违约或违规行为（与特定违约或违规行为无关）。

判断宏联公司是否对修订后的《主许可协议》（包含其通知、整改、协作与合作条款）等存在重大违约或其他违约行为，需要结合《主许可协议》和《第二修订协议》中规定的定义、步骤和必要程序，对所指控的违约行为进行仔细分析。损害赔偿是合同索赔的必要要素。然而，Merges 先生在证词中称，他获得的任何有关估值的事实信息均由 Moser 先生提供；Merges 先生可以确定哪些因素有可能损害品牌价值或商誉，但不能单独确定价值或损害程度。Merges 教授也无法核实 Moser 先生所引用或依赖事实的准确性。关于 Moser 先生的证词对评估是否存在造成损害的违约行为的有用性，这对于在加利福尼亚州的违约索赔中获胜至关重要，Moser 先生作证说，他无法量化任何特定的所指控的违约行为对品牌的影响。他将自己的分析描述为计算多年来发生事件的总体影响。因此，无论是评估所指控的重大违约（如《主许可协议》所定义）还是评估不属于重大违约定义的违约行为，Moser 先生和 Merges 教授都没有提供计算因违约或不履约所造成的损害或损失的方法，而这种计算方法对于确立合同违约是必要的。事实上，鉴于双方合同结构的特点是在许可期开始时支付一次性预付款，且正如被申请人专家令人信服地指出的那样，商誉减损无法简单地通过比较不同时期不同许可的价格或价值来准确评估或估算（考虑到诸多因素的影响），因此很难根据证据确定保罗

上海方舟译审有限公司
翻译专用章
CERTIFIED TRANSLATION

18

公司是否因违约而遭受损失或对品牌价值造成不利影响。

以上列出的指控重大违约和未补救违约的类别说明，被许可方并不存在任何符合《主许可协议》和《第二修订协议》中的定义和条件的实际可诉违约行为（无论是重大违约还是其他未补救违约）。仲裁员认定，按类别对指控进行分组以及所列的具体类别符合 JAMS 规则下关于裁决理由需简明扼要的要求，并且在此情况下，也足以支持认定宏联公司不存在可诉违约行为的结论。

c. 保罗公司主张的重大违约不能作为终止《主许可协议》的理由

2022 年 8 月，保罗公司试图发出一份《终止通知》（目的可能是迫使被申请人作出让步并对《主许可协议》作出新的修订（如前所述），或根据该通知实际终止许可）。如上文协议部分所述，《主许可协议》允许许可方在被许可方发生重大违约（定义见下文）且未能在许可方就该重大违约向其发出书面通知后 30 天内予以补救的情况下终止协议。申请人辩称，保罗公司通过《终止通知》向宏联公司发出了适当的通知并给予了补救机会。保罗公司的专家表示，"就他们【保罗公司】所采取的步骤、时间和通知机制而言，该过程堪称'一次非常干净利落的终止行为'"。

事实上，《终止通知》是无效的。2022 年 8 月 24 日的《终止通知》提出了四个终止理由，表面上均属于《主许可协议》所要求的、能够支持许可方终止协议的重大违约行为：

1. 保罗公司称，宏联公司在文件上伪造了保罗公司的公章，并提供给某些平台用于开设线上商铺；

2. 保罗公司在没有具体说明的情况下声称，宏联公司"在许可区域和分销渠道之外销售和/或分销许可产品"；

3. 保罗公司声称，宏联公司未在《第二修订协议》所述的"特别补救期"内纠正"现有或潜在"违反《主许可协议》的行为(但完全没有具体或明确说明什么是"现有或潜在"违反行为)；且

4. 保罗公司声称，宏联公司错误地拒绝了保罗公司的审计请求。

所有这四项指控都不能作为终止许可的理由，因为事实上，它们并不构成《主许可协议》中定义的重大违约行为，理由如下：

1. 没有证据表明宏联公司伪造过公章或保罗公司的官方文件。事实上，双方都知道，分许可被许可方因无法通过宏联公司获得保罗公司的授权书(LOA)而受挫，之后提交了一份伪造授权书，试图开设一家线上商铺。宏联公司于 2022 年 4 月 19 日从保罗公司处获悉这一不当行为，并在保罗公司发布《终止通知》时仍在进行调查。对于"超出本协议项下授予的许可权范围"构成重大违约的行为，(a)该行为必须由被许可方实施，以及(b)其必须对该知识产权(品牌)的商誉和市场价值产生重大不利影响超过 120 天。而该情况与(a)和(b)条件并不相符。

2. 宏联公司直到仲裁开始前也并不知道保罗公司过于笼统的措辞指的是什么许可产品，后来才知道，保罗公司指的是前分许可被许可方在印度尼西亚销售的品牌太阳镜。因此，这种"超出授权范围"、许可区域之外的行为，是由前分许可被许可方实施的，而不是宏联公司。该情况不属于重大违约，而且已根据《第二修订协议》被豁免。

3. 关于如何确定在特别补救期期间的"现有或潜在的"违反《主许可协议》的行为未得到纠正，《终止通知》对此没有任何解释。宏联公司不知道违约行为是否存在，或者从未存在，是否可能通过补救来避免构成重大违约。实际上，该措辞并未提供任何通知。

4. 关于错误拒绝保罗公司审计请求的指控，宏联公司当时并未意识到该"事项"要求是保罗公司提出的要求提供账簿和记录的尽职调查请求。该要求并非明确提出。无论如何，未能遵守审计要求并非《主许可协议》规定的"重大违约"的依据。

上海东方翻译中心有限公司
翻译专用章

CERTIFIED TRANSLATION

19

收到该《终止通知》后，被许可方授权管理部门总经理 Jennifer Huang 要求提供更多信息，以帮助她处理解罗公司的指控，并协助宏联公司进行补救纠或订正。郑先生立即尝试与未来品牌集团的首席执行官兼董事长 Stan Wan 安排会面。Wan 先生提出了一项"补救措施"，要求宏联公司放弃对保罗公司的任何索赔；让保罗公司直接向分许可被许可方签发所有授权书和防伪标签（从而接管该许可区域的基本许可活动）；在品牌成人服装产品的利润中给予保罗公司绝对多数份额的利益；并要求被申请人承担在全球范围内开发 A.NI.MA 品牌的责任，这是一个耗资巨大的从零开始的项目。郑先生对此感到不满和愤怒，因为《第二修订协议》本应提供的协作与共同协作/合作并未实现。

郑先生和 Huang 女士均不认为宏联公司存在重大违约，并且郑先生不想同意这项在他看来不公平且苛刻的提议。Huang 女士以书面形式向时任未来品牌集团的法务与企业事务总监 Hana Mu 女士否认了指控，并要求其提供所指控重大违约的证据。Mu 女士拒绝提供解释或材料，并在其他非合作性的回应中表示："我们认为他们（指宏联公司）知道一切"。同样，没有提供合同所要求的合作。

2022 年 9 月 23 日，郑先生收到保罗公司的一封正式函件，函件中提及 2022 年 8 月 24 日的《终止通知》，并确认根据《主许可协议》第 13(a)(iii)条的规定，由于被许可方发生重大违约且未能纠正该等重大违约，《主许可协议》现已终止。

保罗公司的行为不仅只是发出了正式的《终止通知》，其还通过直接向分许可被许可方签发保罗公司的授权书来破坏宏联公司与其分许可被许可方的关系，告知他们保罗公司正在取代宏联公司，并开始与其中一些分许可被许可方谈判新的许可协议。宏联公司与至少一个分许可被许可方的关系本已岌岌可危，因为保罗公司拒绝配合向宏联公司提供经认证的授权书，导致宏联公司无法向分许可被许可方交付经认证的授权书。这本身可能就是分许可被许可方伪造保罗公司公章（如果确实发生了）的原因，目的是向某些平台提供开设网店所需的文件。正是这种"伪造"行为构成了保罗公司指控宏联公司犯了"重大违约"的其中一个依据。

在 2022 年 9 月 23 日正式终止协议后，保罗公司与致同会计师事务所(司法会计师事务所)签订合同，助其查明宏联公司可能违反经修订的《主许可协议》的行为。随后，保罗公司于 2022 年 11 月 22 日提交了针对宏联公司的仲裁请求。

**D.**    **保罗公司的《终止通知》和《<主许可协议>终止函》无效，构成其在《主许可协议》项下的违约。**

保罗公司正式终止许可，拒绝与宏联公司合作以使宏联公司了解重大违约(如有)的实情并在此后尝试纠正违约行为，拒绝向宏联公司分许可被许可方签发营销品牌所需的经公证的维权授权书或授权书。其后果是，正如保罗公司所承认的，在所谓的终止日期前至少两个月，保罗公司毫无正当理由地中止了其在《主许可协议》下的履约行为。也就是说，保罗公司在合同期内实质上停止了基本的履约行为，从而违反了合同。

由于保罗公司未能如上所述实质性履行合同(《主许可协议》)，宏联公司被保罗公司指控的任何违约行为(如有)均可免责。保罗公司的《终止通知》存在缺陷，未能向宏联公司提供经过公证的维权授权委托书或授权书，向宏联公司的客户签发自己的授权书，并向宏联公司的分许可被许可方表明自己是真正的利益方，而且拒绝允许宏联公司纠正其可能犯下的任何违约行为，这些都表明保罗公司本身存在重大违约行为。这些行为也表明，鉴于其终止函发出的时间及其前后事件，保罗公司剥夺了宏联公司根据合同本应享有的、对其可能存在的所谓违约行为进行补救的机会。保罗公司于 2022 年 8 月 24 日发出的《终止通知》无效。

因此，《主许可协议》并未得到适当终止，并保持有效至今。即便如此，还有其他理由表明，其他被指控的违约行为都不能构成终止《主许可协议》的依据。除了上述具体原因外，保罗公司也未能证明任何所谓的违约行为对该知识产权的商誉和市场价值产生了不利且重大的影响。

上海东方翻译中心有限公司 翻译专用章 CERTIFIED TRANSLATION

总之，修订后的《主许可协议》是一份有效且具有约束力的协议。宏联公司已完全履行了其在《主许可协议》下的义务。宏联公司支付了《主许可协议》规定的 6500 万美元预付许可费、《第二修订协议》规定的 850 万美元款项，并履行了其在《主许可协议》下的其他义务。即使存在《主许可协议》项下的任何违约行为或不足之处（无论是否被指控为重大违约），根据《第二修订协议》，这些违约或不足之处均被豁免。如前所述，对于《第二修订协议》实施后的任何所指控的违约或违规行为，宏联公司并未获得合同规定的通知和补救、合作和协作的机会，应如宏联公司所请求，给予宏联公司其所达成交易的利益。

E.  **保罗公司未能根据《主许可协议》履行其义务构成违约，宏联公司有权获得其已达成并支付对价的交易利益。**

如上所述，是保罗公司违反了《主许可协议》。保罗公司扣留公证授权委托书和商标证书，并破坏宏联公司在许可区域内对授权产品和授权服务的独占许可权，违反了《主许可协议》第 1（a）节和《第二修订协议》第 2（ii）节。保罗公司干预宏联公司分许可"大嘴猴"品牌的权利、暂停宏联公司的许可、并指示分许可被许可方与保罗公司而非宏联公司合作，这也违反了《主许可协议》。Mu 女士承认保罗公司停止了履行《主许可协议》下的义务，这似乎证实了违约行为的发生。保罗公司声称终止《主许可协议》，但却未遵守第 13 节规定的终止条款（包括通知和补救的要求），这也违反了《主许可协议》。此外，保罗公司从未尝试补救、纠正或减轻其重大违约行为对宏联公司造成的不利影响。

再者，保罗公司未能就《第二修订协议》第 1 节提供实质性利益，因为共同意将 A.NI.MA 品牌许可给宏联公司，但在签署《第二修订协议》之前，A.NI.MA 商标的注册尚未完成，使得宏联公司无法启动该品牌的开发工作。通过声称终止许可时，宏联公司未就该终止允许进行任何纠正与合作，宏联公司也无法有效开发其已付费的品牌。保罗公司的违约行为给宏联公司造成了重大损害。宏联公司的分许可被许可方很可能遭受了重大财务损失。宏联公司被剥夺了剩余八年的利益，而它已为此支付了 7350 万美元（6500 万美元 ＋850 万美元）预付款的利息。

六、  **责任结论**

签署本裁决的仲裁员就责任问题作出裁决，认定宏联公司并未构成重大违约，而保罗公司存在重大未履约的情况，因此宏联公司有权基于合同违约理论获得损害赔偿，该赔偿数额依据浪费成本标准计算。被申请人通过其专家证人在开庭阶段提出了该计量标准，仲裁员在随后就双方诉求和动议出的裁决中确认，该标准属于加州法律下信赖损害赔偿的一种形式。如《中间裁决》、重述《中间裁决》及经修订的重述《中间裁决》中所述，仲裁员裁决如下，并据此认定：没有依据向申请人判予损害赔偿，但有依据向被申请人判了损害赔偿。仲裁员：

(a)  驳回保罗公司在本仲裁中提出的所有救济请求；

(b)  宣告宏联公司并未构成修订后《主许可协议》所定义的重大违约行为；

(c)  宣告保罗公司意图终止《主许可协议》的行为无效；以及

(d)  支持宏联公司针对保罗公司未履约的情况对其提出的反请求，并裁决保罗公司向宏联公司支付因其违约（因其未能且拒绝履行义务所致）而产生的损害赔偿金（基于仲裁中阐述的浪费成本赔偿标准计算），包括加利福尼亚州法律规定的利息。

鉴于上述责任认定构成向宏联公司判予损害赔偿的依据，双方在 2024 年 6 月 25 日至 2025 年 5 月 28 日期间就损害赔偿提交的各种书面陈述以及其他诉求和动议中对此进行了讨论和辩论，仲裁员已撤回《中间裁决》中规定的强制履行和禁令临时措施或建议。这些禁令措施是当事方在仲裁管辖范围内、于损害赔偿具体救济方式和金额最终确定之前，为诚实损害、避免未来对品牌或商业关系造成伤害、防止损失发生和/或维护既有商业关系存在合作可能、和/或实现有序退出而可能采取的措施或依据。但相关措施大部分遭到当事方的忽视或反对。因此，现阶段仲裁员未对任何当事方施加新的履约要求或任何禁令救济措施。*如前所述，*

21

求提供正式文件等），即不强制其恢复原状、维持现状或使其行为符合《主许可协议》或《第二次修订》条款的规定。

申请人专家 Bryan C. Moser 在其针对重述中间裁决的答复及开案陈述报告（第 13 页）中阐明了一项关于合同或许可争议中适用浪费成本计算的基本原则——该原则适用于本案，以避免被申请人就仲裁庭已认定的责任获得重复赔偿。Moser 先生提出的该一般规则全文引述如下：

"¶49.所采用的浪费成本赔偿标准中，未将宏联公司作为被许可方恢复运营的情形纳入考量。浪费成本损害赔偿计算是指，向宏联公司退还从协议终止日至 2030 年《主许可协议》到期日期间对应的许可费部分。该条款默认被许可方不会恢复运营，这导致宏联公司将（或可能将）继续保有该许可的使用权的同时，仍能获得未来时段许可费的退款。因此，对于恢复许可……（将）使宏联公司后续得以继续享有《主许可协议》权益的事实并未纳入考量。这实质上构成了损害赔偿的'双重受偿'。通过载定所有浪费成本和恢复许可，宏联公司基本上获得了直至 2030 年 2 月 28 日的许可证的'免费使用权'。"

因此，仲裁员明确表示：本裁决仅采用信赖损害赔偿（即浪费成本损害赔偿），未强加禁令救济或其他特定履约措施。

截至当前的仲裁费用未予载准。

### 七、 损害赔偿问题

#### A. 加利福尼亚州允许以"浪费成本"的形式主张合同违约的信赖损害赔偿。

申请人在其损害赔偿陈词中主张，浪费成本损害赔偿在加州法律中不属于"适当的损害赔偿形式"。加州立法机关及最高法院均明确，违约诉讼的目的是使申请人恢复到"假设违约未发生时其应有的经济地位"。根据《加利福尼亚州民法典》第 3300 条规定，对于违反合同义务的行为，损害赔偿的衡量标准为"补偿受害方由此直接遭受的所有损害的金额"，或"在正常情况下，可能由此产生的金额"。

正如仲裁员在 2025 年 5 月 8 日《关于申请人中止或重启仲裁请求事项的裁决书》中所述，本案应用的仲裁协议并未对可载定的损害赔偿类型作出明确限制（除其中提及的与本案无关的禁令救济情形外）。

根据加州法律，损害赔偿通常分为两大基本类型，即预期利益损害赔偿与信赖损害赔偿。这些赔偿类型可能以多种名称或标签出现，例如"交易获益损失"、"直接损害"、"间接损害"、"自付成本"、"返还性赔偿"等。无论特定损害赔偿在实际中以何种方式描述（例如工资损失、零部件成本增加、替代或更换费用等），其具体命名方式本身并不影响对某一类损失或损害赔偿的认定。此一般规则可对比参照"美国规则"的具体适用情形。在"美国规则"中，若将损害赔偿明确界定为律师费，则意味着该费用在在特定情形下被排除在可赔偿损害范畴之外。

在本案中，被申请人在陈词、专家报告和摘要、以及开庭程序中所述的浪费成本损害赔偿，实质上是信赖损害赔偿的具体表现形式。根据加州法律，合同违约案件允许主张信赖损害赔偿，特别是在下列情形下：（1）预期利益赔偿（即假设合同正常履约时对约方本应获得的收益）难以证明；（2）该等赔偿具有过度推测性；或（3）涉案合同本身可能存在无盈利性。信赖损害赔偿旨在使守约方恢复至若其未曾信赖违约方承诺时本应处的状况。当期待利益损失具有过度推测性，或申请人因违约遭受损失但期待利益损失难以确定时，法院可判予信赖损害赔偿。就同一索赔或交易，法院通常不会同时判予信赖损害赔偿与期待损害赔偿，以避免当方子获得超额补偿而非公平救济。其核心目的在于，当守约方因信赖对方承诺而遭受损失时，通过损害赔偿使其恢复至信赖该承诺之前原有的财务状况。

加利福尼亚州司法委员会《民事陪审团指引》第 361 号就"信赖损害赔偿"给出如下（可调整）指引：

若贵庭裁定［被告姓名］构成违约，则［原告姓名］可主张追偿其为准备履行合同而支出的合理金额。该等金额即称为"信赖损害赔偿"。［原告姓名］须举证证明其基于对合同之信赖而支出的具体金额。若［原告姓名］成功证明信赖损害赔偿成立,[被告姓名]可通过举证以下[一项或全部]事由，主张免除[部分或全部]赔偿责任：

[1.[原告姓名]基于信赖支出的[部分或全部]费用确属不必要；].[或]

[2. 即使[被告姓名]已完全履行[其]合同义务,[原告姓名]仍将遭受损失。]

被申请人在其损害赔偿陈词中援引美国《合同法重述（第二次）》第 349 条关于信赖损害赔偿的规定，该条款明确，在合同违约诉讼中，将"为履约准备或实际履约过程中产生的支出"作为替代性损害赔偿计算依据。加利福尼亚州最高法院及上诉法院认可信赖损害赔偿的判例，包含当事方基于"合同信赖"而支出费用的情形，详见 Agram 诉 Gavra 案（《加利福尼亚州上诉法院判例汇编》第 236 卷第 4 辑第 91 页，2015 年）。或指合同一方愿意履行合同义务却遭另一方阻止的情形，此时损害赔偿的衡量标准为守约方的实际损失，可体现为其为履约所支出的合理费用，详见 Buxbom 诉 Smith 案（《加利福尼亚州判例汇编》第 23 卷第 2 辑第 535 页，1944 年）。

申请人未援引任何判例来支持以下主张：当信赖损失实际发生时，不应判定信赖损害赔偿；或基于对合同条款或合同义务的信赖而产生的成本损失或支出损害（无论采用何种名称），不应予以赔偿。而申请人援引的 Cooper 诉 Lavely & Singer 专业公司案（《加利福尼亚州上诉法院判例汇编》第 4 辑第 230 卷第 1、17 页，2014 年）中，更多地讨论了当救济措施未得到当事方仲裁协议或适用法律的授权时，对仲裁裁决进行司法审查的范围和标准，而未论及信赖损害赔偿（无论以何种名称）的不可用性。此外，双方当事方似乎均认为，Fahnestock & Co 诉 Waltman 案（《联邦判例汇编》第二辑第 935 卷第 512、519 页，第二巡回上诉法院，1991 年）在本案中并不适用。

开庭程序中，宏联公司已证明其"基于对合同（即《主许可协议》）的信赖而支付了[许可费]"。被申请人支付了一笔大额固定费用，并在后续交易中支付了另一笔大额固定费用，以换取其在《主许可协议》及《第二修订协议》中议定的承诺项。加利福尼亚州的判例法明确指出，被申请人就信赖损害赔偿的举证责任并不繁重。事实上，正如 Agam 诉 Gavra 案（《加州上诉法院判例汇编》第 4 辑第 236 卷第 91、105 页，2015 年）所述，根据美国最高法院经典判例 US 诉 Behan 案（《美国判例汇编》第 110 卷第 338 页，1884 年），守约方"显然有权获得其实际支出的赔偿，除非自愿停止履行合同义务的另一方能明确证明该赔偿请求缺乏依据"。除明确赋予守约方"追偿其实际支出与费用"的权利外（详见 Agram 案，第 91 页），加州法律仅规定两项限制性情况可用以缩减信赖损害赔偿。第一种情形是：被申请人自身基于合同信赖作出过度或不合理支出，此时若裁定支持申请人的信赖利益主张可能导致不公正结果。另一种情形是：违约方能够证明，即便其实际履行了合同义务，守约方仍将遭受重大损失。申请人未能证明存在上述两种限制情形，且根据本案仲裁程序中呈现的事实，该等情形似乎亦不成立。因此，被申请人为履行合同所作准备支出的费用（本案中即许可费）应作为"信赖损害赔偿"予以追偿。此项赔偿并非未来损害赔偿款项，因为该金额既非通过分期付款或其他周期性支付的方式在未来持续支付，亦非参照未来预期收益金额进行计算。事实上，该笔款项系被申请人基于"对合同的信赖"而预先支付的固定费用，已在过去为预期履约行为完成全额支付。

**B.** **被申请人并未就其就 2022 年 9 月 22 日合同终止及违约行为之后的许可期内信赖损害赔偿权。**

申请人主张：即便仲裁员最终认定可采用浪费成本或信赖损害赔偿作为衡量标准，仍应驳回被申请人的此项赔偿请求，因其未在本次仲裁的书面陈词或其他陈述中明确提出该项主张，已构成对相关权利的默示放弃。仲裁员已在先前针对《中止或重启仲裁程序请求》相关陈词的裁决中考量过此项主张，并认定：被申请人的损害赔偿专家 Pauline Booth 就浪费成本损害

23

713

赔偿及其适用结果发表意见并进行阐释时，已使申请人充分知悉将采用信赖利益型赔偿标准；被申请人在其书面陈述中主张浪费成本损害赔偿时亦履行了同等告知义务。

根据先前裁决，被申请人并未放弃浪费成本赔偿的主张权，并且已充分告知申请人将采用此项赔偿标准。但根据该告知内容，仲裁庭认定此项衡量标准不适用于 2022 年 9 月 23 日之前的潜在损害赔偿主张。正如申请人所主张，Pauline Booth 女士采用浪费成本（信赖利益）衡量标准的方式，系针对 2022 年 9 月 22 日《主许可协议》终止事件所引发的后果。根据 Booth 女士自 2022 年 9 月 22 日终止日起算，被申请人基于对 15 年零 2 个月合同期限的信赖而支付一次性许可费用，合同已履行 7 年 8 个月 23 天。

因此，就主张 2022 年 9 月 23 日（即 9 月 22 日之后）起算期间的浪费成本赔偿而言，被申请人并未构成权利放弃。

C. **以"浪费成本"形式主张的信赖损害赔偿，适用于救济保罗公司对宏联公司在《主许可协议》项下合同权利及合同预期利益的根本违约行为。**

申请人同时提出异议，认为浪费成本赔偿并非被申请人损害赔偿的真实衡量标准，且被申请人预期持有许可的期限不能简单地用已支付金额均摊计算，原因在于：(i) 被申请人不同时期的预期收益存在差异，事实上，根据 Booth 女士的评估，若许可协议未被违约，被申请人乃可继续获得与过去两年基本相同的特许权使用费收益；(ii) 被申请人无权就未来损失主张赔偿。申请人的第一项异议（i）实质上针对的是期待利益赔偿标准，而非信赖利益赔偿标准；第二项异议（ii）如前所述，在本案中无需考虑。

**就本案而言，若采用预期利益损害赔偿标准，并考量可能影响赔偿金额的各项因素，将导致计算过程异常复杂且艰巨；因此，与案件事实相符的信赖利益赔偿标准因其简便性、赔偿金额确定性更高而更具适用优势。同理，此项衡量标准不会随年份差异而变化，原因在于：本案实质针对的是被申请人支付的一笔固定额许可费，该费用系为其预期可获得稳定许可授权而支付——无论被申请人后续如何利用该许可发展业务（包括不同年份利润波动、发展期可能出现盈亏交替等情形）。固定许可费通常由合同明确约定，且一般经由双方协商达成一致后最终确认。固定许可费的这一典型特征（以及其他因素）表明，该费用为衡量被申请人因违约拒绝给付可使用授权（无论授权时未来利润或其他成功指标存在多大不确定性）所遭受损失的公平合理依据。本案中，被申请人专家提出的"浪费成本"这一信赖利益损害赔偿衡量标准，相较于需考量零售市场波动因素的长期许可协议下的预期利益赔偿标准，能提供更为稳定且易于确定的赔偿金额。**

本仲裁程序已查明：被申请人宏联公司于 2015 年分两期（分别为 1000 万美元和 5500 万美元）预先支付了总计 6500 万美元的固定许可费，所获许可期限自 2015 年 1 月 1 日起至 2030 年 1 月 28 日止。Booth 女士在其《开案报告》中引用《主许可协议》时指出，构成信赖损害赔偿基础的两笔付款分别为：宏联公司支付的"全额预付许可费 5500 万美元"以及"不可退还的延期费 1000 万美元"。被申请人主张，尽管 Booth 女士明确将 2022 年 9 月 23 日（即申请人不当终止《主许可协议》导致被申请人合同预期利益受损的日期）作为计算宏联公司合同履行利益损失的起始点，但鉴于保罗公司多次拒绝履约的情形，更早的违约期间也应纳入损失计算范围。尽管如此，鉴于申请人提出的弃权主张以及要求向其履行告知义务的论证力度，本仲裁员最终选定了 Booth 女士明确指明的期间：自 2022 年 9 月起，至《主许可协议》约定的许可期合同终止日 2030 年 2 月 28 日止（下称"许可期"）。

因此，《主许可协议》于 2022 年 9 月 22 日终止时，该 15 年零 2 个月的合同期限已履行 7 年 8 个月 23 天。正如 Booth 女士在《开案报告》第 6 节所述，全额支付的许可费通常在权利授予的整个许可期内进行分摊。本案中，该计算方式与宏联公司财务报表中对许可费的分摊处理相一致，此点已由 Booth 女士引用证明。根据 Booth 女士在《开案报告》续及 2024 年 3 月 7 日陈述中的主张，截至终止日，固定许可费中可分摊至 2015 年 1 月 1 日至 2022 年 9 月 23 日许可期间的部分为 28,033,883 美元，剩余许可期部分对应金额为 26,966,117 美元，

24

该部分即构成因申请人违约不当终止《主许可协议》所致的浪费成本损害赔偿金额。

**D.**  **宏联公司就违反《第二修订协议》或品牌管理费用支付所主张的信赖损害赔偿请求未能提供充分证据支持，不予支持其禁令救济申请。**

除因违反《主许可协议》不当终止产生的 26,966,117 美元浪费成本损害赔偿外，宏联公司另主张并经由 Booth 女士核算下述基于信赖利益的额外损害赔偿：（1）就 A.NI.MA 品牌授权费及其他基于双方于 2021 年 8 月 19 日签订的《第二修订协议》所涉事项，宏联公司向保罗公司支付的 850 万美元；（2）品牌管理费 217,178 美元。

关于《第二修订协议》项下（与《主许可协议》同期限）的最低保证付款，现有证据充分表明：宏联公司因保罗公司延迟履约及履约不充分而遭受预期利益损失。不可否认，宏联公司确因该笔付款获得了其认可的若干权益，至少包含：对于《第二修订协议》签署前宏联公司被指控的特定历史违约行为的责任豁免保证。宏联公司还主张其未能获得对价利益，因为即便在《第二修订协议》生效期间，保罗公司多次（包括本次仲裁程序中）否认该修订协议构成其对所指称宏联公司违约行为的豁免。在本案仲裁中，仲裁员在认定申请人及/或被申请人就《主许可协议》相关索赔主张应承担的责任时，仍将《第二修订协议》对既往违约行为的豁免纳入考量范畴。仲裁员认定：就《第二修订协议》项下 850 万美元付款的损害赔偿请求而言，宏联公司未能充分审查非区分被拒绝履行的承诺义务与已实际履行的合同义务。尽管被申请人依据《第二修订协议》要求信赖损害赔偿，但被申请人因申请人违反《第二修订协议》而有权获得此类赔偿的情况尚未得到清晰且充分的证明。

**Booth 女士及被申请人亦将品牌管理费纳入其主张的宏联公司应获赔信赖损害赔偿的范畴。** 尽管 Booth 女士主张将品牌管理费列为分项费用列明，但被申请人始终未就该费用应纳入其信赖损害赔偿范围进行充分分论证。基于此，仲裁员此前未明确将品牌管理费作为信赖损害赔偿的一部分予以裁决——无论是依据信赖利益理论还是其他理论——现亦不予支持。

在当前诉讼阶段，无论是采取要求发布新闻稿、采取防范商业关系损害的措施、建立第三方侵权行为监控机制，还是要求提供正式商标文件等形式，均不具备颁发禁令救济的法律依据。此处裁决的唯一形式为金钱损害赔偿，且被申请人系胜诉方。

**D.**  **宏联公司有权就申请人违反《主许可协议》而判给的"信赖损害赔偿"（即"浪费成本"）获得加州法定利率的判决后利息。**

JAMS 规则第 24(g)条（适用于本案）规定，仲裁员可依据当事人协议或适用法律，裁量支持律师费、相关费用及利息（利率与起算日期由仲裁员认为适当者为准）。加州法律（本案适用法）明确允许仲裁裁决利息，除非当事方另有约定，否则仲裁庭可以裁决利息（《加州民事诉讼法》第 1297.317 条）。经查，各当事方未就排除利息裁决达成任何事先协议。

国际商事仲裁权威学者 Gary B. Born 在其专著《国际商事仲裁》(第三版)(Kluwer International 出版社，2022 年 8 月第八版，被申请人证据编号 RLA-93，参见脚注 651-654 对应正文）中阐述如下："利息裁决请求会引发法律选择问题。具体而言，与其他情形一样，会产生关于仲裁庭裁决利息的权限及行使该权限标准的问题。就仲裁庭裁决利息的权限或权力而言，有实质理由主张适用仲裁协议准据法，其理论基础是仲裁员的权力源自仲裁协议。另一种方法是适用仲裁地法律——其理论依据是大多数关于仲裁员权限的问题（包括自裁管辖权、采取临时措施的权力和证据开示命令权）都受仲裁地法律管辖。虽然存在讨论空间，但更合理的观点是，在没有相反协议的情况下，关于仲裁员裁决利息权限的问题应适用仲裁地法律。该法律通常被认为与仲裁程序性和救济性权力问题联系最为紧密，且通常也应适用于仲裁员权限相关问题。"

无论采信主张适用仲裁协议准据法的"实质理由"，或认同仲裁利息裁决应受仲裁地法管辖的"更优观点"，本仲裁员基于其广泛裁量权，均有充分理由适用加州法定年利率 10%的单利标准——该利率依加州法律适用于合同违约情形——以裁定本案判决前利息。具体参见

25

Good Times Restaurants, LLC 诉 Shindig Hospital Group LLC 案（2025 WL 522872 *2（N. D. Cal,
2025））（被申请人法律依据 RLA-102），该判例要求被告自合同和解确定的债务到期日起，
按 10%的法定利率支付未偿金额的判决前利息，其法律依据为《加州民法典》第 3289(b)条
明定的合同违约后年利率 10%之规定。

鉴于，依照 2025 年 6 月 13 日中间裁决所确定的损害赔偿裁定，被申请人通过向申请人提出
的反请求，有权就申请人未能履行及/或拒绝履约的行为获得赔偿，具体包括：（a）基于仲
裁中确定的浪费成本（信赖损害赔偿标准），计 26,966,117 美元；及（b）加利福尼亚州法
律准许的任何利息。应支付给被申请人的判决前利息应自 2022 年 2 月 23 日（申请人违约之
日）起算，直至预计作出最终裁决之日（2025 年 7 月 2 日）止，共计 1,225 天（自违约之日
起至最终裁决之日止的天数）。按照年利率 10%的单利计算（即日利率 0.027%），以宏联
公司所遭受的 26,966,117 美元损害赔偿金为基数，每日利息为 7,387.98 美元；以 1,225 天为
计息期间计算本金产生的利息总额为 9,050,272.14 美元。

此外，仲裁员依据《加州民事诉讼法》第 685.010(a)(1)条的授权，行使自由裁量权裁定对最
终裁决所判定金额（即金钱判决本金）按年利率 10%的单利（即日利率 0.027%）计息，直
至全部清偿完毕。

因此，本最终裁决判定被申请人获赔总额为 36,016,389.14 美元（包括 26,966,117 美元损害
赔偿金本金及自 2022 年 2 月 23 日起至最终裁决之日止按 10%单利计息的 9,050,272.14 美元
利息）（简称"裁决金额"），且对于判定金额中任何未支付部分，自最终裁决之日起至全
部履行完毕之日止，应按年利率 10%的单利（即日利率 0.027%）继续计息。

八、 **裁决摘要**

(a) 被申请人未对申请人构成经修订《主许可协议》所定义的可诉的重大违约。

(b) 驳回申请人在本仲裁中提出的所有救济请求；

(c) 申请人针对被申请人作出的《主许可协议》终止行为无效、不生效，且构成对该协议的
违约；

(d) 被申请人未能证明其有权就申请人在争议期间违反《主许可协议之第二修订协议》的行
为主张损害赔偿；

(e) 被申请人通过对申请人提出的反索赔，有权就申请人未履约和拒不履约的行为获得金钱
损害赔偿，具体金额包括：（a）基于仲裁中确定的浪费成本赔偿，计 26,966,117 美元；
及（b）加利福尼亚州法律准许的任何利息。

(f) 申请人应向被申请人支付 36,016,389.14 美元（包括:(a)26,966,117 美元损害赔偿金本金，
及(b)自 2022 年 2 月 23 日起至最终裁决之日止按 10%单利计算的利息 9,050,272.14 美元）
（统称"裁决金额"），另加(c)自最终裁决之日起至全部履行完毕之日止，对裁决金额
中任何未支付部分按年利率 10%的单利（即日利率 0.027%）计算的利息。

(g) 被申请人为胜诉方。

(h) 本案不就费用或成本作出裁决。仲裁程序所涉全部费用应由所有各当事方自行承担其相
应份额。

九、 **本仲裁程序所提交裁决的全部争议事项均已获最终解决。**

本裁决为具有约束力的仲裁最终裁决，对本次仲裁程序提交裁决的一切诉求与争议作出了终
局性裁定。

截至本裁决作出之日，申请人所提全部复议请求及补充请求均已得到处理和/或被驳回，其
理由为：该等请求所涉事项或已通过先前中间裁决及/或重述裁决获得解决，或已被排除；
且申请人未提出任何程序不当的主张。

关于管辖权的一切异议及相关驳回申请，基于本裁决及先前裁定所述理由，均已或现均予驳回，理由为：申请人所提该等主张均无事实依据，此前已提出的理由目前也不构成依据。这包括申请人于 2025 年 6 月 20 日提交的"对仲裁员管辖权持续异议及驳回动议"，现基于本仲裁员 2025 年 6 月 19 日就申请人 2025 年 6 月 11 日"管辖权异议及驳回动议"所作裁定相同的理由，分别裁定该等异议因无事实依据而予以驳回、相关动议不予支持。

所有中间裁决及任何重述的中间裁决均被纳入本最终裁决。为澄清目的，本最终裁决对部分事项的阐述较之中间裁决更为详尽或采用不同表述方式。

本最终裁决构成对本次仲裁所提一切诉求的完整、彻底的了结、解决与满足。凡本裁决未明确裁定的其他诉求，均视为已予驳回。

根据双方当事方之仲裁协议，双方同意可向任何具有管辖权的法院申请对本最终裁决作出判决并予以执行。

特此裁定。

日期：2025 年 7 月 2 日

Lizbeth Hasse, Esq.

**Lizbeth Hasse**
仲裁员

参见附件
符合加州公证要求
公证书



27

717

## 美国邮寄送达证明

### 关于：保罗弗兰克有限公司诉宏联国际贸易有限公司案
### 案件编号：5220002118

本人 Aimee Hwang，非本案当事人，特此声明：本人于 2025 年 7 月 2 日通过加利福尼亚州旧金山的美国邮政将随附《最终裁决书》真实副本装入预付邮资的密封信封，邮寄送达本案各方当事人，具体收件信息如下：

Matthew Weldon Esq.
Thomas A. Warns Esq.
K&L Gates LLP
599 Lexington Ave.
Floor 32
New York, NY 10022-6030
　　代理当事人：
　　宏联国际贸易有限公司

本人声明上述内容真实无误，如作伪证愿受处罚。本文件于 2025 年 7 月 2 日在加利福尼亚州旧金山出具。

Aimee Hwang

# 公　证　书

（2025）沪静证经字第 549 号

申请人：宏联（上海）品牌管理有限公司

委托代理人：韩沅兵，男，2000 年 6 月 30 日出生，公民身份号码：360721200006300070。

公证事项：影印本与原本相符

兹证明前面的影印本与宏联（上海）品牌管理有限公司的委托代理人韩沅兵出示给本公证员的《FINAL AWARD》的原本相符。前面的影印本所附的中文译本内容与英文原本内容相符。

中华人民共和国上海市静安公证处

公　证　员　

2025 年 7 月 28 日

